1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| HT REDMOND LLC, a Washington limited liability company, | Case No. 2:25-cv-02572-TLF |
| Plaintiff, | **DECLARATION OF CHRISTY CHENG IN SUPPORT OF HEYTEA'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO COMPEL ARBITRATION** |
| v. | |
| HK HEYCHA LIMITED d/b/a HEYTEA, a Hong Kong limited company; XIAOBIN XU, an individual; ZHICHAO LIU, an individual; JOHN DOES 1-10, d/b/a HEYTEA, | |
| Defendants. | |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF CHRISTY CHENG - 1

Docusign Envelope ID: 48685C60-B8E7-4E5C-80A1-99186248EA19

I, Christy Cheng, hereby declare as follows:

1.     I am a Business Development Manager at HK Heycha Limited d/b/a Heytea ("Heytea"). I make this declaration in support of Heytea's Motion to Dismiss, or in the Alternative, to Compel Arbitration, and based on personal knowledge and knowledge gained from a review of Heytea's business records maintained in the ordinary course of Heytea's business. I have access to executed copies of Heytea's commercial agreements and other related documents and records concerning the operation of Heytea-branded retail beverage stores, and I am familiar with how Heytea makes and keeps its business records in the ordinary course of business.

2.     Heytea is a prominent Chinese brand known for its freshly prepared tea beverages. In my role as Business Development Manager, I have gained knowledge of the commercial agreements executed by Heytea and Heytea's relationship with United States based operators of Heytea-branded stores, including the Plaintiff in this case, HT Redmond, LLC.

3.     A true and correct copy of the written agreement between Heytea and HT Redmond LLC, executed on June 27, 2024 (the "Agreement") is attached hereto as **Exhibit A**.

4.     The Agreement contains a broad arbitration clause requiring that "all controversies, disputes, or claims . . . arising out of or related to this Agreement . . . be submitted for binding arbitration." (Agreement §17E.)


I declare under penalty of perjury that the foregoing is true and correct.


Executed on January 13, 2026.                                _____

                                                             Christy Cheng

Exhibit A

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

# HK HEYCHA LIMITED

# FRANCHISE AGREEMENT

HT Redmond LLC

_____ FRANCHISEE

Jul-28-2024

_____ EFFECTIVE DATE ("Effective Date")

## FRANCHISE AGREEMENT NO. _____

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## TABLE OF CONTENT

1. GRANT OF FRANCHISE. ..............................................................................................1

    1B. ACKNOWLEDGMENTS .......................................................................................1
    1C. TERM AND SCOPE OF FRANCHISE. ...............................................................2
    1D. OWNERSHIP AND ORGANIZATION OF YOUR ENTITY. ..............................3

2. DEVELOPMENT AND OPENING OF STORES. .......................................................4

    2A. DEVELOPMENT SCHEDULE AND DEVELOPMENT TERRITORY. ...............4
    2B. SITE SELECTION AND LEASE. ........................................................................4
    2C. NO PROTECTED TERRITORY; TERRITORIAL RIGHTS WE RESERVE. .......6
    2D. RELOCATION OF THE SITE. ............................................................................7
    2E. DEVELOPMENT AND CONSTRUCTION OF HEYTEA STORE. ....................7
    2F. OPERATING ASSETS. .......................................................................................8
    2G. COMPUTER SYSTEM. ......................................................................................8
    2H. STORE OPENING. .............................................................................................9

3.   FEES. ........................................................................................................................10

    3A. INITIAL AND SUBSEQUENT FRANCHISE FEE.............................................10
    3B. LEGAL PROCESSING FEE. ..............................................................................10
    3C. SECURITY DEPOSIT. .......................................................................................10
    3D. INITIAL SERVICE FEE AND MONTHLY SERVICE FEE.................................11
    3E. ROYALTY. .........................................................................................................11
    3F. INTEREST ON LATE PAYMENTS. ...................................................................11
    3G. APPLICATION OF PAYMENTS. ......................................................................12
    3H. METHOD OF PAYMENT. ..................................................................................12
    3I. CURRENCY. .......................................................................................................12
    3J. WITHHOLDING TAXES.....................................................................................12

4.   TRAINING AND ASSISTANCE. ..............................................................................13

    4A. INITIAL TRAINING PROGRAM. ......................................................................13
    4B. INITIAL ON-SITE ASSISTANCE. .....................................................................15
    4C. GENERAL GUIDANCE. .....................................................................................15
    4D. OPERATIONS MANUAL. ..................................................................................16

5.   COPYRIGHTS AND MARKS. ..................................................................................16

5A. COPYRIGHTS......................................................................................................16

    5B. OWNERSHIP AND GOODWILL OF MARKS....................................................16
    5C. LIMITATIONS ON YOUR USE OF MARKS.....................................................17
    5D. NOTIFICATION OF INFRINGEMENTS AND CLAIMS. ...................................17
    5E. DISCONTINUANCE OF USE OF MARKS. .......................................................18
    5F. OWNERS BOUND. .............................................................................................18

6.   CONFIDENTIAL INFORMATION. ..........................................................................18

7.   EXCLUSIVE RELATIONSHIP DURING TERM. .....................................................19

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

7A. COVENANTS AGAINST COMPETITION. ....................................................19
7B. NON-INTERFERENCE. .............................................................................20
7C. NON-DISPARAGEMENT. ..........................................................................20
8. SYSTEM STANDARDS. ...............................................................................20
8A. COMPLIANCE WITH SYSTEM STANDARDS. ...........................................20
8B. VARIATION AND MODIFICATION OF SYSTEM STANDARDS. .................21
8C. CONDITION AND APPEARANCE OF HEYTEA STORES. .........................22
8D. APPROVED PRODUCTS AND SERVICES. .................................................23
8E. APPROVED DISTRIBUTORS AND SUPPLIERS. .......................................24
8F. COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES. ...........25
8G. INFORMATION SECURITY .....................................................................25
8H. MANAGEMENT OF YOUR HEYTEA STORE(S). ......................................26
8I. EMPLOYEES, AGENTS & INDEPENDENT CONTRACTORS. .....................27
8J. INSURANCE. ...........................................................................................28
8K. PRICING. ...............................................................................................28
9. MARKETING. ............................................................................................29
9A. ADVERTISING REQUIRED BY US. ..........................................................29
9B. ADVERTISING BY YOU. ..........................................................................29
9C. MINIMUM MARKETING SPENDING. ......................................................30
9D. FRANCHISE SYSTEM WEBSITE ..............................................................30
10. RECORDS, REPORTS, AND FINANCIAL STATEMENTS. ...........................31
11. INSPECTIONS AND AUDITS. ...................................................................32
11A. OUR RIGHT TO INSPECT YOUR STORE(S). ..........................................32
11B. OUR RIGHT TO AUDIT. ........................................................................32
12. TRANSFER. .............................................................................................33
12A. BY US. .................................................................................................33
12B. BY YOU. ...............................................................................................33
12C. CONDITIONS FOR APPROVAL OF TRANSFER. .....................................34
12D. TRANSFER TO A WHOLLY-OWNED ENTITY. ........................................36
12E. OUR RIGHT OF FIRST REFUSAL. .........................................................36
12F. YOUR DEATH OR DISABILITY. .............................................................38
13. EXPIRATION OF THIS AGREEMENT. .......................................................38
13A. YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE. ......................38
13B. GRANT OF A SUCCESSOR FRANCHISE. ................................................39
14. TERMINATION OF AGREEMENT. ............................................................40
14A. TERMINATION BY YOU. .......................................................................40
14B. TERMINATION BY US. ..........................................................................40
14C. TERMINATION BY MUTUAL AGREEMENT. ...........................................42
15. RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION. ....43
15A. PAYMENT OF AMOUNTS OWED TO US. ...............................................43

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

15B.  DE-IDENTIFICATION OR THE TERMINATION STORE. ...............................43
15C.  CONFIDENTIAL & PERSONAL INFORMATION. .....................................44
15D.  OUR RIGHT TO PURCHASE YOUR STORE(S)........................................44
15E.  NON-INTERFERENCE. ................................................................45
15F.  NON-DISPARAGEMENT. .............................................................45
15G.  CONTINUING OBLIGATIONS. .......................................................46

16.  RELATIONSHIP OF THE PARTIES/INDEMNIFICATION. .............................46

16A.  INDEPENDENT CONTRACTORS. ....................................................46
16B.  NO LIABILITY FOR ACTS OF OTHER PARTY. ......................................46
16C.  TAXES....................................................................................46
16D.  INDEMNIFICATION. ..................................................................47

17.  ENFORCEMENT. ..........................................................................48

17A.  SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS. .......................48
17B.  WAIVER OF OBLIGATIONS. .........................................................49
17C.  COSTS AND ATTORNEYS' FEES. ....................................................49
17D.  RIGHTS OF PARTIES ARE CUMULATIVE. ...........................................50
17E.  ARBITRATION. .........................................................................50
17F.  GOVERNING LAW. .....................................................................52
17G.  CONSENT TO JURISDICTION..........................................................52
17H.  WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL. ..............................52
17I.  BINDING EFFECT. ......................................................................53
17J.  LIMITATIONS OF CLAIMS AND CLASS ACTION BAR. ..............................53
17K.  CONSTRUCTION........................................................................53

18.  DELEGATION OF PERFORMANCE. ....................................................54

19.  NOTICES AND PAYMENTS................................................................54

20.  BUSINESS JUDGMENT. ...................................................................55

21.  EXECUTION. ...............................................................................55

22.  DEFINITIONS ...............................................................................55

**EXHIBITS**

EXHIBIT A YOU AND YOUR OWNERS
EXHIBIT B  DEVELOPMENT SCHEDULE
EXHIBIT B-1 FRANCHISE AGREEMENT SUPPLEMENT
    APPENDIX A DEVELOPMENT SCHEDULE
EXHIBIT C STORE RIDER
EXHIBIT D CONFIDENTIALITY AND NON-COMPETITION AGREEMENT
EXHIBIT E FEE SCHEDULE
EXHIBIT F ESSENTIAL INGREDIENTS
EXHIBIT G WASHINGTON FRANCHISE AGREEMENT ADDENDUM

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

EXHIBIT H STORE MANAGEMENT POLICY
EXHIBIT I ANTI-CORRUPTION AND ANTI-COMMERCIAL BRIBERY AGREEMENT

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (this "Agreement") is made and entered into by and between **HK HEYCHA LIMITED**, a Hong Kong limited company, with its principal business address at Hong Kong Special Administration District, China ("**we**," "**us**," or "**our**"), and _HT Redmond LLC_, a Washington _LLC_ whose principal business address is _16595 Redmond Way Suite 165_, Redmond, WA 98052 ("you" or "your") as of the Effective Date.

**PREAMBLES.**

We and our Affiliates have, with considerable effort, developed (and continue to develop and modify) a system ("**Franchise System**") and franchise opportunity to sell a variety of specialty teas in a retail Store ("**Heytea Store**");

We and our Affiliates grant others franchises to use the Franchise System and Marks to operate Heytea Stores; and

You desire to apply for a franchise to own and operate a Heytea Store and we desire to grant you a franchise.

NOW THEREFORE, for and in consideration of the mutual covenants herein set forth, and other good and valuable consideration, the receipt and sufficiency of which each party hereby acknowledges, and each party fully intending to be legally bound hereby, we and you mutually agree as follows:

1. **GRANT OF FRANCHISE.**

   (1) We grant to you, and you accept from us, the franchise to use the Franchise System and Marks in connection with the establishment and operation of a Heytea Store as Your Franchised Business as described in **Exhibit B** hereto. You agree to use the Franchise System and Marks, as they may be changed, improved, and further developed by us from time to time, only in accordance with the terms and conditions of this Agreement.

   (2) We have the sole right to approve or disapprove your application for Additional Stores. If we grant your application for Additional Stores, you shall sign the Franchise Agreement Supplement as set forth in **Exhibit B-1** and pay the Subsequent Franchise Fee, Initial Service Fee, Security Deposit and any other fees identified therein.

**1B. ACKNOWLEDGMENTS.**
You acknowledge that:

(1) you have independently investigated this franchise opportunity and recognize that, like any other business, the nature of Your Franchise Business and the business that a Heytea Store conducts may (and probably will) evolve and change over time;

1

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

(2)  we do not guarantee the success of Your Franchise Business; an investment in Your Franchise Business involves business risks that could result in the loss of a significant portion or all of your investment;

(3)  among other things, your business abilities and efforts are vital to Your Franchise Business;

(4)  attracting customers for Your Franchise Business will require you to make consistent marketing efforts in your community through various methods, including media advertising, direct mail advertising and networking, online and social media marketing, and display and use of promotional materials;

(5)  retaining customers for Your Franchise Business will require you to have high standards of quality and service;

(6)  you have not received from us, and are not relying on, any representations or guarantees, express or implied, as to the potential volume, sales, income, or profits of Your Franchise Business;

(7)  to induce our entry into this Agreement, you have represented to us that all statements you have made and all materials you have given us are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the franchise;

(8)  you have read this Agreement and our franchise disclosure document and understand and accept that this Agreement's terms and covenants are reasonably necessary for us to maintain our high standards of quality and service and to protect and preserve the goodwill of the Marks;

(9)  we have the right to restrict your sources of goods and services, as provided in various sections of this Agreement;

(10) we have not made any representation, warranty, or other claim regarding this franchise opportunity, other than those made in this Agreement;

(11) you have independently evaluated this opportunity, including by using your business professionals and advisors, and have relied solely on those evaluations in deciding to enter into this Agreement;

(12) you had the opportunity to ask any questions regarding the information we provide to you concerning this franchise opportunity;

(13) you had the opportunity, and we have encouraged you, to have this Agreement and all other related agreements we gave you or made available to you reviewed by an attorney engaged by you;

(14) you have disclosed to us all business interests of you and your owners that may be construed as Competitive Business, regardless of the size of such interest, the likelihood that such interests would be conclusively deemed a Competitive Business, and regardless as to whether you or your owners are prohibited under the terms of this Agreement from conducting such business; and

(15) you have a sufficient net worth to make the investment in this franchise opportunity, and you will continue to have sufficient funds to meet all of your obligations under this Agreement.

## 1C.  TERM AND SCOPE OF FRANCHISE.

The franchise granted hereunder shall start from the Effective Date and expires at the end of the Term. You shall at all times faithfully, honestly and diligently perform your obligations

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

hereunder and exert your best efforts to operate and promote Your Franchise Business. Upon expiration of the Term, unless you are granted a successor franchise pursuant to the terms of Section 13, your franchise will terminate with respect to Your Franchise Business. You shall utilize the Marks and Franchise System to operate all aspects of Your Franchise Business in accordance with the methods and systems developed and prescribed from time to time by us, all of which are a part of the Franchise System. Your Heytea Store shall only offer such products and services as we shall designate and shall be restricted from manufacturing, offering or selling any products or services not previously approved by us in writing.

Other than the franchise that we have expressly granted to you pursuant to the terms of Section 1C, you do not have any other rights, privilege or option with respect to any other related or non-related business operations, concepts, products or services in which we or our Affiliates may be involved from time to time, now or in the future.

## 1D. OWNERSHIP AND ORGANIZATION OF YOUR ENTITY.

You represent that:

(1) You are duly formed, validly existing and in good standing under the laws of the jurisdiction in which you were formed and operate, and have the authority to execute, deliver, and perform the Agreement and your obligations under this Agreement and all related agreements;

(2) The execution and delivery of this Agreement by you and, the performance of your obligations hereunder will not constitute or result in (A) a breach or violation of, or a default under, your organizational documents; (B) a breach or violation of, a termination (or right of termination) or default under, the creation or acceleration of any obligations under, or the creation of an encumbrance on, any of your assets (with or without notice, lapse of time or both) pursuant to any agreement, lease, license, contract, note, mortgage, indenture, arrangement or other obligation binding upon you, or (C) conflict with, breach or violate any law applicable to you or by which your properties are bound or affected,;

(3) **Exhibit A** to this Agreement completely and accurately describes all of your shareholders, members or other equity owners and their respective equity interests in you as of the Effective Date;

(4) Subject to our rights and your obligations under Section 12, you and your shareholders, members or other equity owners agree to immediately notify us of any changes of ownership in you and sign and deliver to us a revised **Exhibit A** to reflect such changes, failure of which will constitute a material breach of this Agreement and will entitle us to terminate this Agreement;

(5) You must identify an Operating Partner as described in **Exhibit A** at all times during the Term. We reserve the right to approve the Operating Partner and any replacement thereof. In the event that your Operating Partner ceases to mee the qualifications as described in **Exhibit A,** or we disapprove of your Operating Partner, you must identify a new Operating Partner within thirty (30) days of such cessation or disapproval for our review and approval, failure of which will constitute a material breach of this Agreement;

(6) You acknowledge that the Operating Partner has full authorization to deal with us on your behalf for all matters whatsoever that may arise with respect to Your Franchise Business or this Agreement. Any decision made by the Operating Partner will be final and binding

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

on you and we will be entitled to rely solely on the decision of the Operating Partner without discussing the matter with any other party.; and

(7) Your Franchise Business will be the only business that you operate through that Entity unless otherwise approved by us.

## 2. DEVELOPMENT AND OPENING OF STORES.

### 2A. DEVELOPMENT SCHEDULE AND DEVELOPMENT TERRITORY.

You shall comply with all terms and conditions under this Agreement to develop and open Your Heytea Store within the Development Territory in accordance with the Development Schedule identified in **Exhibit B** hereto. If you have the right to develop multiple Heytea Stores under this Agreement, your failure to open any Heytea Store by the deadline specified in the Development Schedule will result in your losing the right to open new Heytea Stores under this Agreement and we shall have right to reduce the size of the Development Territory. We are relying on your representation that you have conducted your own independent investigation and have determined that you can satisfy your obligations to develop Your Heytea Store(s) in accordance with the Development Schedule identified on **Exhibit B**.

You acknowledge that the franchise granted hereunder is non-exclusive and the Development Territory is not an exclusive territory. We retain the rights, among others, to use, and to license others to use, the Marks and Franchise System for the operation of Heytea Stores. You have no territorial protection in the Development Territory and we and our Affiliates retain all rights with respect to the placement of Heytea Stores and other businesses using the Marks and Franchise System, the sale of similar or dissimilar products and services, and any other activities.

We reserve our right to terminate this Agreement if you do not open and operate a Heytea Store in accordance with the Development Schedule and you shall compensate us for all costs and expenses incurred if Initial Franchise Fee may not cover all such costs and expenses. ]]

### 2B. SITE SELECTION AND LEASE.

If the Premise(s) of Your Heytea Store(s) is not specified on **Exhibit B** of this Agreement as of the Effective Date, you must submit to us the Site(s) Evaluation Report within 30 days after the Effective Date, which shall contain the following documents and information: (a) a description of the proposed site, (b) a letter of intent or other evidence confirming your favorable prospects for obtaining the proposed site, and (c) other documents or evidence as we require or demand. We may also require that you at your sole cost hire a service provider that we designate, which may be one of our Affiliates, to assist you with the site selection process. Upon receiving the Site(s) Evaluation Report, we may accept or not accept the Premise(s) you propose. If we accept the proposed site, you must send us the Site(s) Documents within 15 days after we request. Upon receiving the Site(s) Documents and payment of the Initial Franchise Fee, Initial Service Fee, Subsequent Franchise Fee (if applicable) and/or the Security Deposit, we will provide you a counter-signed Store Rider (attached as **Exhibit C**) as the approval of the site and acknowledging the Premise(s) of the Store. You may use each Premise(s) approved by us only

4

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

for the business of one Heytea Store. You agree not to conduct the business of any Heytea Store at any site other than the approved Premise(s) for that Store. You must obtain our written approved site for the Premise(s) of your first Heytea Store within 120 days of the Effective Date. We reserve our right to terminate this Agreement if you fail to obtain such site within such period.

The rights that are hereby granted to you are for the specific Premises(s) and cannot be transferred to an alternative Premise(s), or any other location, without our prior written approval. If the Franchisee has operated a Heytea Store for not less than 6 months and desires to relocate it to an alternative site, you must set forth your reasons for requesting the relocation in writing to us, along with a proposed new location. We will have 30 days from receipt of your written request to respond. If we approve the relocation and the proposed new location, and if the ownership of Your Franchise Business does not change in any respect from the ownership of the Your Franchise Business before the relocation, then you may move your Heytea Store to the new approved location, provided that you sign our then current form of Franchise Agreement and opens the Heytea Store at the new location per the terms and conditions of this Agreement, including section 2D, within 12 months after the Heytea Store closes at its former location.

We have the right to accept or not accept all proposed sites, including sites selected using the services of any of our designs, in our sole discretion. Our determination is based on various criteria, which we may change in our sole discretion, including population density, local household income level, business flow of traffic, traffic count and patterns, accessibility, parking, visibility, characteristics of the general location/neighborhood/existing buildings, demographics, store size, competition landscape, applicable public health regulations and license availability. We will use reasonable efforts (but not obliged) to determine whether to accept the proposed site within thirty (30) days after receiving your report.

You acknowledge that your acceptance of any site is based on your own independent investigation of the site's suitability for a Heytea Store. Neither the information we give you regarding a site for a Premise(s) (including any recommendations) nor the assistance we or our representatives provide you with in selecting any site, constitutes our representation or warranty of any kind, express or implied, of the site's suitability for a Heytea Store or any other purpose. Our recommendations and assistance indicate only that we believe that the site and location may meet our then-current criteria. Applying criteria that have appeared effective with other sites and locations might not accurately reflect the potential for all sites and locations, and factors included in or excluded from our criteria could change, altering the potential of a site or location. The uncertainty and variability of these criteria are beyond our control, and we are not responsible if a site and location we recommend fails to meet your expectations.

You shall provide any Lease agreements and all site-related documents to us for review and approval in our sole discretion prior to their execution. We may conditionally approve the location on a Lease or other appropriate site-related documents if the Lease or other appropriate site-related documents contain the following terms, in our sole discretion. The Lease must contain all of the following provisions: (i) the lessor to the lease must permit you to open, promote and operate Your Heytea Store(s) and Your Franchise Business in accordance with the terms of this Agreement; (ii) the Lease shall require that the Premise(s) shall be used only for the

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

operation of Your Heytea Store(s) and no other business, and shall prohibit your assignment or modification of any lease term or other rights without our prior written consent; (iii) the lessor shall provide us with copies of any written notices to you (whether relating to default or otherwise) and the right to cure any default if we so choose; and (iv) the lease shall grant us the right to enter your Heytea Store during normal business hours for purposes of inspection or to take steps to protect the Marks and/or prevent/cure any default under the Lease or this Agreement. You must deliver to us a copy of the signed lease or sublease and all related documents within five (5) days after their execution. Our review of any Lease documents, or any advice or recommendation that we may in our discretion provide, is not and shall not be construed as a representation or warranty that the Lease agreement or any of its terms will be in our or your best interest. You acknowledge that You shall solely rely on your own review of any such Lease documents and have been encouraged by us to review the same with a competent attorney.

## 2C. NO PROTECTED TERRITORY; TERRITORIAL RIGHTS WE RESERVE.

You acknowledge that You will not be awarded any "protected" or "reserved" territorial or other rights and that You will not receive an exclusive territory. You may face competition from other franchisees, including a Heytea franchise, from outlets that we own, or from other channels of distribution or competitive brands that we or our Affiliates control.

You expressly acknowledge that You have no territorial protection and we and our Affiliates retain all rights with respect to the placement of Heytea Stores and other businesses using the Marks, the sale of similar or dissimilar products and services, and any other activities regardless of their proximity to or competition with Your Heytea Store(s). These rights include:

(1) The right to establish and operate, and allow others to establish and operate, other Heytea Stores and other businesses using the Marks or the Franchise System, through any Online Presence, grocery outlets or any other form of businesses, on any terms and conditions we approve;

(2) the right to establish, operate or become associated with, and allow others to establish, operate or become associated with, additional concepts or businesses (including any other Stores) providing products or services the same or similar to those provided at Your Heytea Store(s) in any location under any trade names, trademarks, service marks and commercial symbols other than the Marks, including but not limited through dual-branding or any other franchise systems that we may or may not Control;

(3) the right to establish and operate, and allow others to establish and operate, other distribution channels (including, the internet or retail stores) wherever located or operating regardless of the nature or location of the customers, with whom such other distribution channels do business, that operate under the Marks or any other trade names, trademarks, service marks or commercial symbols that are the same as or different from Stores, and that sell products and/or services that are identical or similar to, and/or competitive with, those that Stores customarily sell under any terms and conditions we approve;

(4) offer and sell (and grant others to offer and sell) goods and services to customers located anywhere;

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

(5) the right to acquire, or be acquired by (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction) a business providing products and services similar or the same to those provided at Stores, even if such business operates, franchises and/or licenses Competitive Businesses; and

(6) engage in all other activities not expressly prohibited by this Agreement.

## 2D. RELOCATION OF THE SITE.

You may not relocate the Premise(s) we have approved without our prior written approval. If we approve you to relocate a Heytea Store, the relocation will be subject to the site selection provisions set forth above and will occur at your sole expense. You shall also compensate for all costs incurred by us in reviewing and approving or disapproving your relocation. In addition, you will be assessed a one-time Relocation Fee due and payable within five (5) days of us accepting your proposed relocation site.

## 2E. DEVELOPMENT AND CONSTRUCTION OF HEYTEA STORE.

You are responsible for developing the Premise(s). If you need to secure financing to complete your development obligations, you agree to do so independently and at your own expense. We will provide you with required and suggested specifications for each Premise(s), including requirements for dimensions, design (including 3D design and relative drawings), image, interior layout, decor, fixtures, equipment, signs, furnishings, and color scheme. You shall develop, construct and decorate each Premise(s) at your own expense according to plans and specifications approved and/or provided by us and in accordance with the requirements of the applicable Lease. The specifications and plans we provide you for each Premise(s) do not reflect the requirements of any applicable law, code, or regulation, including those arising from any applicable laws, regulations and/or rules governing public accommodations for persons with disabilities. It is your responsibility to confirm all required construction plans and specifications comply with any and all applicable laws/regulations/rules/ordinances, building codes, permit requirements, and Lease requirements and restrictions.

You must retain, at your expense, an architect and a general contractor to produce development plans for each Premise(s). You must notify us of your preferred choice of architect and general contractor, and we reserve the right to require you to use one of our approved architects and/or general contractors (which may be one of our Affiliates) if we determine, in our sole discretion, that the architect you retained cannot perform the development and construction plans in accordance with our System Standards. You must send us your development and construction plans and specifications for our review and written approval before you begin construction or decoration on any Premise(s). You must send us any revisions of plans or specifications for approval before such revisions are implemented. Our review is limited to ensuring your compliance with our design requirements and does not assess compliance with applicable laws and regulations, including those arising under any applicable laws, regulations and/or rules governing public accommodations for persons with disabilities. Ensuring that any Premise(s) complies with these laws is your responsibility.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

We reserve the right to require you to remodel or re-construct each of Your Heytea Store(s) for not more than once during each Term based on our specifications, plans and designs.

You shall indemnify, defend and hold harmless us and our Affiliates against any damages caused or costs (including reasonable amount of attorney's fees) as a result of your violation of applicable laws, regulations and/or rules as a result of your development, construction or decoration work on the Premises except that such violation is solely caused by our required or suggested specifications.

## 2F.  OPERATING ASSETS.

Before you open Your Heytea Store(s), you shall obtain and install the Operating Assets. You shall purchase or lease the brands, types, and models of Operating Assets that we designate or approve. You shall purchase or lease the Operating Assets only from Suppliers we designate or approve (which may include or be limited to us and/or our Affiliates).

## 2G.  COMPUTER SYSTEM.

You shall obtain and use the Computer System for Your Franchise Business. We may modify specifications for and components of the Computer System from time to time and you shall implement our modifications within the time-period we indicate. We might periodically require you to purchase, lease, and/or license new or modified computer hardware and/or software and to obtain service and support for the Computer System. You acknowledge that we cannot estimate the future costs of the Computer System or required service or support, and although these costs might not be fully amortizable over this Agreement's remaining term, you shall be responsible for obtaining the Computer System (and any additions, updated and modifications), including any required service or support for Your Franchise Business.

You must obtain and install the Computer System at Your Heytea Store(s), and ensure that the Computer System is functioning properly, before you open that Heytea Store. You must install surveillance equipment at Your Heytea Store(s) and retain any and all relevant monitoring data for at least a period of six (6) months.

We have right to charge for any software or technology that we, our Affiliates or third party designees license to you and for other maintenance and support services that we, our Affiliates or third-party designees provide during this Term. We will license our proprietary software to you. You may purchase or license from third parties non-proprietary softwares or technology. We shall have sole right to supervise and regulate your use of all softwares and technology in Your Franchised Business.

The Computer System shall give us and our Affiliates access to all information generated by the Computer System, including price maintenance and information relating to customers for Your Franchise Business. At our request or if necessary, you shall sign a release with any Supplier of your Computer System which shall provide us with unlimited access to your data.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You will have sole and complete responsibility for acquiring, operating, maintaining and upgrading: (1) the Computer System; (2) the connectivity of your Computer System (including the point-of-sale system); and (3) third-party interfaces between the Computer System and our and/or any third party's computer system. You will have sole and complete responsibility for any and all consequences if the Computer System is not properly operated, maintained, and upgraded.

You shall indemnify, defend and hold harmless us and our Affiliates against and from any damages caused or costs (including reasonable amount of attorney's fees) incurred as a result of your purchase, installment and upgrading of Computer System, including claims from a third party for intellectual property infringement, except that such damages or costs sole caused or incurred by software, hardware, system or technology we or our Affiliates or third party design provides.

## 2H. STORE OPENING.

You may not open any of Your Heytea Store(s) until (i) your personnel satisfactorily complete the Initial Training Program, as required pursuant to Section 4.A, and (ii) you pay the Initial Franchise Fee, Initial Service Fee, Legal Processing Fee, Subsequent Franchise Fee (if the Store is an Additional Store), the Security Deposit and all other amounts due to us. Additionally, you may not open Your Heytea Store(s) until:

(1) we provide you a counter-signed Store Rider approving the opening of the Heytea Store and the Premise(s);

(2) the Heytea Store meets our standards and specifications, including but not limited to the fulfillment of your obligations under Sections 2B, 2E and 2G (although our acceptance is not a representation or warranty, express or implied, that the Heytea Store complies with any engineering, licensing, environmental, labor, health, building, fire, sanitation, occupational, landlord's, insurance, safety, tax, governmental, or other statutes, laws, ordinances, rules, regulations, requirements, or recommendations, nor is our acceptance a waiver of our right to require continuing compliance with our requirements, standards, or policies);

(3) you provide us with certificates for all required insurance policies (as described in Section 8.J) for the Heytea Store, a copy of the Lease governing the Premise(s) of the Heytea Store satisfactory to us, a copy of all permits you obtain for the Heytea Store, and any other documents we request from you;

(4) you obtain all required supplies, opening inventory, and Operating Assets as provided in Section 2F for the Heytea Store;

(5) you obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating and installation services for the Heytea Store;

(6) you meet all regulatory requirements, including all applicable professional regulations, for the Heytea Store;

(7) you and your staff complete all training as required under Section 4 to our satisfaction;

(8) you notify us of your projected opening date, and we approve you to open Your Heytea Store(s) on that date; and

(9) other conditions provided hereunder which are necessary to open a Heytea Store.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

Subject to your obligation to meet all of the conditions we specify to open Your Heytea Store(s), you agree to open each of Your Heytea Store(s) in accordance with the Development Schedule attached as **Exhibit B**, or we have a right to terminate this Agreement pursuant to Section 14B(4) hereto.

## 3. FEES.

### 3A. INITIAL AND SUBSEQUENT FRANCHISE FEE.

You shall pay us the Initial Franchise Fee. The Initial Franchise Fee is not refundable under any circumstances. You must pay us the Initial Franchise Fee by electronic or wire transfer of immediately available funds to an account we designate, or by any other method we specify. The Initial Franchise Fee must be paid to us within five (5) days of the Effective Date. In the event we approve your opening Additional Heytea Stores, you will sign the Franchise Agreement Supplement and pay us the then-current Subsequent Franchise Fee for each Additional Heytea Store as identified in the Franchise Agreement Supplement. The Subsequent Franchise Fee will not be refundable under any circumstance. You must pay us the Subsequent Franchise Fee within five (5) days of the supplement effective date of the Franchise Agreement Supplement by wire transfer of immediately available funds to an account we designate, or by any other method we specify.

### 3B. LEGAL PROCESSING FEE.

You shall pay us the Legal Processing Fee upon execution of every amendment to this Agreement or any Franchise Agreement Supplement that you have requested. The Legal Processing Fee is not refundable under any circumstances. You must pay us the Legal Processing Fee by electronic or wire transfer of immediately available funds to an account we designate, or by any other method we specify. The Legal Processing Fee is intended to reimburse our costs associated with processing amendments to the franchise documents for your Franchise Business that you request; however, the Legal Processing Fee will not be modified based on the specific costs we incur. You shall pay the Legal Processing Fee within five (5) days after you decide to amend or revise our amendment to this Agreement or any Franchise Agreement Supplement.

### 3C. SECURITY DEPOSIT.

For each Heytea Store you develop, you agree to pay us the Security Deposit for Your Heytea Store(s). You must pay us the Security Deposit within five (5) days of the Effective Date of this Agreement and any applicable Franchise Agreement Supplement by electronic or wire transfer of immediately available funds to an account we designate, or by any other method we specify. We will return the Security Deposit to you within thirty (30) days upon the expiry of the Term, without interest, if (i) you have strictly complied with all terms of this Agreement, including your obligation to open Your Heytea Store(s) by the applicable deadlines, and all System Standards, for the entire duration of the Term, and (ii) you have paid all amounts as they become due (including, for any Operating Assets, Initial Franchise Fee, Initial Service Fee, Royalty, Service Fee, and all amount due to any Suppliers) in connection with the operation of Your Franchise Business. We

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

will determine whether you have complied with the terms of this Agreement and our System Standards and paid all amounts owed to us and our Affiliates in our sole discretion. You agree that we can offset the amount owed to you with any amount you owed to us. You shall work with us to determine the amount you owed to us which shall be the amount approved by you. Nothing in this Agreement requires us to maintain a separate account for the Security Deposit, or to account for such amounts separately in our books and records. We reserve the rights to deduct or offset any amounts that you owe us or our Affiliates from the Security Deposit. If we terminate this Agreement under Section 14.B or you terminate this Agreement prior to the expiry of the Term other than as permitted under Section 14.A, we will have no obligation to return any part of the Security Deposit, which will be forfeited to us.

## 3D. INITIAL SERVICE FEE AND MONTHLY SERVICE FEE.

As consideration for the initial services, we or any of our Affiliates provide to Your Franchise Business on or before the opening of each of Your Heytea Store(s), you shall pay us one non-recurring non-refundable Initial Service Fee for each of Your Heytea Store(s) within five (5) days of the effective date of this Agreement and any applicable Franchise Agreement Supplement.

As consideration for the Services, we provide to Your Franchise Business and in addition to the Royalty, you shall pay us a non-refundable monthly Services Fee without offset, credit or deduction of any nature. Beginning on the calendar month of Your Heytea Store(s)'s opening and throughout the Term of this Agreement, you shall deliver to us a monthly sales report with respect to the Net Sales accrued during the previous calendar months on or before the fifth (5th) day of each calendar month. Within five (5) days from the date of receipt of the monthly sales report, we will invoice you for the monthly Service Fee payable for the applicable month based on the monthly sales report, and you shall pay the Service Fee amount to us within five (5) days thereof.

## 3E. ROYALTY.

As consideration for the Services, we provide to Your Franchise Business and in addition to the Service Fee, you shall pay us a monthly Royalty without offset, credit or deduction of any nature. Beginning on the calendar month of Your Heytea Store's opening and throughout the Term of this Agreement, you shall deliver to us a monthly sales report with respect to the Net Sales accrued during the previous calendar months on or before the fifth (5th) day of each calendar month. Within five (5) days from the date of receipt of the monthly sales report, we will invoice you for the Royalty payable for the applicable month based on the monthly sales report, and you shall pay the Royalty amount to us within five (5) days thereof. If you fail to provide the monthly sale report for the previous month, we have right to determine your sales number based on the monthly sales reports we received before, in addition to our right to terminate this Agreement.

## 3F. INTEREST ON LATE PAYMENTS.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

All amounts that you owe us for any reason will bear interest accruing as of their original due date at one- and one-half percent (1.5%) per month or the highest commercial contract interest rate the law allows, whichever is less. We may debit your bank account automatically for service charges and interest. You acknowledge that this Section is not our agreement to accept any payments after they are due or our commitment to extend credit to you or finance the operation of Your Franchise Business.

### 3G. APPLICATION OF PAYMENTS.

Despite any designation you make, you agree and acknowledge that we may apply any of your payments to us or our Affiliates to any of your past due indebtedness to us or our Affiliates. You acknowledge and agree that we may set off any amounts you or your owners owe us or our Affiliates against any amounts we or our Affiliates owe you or your owners. You shall work with us to determine and approve the amount you owe us. You may not withhold payment of any amounts you owe us due to our alleged nonperformance of any of our obligations under this Agreement.

### 3H. METHOD OF PAYMENT.

You must make all payments due under this Agreement by wire or electronic transfer or in any other manner we designate in the Operations Manual from time to time and you agree to comply with all of our payment instructions.

In the event we designate automatic debiting or similar services as method of payment, you shall make all necessary authorization for such debiting services and keep in your designated debiting account at the amount equal to at least 110% of the estimated monthly payments due.

You shall be responsible for all third party fees arising from making any and all payment to us under this Agreement, including but not limited to bank charges, third party channel fee and electronic wallet charges, if applicable.

### 3I. CURRENCY.

All references to money amounts in this Agreement, unless otherwise specified, shall be to United States Dollar. All payments that you make to us under the terms of this Agreement must be in United States Dollars.

### 3J. WITHHOLDING TAXES.

All payments to be made by you to us under this Agreement and any Franchise Agreement Supplement (if applicable) shall be made free and clear of and without any tax withholding unless you are required to make a withhold per applicable tax laws or regulations, in which case the sum payable by you (in respect of which such tax deduction is required to be made) shall be increased to the extent necessary to ensure that we receive a sum net of any deduction or withholding equal to the sum which we would have received had no such tax deduction been made or required to be made.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You shall promptly deliver to us copies of receipts from applicable governmental authorities for all such taxes withheld and paid within thirty (30) days of payment. You shall be responsible for, and will indemnify, defend and hold us and our Affiliates harmless against, any penalties, interest and expenses incurred by or assessed against us as a result of your failure either to withhold such taxes or to timely remit them to the appropriate taxing authority or otherwise fail to comply with relevant tax laws or regulations. You shall fully and promptly cooperate with us to provide such information and records as we may request in connection with any application by us to any taxing authority with respect to tax credits, exemptions or refunds for any withholding or other taxes paid or payable by you.

## 4.  TRAINING AND ASSISTANCE.

## 4A.  INITIAL TRAINING PROGRAM.

No later than 90 days after the Effective Date and prior to opening or operating your first Heytea Store,  or an alternative date agreed otherwise,  your personnel must attend the Initial Training Program as follows:

(1)  We provide Initial Training Program for managerial level employees up to two (2) attendees as follows: your original Designated Store Manager who is expected to manager and supervise your first Heytea Store upon its opening must attend our Initial Training Program for the managerial level employees, and one of your Operating Partner or your original Designated Shift Manager (if applicable) may also attend the Initial Training Program for the managerial level employees at your election; provided, however, that you shall provide an our prior approved training program to each Operating Partner or Designated Shift Manager that has not attended or completed the full course of the Initial Training Program for the managerial level employees before he or she begins to provide services at any of Your Heytea Store(s). You shall provide an our approved training program that we approve to each replacement or additional Operating Partner, Designated Store Manager or Designated Shift Manager that has not attended or completed the full course of Initial Training Program for the managerial level employees before he or she begins to provide services at of  Your Heytea Store(s), and upon your prior written request, we may decide, which decision shall be made at our sole discretion, to provide your replacement or additional Operating Partner, Designated Store Manager and/or Designated Shift Manager with additional Initial Training Program for the managerial level employees at the then-current price for such training.  You shall represent that all your Operating Partner or Designated Shift Managers have completed Initial Training Program;

(2)  Upon your prior written request, we may decide, which decision shall be made at our sole discretion, to provide up to nine (9) of your Staff with Initial Training Program for Staff level employees.

You shall be responsible for all out-of-pocket expenses, including food, beverage, accommodation, air, rail or local transportation and mobile communication costs incurred by any of your personnel in attending the Initial Training Program or any subsequent training.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

We will determine the identity and composition of the trainer(s) conducting all portions of the Initial Training Program in our discretion  All training locations shall be at the stores operated by us or our training facilities. We will provide the Initial Training Program at the times we determine in our sole discretion at the location that you select which may include sending our staff to Your Heytea Store(s) to conduct any part of the Initial Training Program; provided that the Initial Service Fee due and payable by you may vary depending on the location you request for the Initial Training Program as set out in **Exhibit E**. The Initial Service Fee includes cost for all Initial Training Program, which shall include up to two (2) attendees for Initial Training Program for managerial level employees and up to nine (9) attendees for Initial Training Program for Staff level employees. You shall pay all cost of Initial Training Program for additional personnel for training taking place simultaneously that exceeds the aforementioned limit at the rate mutually agreed by you and us; provided, however, that you must obtain our approval and pay the then-current price for any subsequent sessions of Initial Training Program for managerial or staff level employees to send any additional personnel to the Initial Training Program.

Upon your prior written request, we may decide, which decision shall be made at our sole discretion, to provide all or any part of the Initial Training Program on site at any of Your Heytea Store(s); provided that, in addition to the Initial Service Fee, you will also pay all Assistant's Expense incurred by any trainer(s) for any Initial Training Program provided on site. The Initial Training Program will be one (1) to two (2) months in duration for Your Heytea Store(s). However, we will determine, in our sole discretion, the specific length and content of the Initial Training Program. We reserve the right to vary, shorten or waive the Initial Training Program based on the experience, prior training record and skill level of the individual(s) attending. We reserve the right to require any additional managers and/or assistant managers of Your Franchise Business to attend the Initial Training Program, in our sole discretion. Scheduling of the Initial Training Program is based on facility availability and the projected opening dates for Your Heytea Store(s).

If your Operating Partner, any Designated Store Manager or Designated Shift Manager (if applicable), or any manager and/or assistant manager required by us, fail to satisfactorily complete the Initial Training Program then we reserve the right, in our sole discretion, to terminate this Agreement.

You are responsible for providing an our approved training program for all your employees other than the attendees of the Initial Training Program. All employees must satisfactorily pass the program prior to providing services at Your Franchise Business. We reserve the right to approve the length and content of all training programs you provide. If we determine, in our sole discretion, that your Operating Partner, any Designated Store Manager or Designated Shift Manager (if applicable), or any manager and/or assistance manager, is not properly trained to provide the services offered by Your Franchise Business, we may require such person to cease providing services at Your Franchise Business. If you appoint a new Designated Store Manager or Designated Shift Manager, he or she must complete a training program that you provide and we approve to our satisfaction within thirty (30) days of the appointment date.

We may periodically require your Operating Partner, any Designated Store Manager or Designated Shift Manager (if applicable), or any manager and/or assistance manager of Your

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

Franchise Business to attend various training courses, trade shows, ongoing education or certification programs, and/or webinars at the times and locations designated by us. Besides attending these training courses, programs and events, we may additionally require your Operating Partner and any Designated Store Manager or Designated Shift Manager (if applicable) to attend a periodic meeting of franchise owners. These meetings will be held at our discretion and at locations and times we designate.

You agree to pay all travel, living, incidental and other expenses (including, wages, transportation, food, lodging, and workers' compensation insurance) that any of your attendees incurs during the Initial Training Program, and any and all other instructional, informational or remedial meetings, seminars and/or training courses and programs. You are also responsible for the Assistant's Expenses we incur in sending our assistants to Your Franchise Business to conduct training, including any Initial Training Program.

We reserve the right to require that any person that wishes to attend the Initial Training Program execute our then-current form of non-disclosure and non-competition agreement (to the extent compliance with applicable laws) and a waiver and release form.

You understand and agree that any specific training or advice we provide does not create an obligation (whether by course of dealing or otherwise) to continue to provide such specific training or advice, all of which we may discontinue and modify from time to time.

## 4B.  INITIAL ON-SITE ASSISTANCE.

For each of Your Heytea Store(s), we will make one (1) assistance staff member available to provide you Initial On-Site(s) Assistance, which may start any time up to one week prior to and end one week after the scheduled opening date of Your Heytea Store(s). You acknowledge and agree that we will determine the specific duration, content, scope and scheduling of all Initial On-Site(s) Assistance in our sole discretion based on the reasonable availability of our assistance staff, which may involve our consultant being at Your Heytea Store(s) for fewer than all of its business hours of operation. You may request that we provide additional opening assistance and support for Your Heytea Store(s), and we will determine whether to provide such assistance in our sole discretion, or we may determine independently in our sole discretion that such support is necessary.

We will select the assistance staff member(s) that will provide you Initial On-Site(s) Assistance in our sole discretion, and we reserve the right to periodically replace the assistance staff member(s) we provide. You will pay us the On-Site Assistance Fee for the Initial On-Site(s) Assistance within five (5) days of issuance of our invoice after determination of the number of assistance staff member and number of days necessary for your Initial On-Site Assistance and shall be responsible for the Assistant's Expenses incurred by us and any assistance staff member for providing any Initial On-Site(s) Assistance.

## 4C.  GENERAL GUIDANCE.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

We may advise you from time to time regarding the operation of Your Franchise Business based on your reports or our inspections. We may guide you with respect to: (i) standards, specifications, and operating procedures and methods that Heytea Stores use, including, facility appearance, guest service procedures, and quality control; (ii) equipment and facility maintenance; (iii) inventory management and working with national Suppliers; and (iv) advertising, marketing and branding strategies. Such guidance will be furnished in the form of our Operations Manual. We may also provide guidance via telephonic conversations, emails and/or consultation at our offices. If you request, and we agree to provide, additional or special guidance, assistance, or training, we may charge you our then-current fee for any additional assistance and the Assistant's Expenses we incur. We reserve the right to periodically visit the Premise(s) and evaluate Your Franchise Business.

## 4D. OPERATIONS MANUAL.

We will make one (1) copy of our Operations Manual for the operation of Heytea Stores available to you during the Term. The Operations Manual contains the System Standards and information on your other obligations under this Agreement. We may modify the Operations Manual periodically to reflect changes in System Standards. If there is a dispute over its contents, our master copy of the Operations Manual shall control.

You acknowledge and agree that the Operations Manual's contents are confidential and that you will not disclose the Operations Manual to any Person other than any employee who needs to know its contents. You may not at any time copy, duplicate, record, or otherwise reproduce any part of the Operations Manual. You agree to keep your copy of the Operations Manual current and in a secure location. If your copy of the Operations Manual is lost, destroyed, or significantly damaged, you agree to obtain a replacement copy at our then-current charge. At our option, we may make some or all of the Operations Manual available through an Online Presence. If we do so, you must monitor and access that Online Presence for any updates to the Operations Manual. Any passwords or other digital identification necessary to access the Operations Manual on any Online Presence will also be part of the Confidential Information. You acknowledge that the Operations Manual is solely our property and shall be returned to us upon expiration, termination or non-renewal of this Agreement for any reason.

## 5.    COPYRIGHTS AND MARKS.

## 5A. COPYRIGHTS

We and our Affiliates are the sole owners of all copyrights in the Operations Manual and all supplemental materials, all logos or other materials identified as ours that we provide to you, and in all advertising and promotional material created by or for us. You may not copy any such materials, nor create derivative works of any such materials, except as we specifically authorize or permit.

## 5B. OWNERSHIP AND GOODWILL OF MARKS.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You acknowledge that your use of the Marks, other than s expressly authorized by this Agreement, without our prior written consent, constitutes a material breach of this Agreement and infringes our and our Affiliates' rights in the Marks and does not extend beyond the expiration or termination of this Agreement. Your unauthorized use of the Marks will cause us and our Affiliates irreparable harm for which there is no adequate remedy at law and will entitle us and our Affiliates to injunctive relief or other equity remedies. You acknowledge and agree that your use of the Marks and any of our goodwill established by that use are exclusively for our and our Affiliates' benefit and this Agreement does not confer any goodwill or other interests in the Marks to you (other than the right to operate Your Franchise Business under this Agreement). All provisions of this Agreement relating to the Marks apply to any additional proprietary trade and service marks we authorize you to use. You may not at any time during or after this Agreement's term contest or assist any other Person in contesting the validity of the Marks or our and our Affiliates' ownership or other rights of the Marks.

## 5C. LIMITATIONS ON YOUR USE OF MARKS.

Your right to use the Marks is derived only from this Agreement. You may only use the Marks to operate Your Franchise Business according to this Agreement and in accordance with System Standards. You have no right to sublicense or assign your right to use the Marks to anybody, except with our prior written consent. You shall display the Marks prominently as we prescribe at Your Franchise Business and on forms, advertising, supplies, employee uniforms and other materials we designate. You may not use any other trademarks, service marks or commercial symbols to identify or operate Your Franchise Business.

You shall identify yourself as the independent owner of Your Franchise Business in the manner we prescribe. You may not use any Mark (i) as part of any corporate or legal business name, (ii) with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos we have licensed to you), (iii) in selling any unauthorized services or products, (iv) as part of any Online Presence, except in accordance with our guidelines in the Operations Manual; (v) in advertising the transfer, sale, or other disposition of Your Franchise Business or an ownership interest in you, or (vi) in any other manner that we have not expressly authorized in writing. You shall give the notices of trade and service mark registrations that we specify and to obtain any fictitious or assumed name registrations required under applicable law.

We will have the sole right to modify or change the Marks upon written notice to you specifically describing such modification or change. Our right shall include the right to require you to use one or more logos and trademarks that are entirely different from the Marks Your Franchised Business is currently. We make all such modifications and changes in the Marks only for marketing, trademark or other good faith reasons for all Heytea Stores in the U.S. You shall, upon notice from us, to regard each such modified, changed, new or additional trademarks or logos as being within the definition of "Marks" under this Agreement, and to adopt and use each such trademark or logo at your expense in accordance with the terms and conditions of this Agreement. We will not be obligated to reimburse you for any loss of revenue or expenses caused by any such modifications or changes.

## 5D. NOTIFICATION OF INFRINGEMENTS AND CLAIMS.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You shall notify us immediately of any apparent infringement or challenge to your use of any Mark by any third party, or of any Person's claim of any rights in any Mark, and not to communicate with any Person other than us, our attorneys, and your attorneys, regarding any possible infringement, challenge, or claim. We and our Affiliates' may take any action we deem appropriate (including no action) and control exclusively any litigation, patent and trademark office proceeding, or other administrative proceeding arising from any infringement, challenge, or claim or otherwise concerning any Mark. You shall sign any documents and take any other reasonable action that, in the opinion of our and our Affiliates' attorneys, are necessary or advisable to protect and maintain our interests in any litigation or patent and trademark office or other proceeding or otherwise to protect and maintain our interests in the Marks. We will reimburse you for your reasonable costs of taking any action that we have asked you to take. In the event we receive any recovery based on our claim of infringement, we will have the exclusive right to such recovery.

## 5E.  DISCONTINUANCE OF USE OF MARKS.

We may at any time, in our sole discretion, require you to discontinue using any Mark and/or use one or more additional or substitute Marks. You agree to replace the Marks at Your Franchise Business with the additional or substitute Marks we specify and comply with all other directions we give regarding the Marks at Your Franchise Business within a reasonable time after receiving notice from us. We are not required to reimburse you for any costs or expenses associated with making such changes, for any loss of revenue due to any modified or discontinued Mark, or for your expenses of promoting a modified or substitute Mark.

Our rights in this Section 5.D apply to any and all of the Marks (and any portion of any Mark) that we authorize you to use in this Agreement. We may exercise these rights at any time and for any reason, business or otherwise, that we think best. You acknowledge both our right to take this action and your obligation to comply with our directions.

## 5F.  OWNERS BOUND.

Unless otherwise specified, each and every one of your obligations to take or refrain from taking specific actions, or to engage or refrain from engaging in specific activities, set forth in this Section 5, shall also apply to each of your owners.

## 6.  CONFIDENTIAL INFORMATION.

We possess (and will continue to develop and acquire) the Confidential Information, some of which constitutes trade secrets under applicable law relating to developing and operating Heytea Stores. All Confidential Information will be owned by us. You acknowledge and agree that you will not acquire any interest in Confidential Information, other than the right to use it as we specify in operating Your Franchise Business during this Agreement's term, and that Confidential Information is proprietary, includes our trade secrets, and is disclosed to you only on the condition that you agree, and you in fact do agree, that you and your owners, and cause your directors, officers, employees, contractors, advisors, agents:

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

(1) will not use Confidential Information in any other business or capacity;

(2) will keep each item deemed to be part of Confidential Information absolutely confidential, both during this Agreement's term and then thereafter;

(3) will not make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form;

(4) will adopt and implement reasonable procedures to prevent unauthorized use or disclosure of Confidential Information, including by restricting its disclosure and/or by requiring Persons who have access to the Confidential Information to execute our form non-disclosure and non-competition agreement in the form attached as **Exhibit D**; and

(5) will not sell, trade or otherwise profit in any way from the Confidential Information, except using methods approved by us.

Confidential Information does not include information, knowledge, or know-how, which (i) before we provided it to you, lawfully came to your attention, (ii) before we disclosed it to you, had already lawfully become known to you through publication or communication by others (without violating an obligation to us or our Affiliates), or (iii) after we disclosed it to you, lawfully becomes known through publication or communication by others (without violating an obligation to us or our Affiliates). However, if we include any matter in Confidential Information, anyone who claims that it is not Confidential Information must prove that one of the exclusions provided in this paragraph is fulfilled.

All ideas, concepts, techniques, or materials relating to a Heytea Store, whether or not protectable intellectual property and whether created by or for you or your owners, directors, officers, employees or contractors, must be promptly disclosed to us and will be our sole and exclusive property, part of the Franchise System, and works made-for-hire for us. To the extent that any item does not qualify as a "work made-for- hire" for us, you hereby assign ownership of that item, and all related rights to that item, to us and agree to take whatever action (including signing assignment or other documents) we request to evidence our ownership or to help us obtain intellectual property rights in the item.

Upon request, you should immediately return to us all Confidential Information.

### 7. EXCLUSIVE RELATIONSHIP DURING TERM.

### 7A. COVENANTS AGAINST COMPETITION.

You acknowledge that we have granted you a franchise in consideration of and reliance on your agreement to deal exclusively with us. You therefore agree that beginning on the Effective Date and ending on (i) the date that the Term expires, or (ii) the date that you cease operating Your Franchise Business under the terms of this Agreement, neither you, any of your owners, nor any of your or your owners' immediate family members (which includes your spouse) will:

(1) have any direct or indirect controlling or non- controlling interest as an owner (whether of record, beneficially, or otherwise) in a Competitive Business wherever located or operating (except that equity ownership of less than two percent (2%) of a Competitive Business whose stock or other forms of ownership interest are publicly traded on a recognized United States stock exchange will not be deemed to violate this subparagraph);

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

(2) perform services as a director, officer, manager, employee, consultant, representative, or agent or otherwise for a Competitive Business, wherever located or operating;

(3) divert or attempt to divert any actual or potential business or customer of Your Franchise Business to a Competitive Business; or

(4) engage in any other activity which might injure the goodwill of the Marks and Franchise System.

You agree to obtain similar covenants from your personnel as we specify, including officers, directors, managers and other employees attending our Initial Training Program or any subsequent training, seminars or courses or having access to Confidential Information. We have the right to regulate the form of agreement that you use and to be a third-party beneficiary of that agreement with independent enforcement rights.

You shall disclose to us all business interests of you or your owners during the Term that sell any products or services being offered by Stores, regardless of the size of such interest, or the likelihood that such interests would be deemed a Competitive Business.

You acknowledge that the restrictions as provided herein are reasonable and do not impose a greater restraint than is necessary to protect our business interests. If any of the limitation in such sections is held unenforceable by a court or governmental agency, then such limitation will be deemed to be reduced as necessary to enable the court or agency to enforce such limitation to the fullest extent permitted under applicable law.

**7B. NON-INTERFERENCE.**

You agree that, during the Term, neither you, any of your owners, nor any of your or your owners' immediate family members (which includes your spouse), including respective directors, officers, employees, agents, advisors, contractors will interfere, or attempt to interfere with our or our Affiliates' relationships with any customers, vendors, franchises, or consultants.

**7C. NON-DISPARAGEMENT.**

You shall not (and to use your best efforts to cause your current and former shareholders, members, officers, directors, principals, agents, partners, employees, representatives, attorneys, spouses, affiliates, successors and assigns not to) (i) disparage or otherwise speak or write negatively, directly or indirectly, of us, our Affiliates, any of our or our Affiliates' directors, officers, employees, representatives or affiliates, the "HEYTEA" brand, the Franchise System, any Heytea Store, any business using the Marks, or (ii) take any other action which would, directly or indirectly, subject the "HEYTEA" brand to ridicule, scandal, reproach, scorn, or indignity, or which would negatively impact the goodwill of us or the "HEYTEA" brand.

**8. SYSTEM STANDARDS.**

**8A. COMPLIANCE WITH SYSTEM STANDARDS.**

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You acknowledge and agree that operating and maintaining Your Franchise Business according to System Standards is essential to preserve the goodwill of the Marks and all Heytea Stores. Therefore, you shall at all times to operate and maintain Your Franchise Business according to all of our System Standards, as we periodically modify and supplement them, even if you believe that a System Standard is not in the Franchise System's or your best interests. Although we retain the right to establish and periodically modify System Standards, your Operating Partner is solely responsible for the management and operation of Your Franchise Business and for implementing and maintaining System Standards at Your Franchise Business. System Standards are our sole property.

As examples, and without limitation, System Standards may regulate any one or more of the following, in addition to the items described in Sections 8.B through 8.K below:

(1) quantity and types of equipment and inventory you must purchase and/or maintain;
(2) sales, marketing, advertising, and promotional campaigns, including prize contests, special offers and other national, regional or local marketing programs, and materials and media used in these programs;
(3) if we require you to offer delivery, catering and/or any other off-site services, the ways you use to operate, offer and sell such services;
(4) use and display of the Marks on uniforms, labels, forms, paper, products, and other supplies;
(5) issuing and honoring gift cards, gift certificates and similar items, and participating in loyalty card programs;
(6) staffing levels for Your Franchise Business and employee credentials and qualifications, training, dress, and appearance (although you have sole responsibility and authority concerning employee selection and promotion, hours worked, rates of pay and other benefits, work assigned, and working conditions);
(7) days and hours of operation;
(8) customer service standards and policies;
(9) product and service development programs, including participation in market research and testing;
(10) participation in, and dues assessed for, advisory councils, if any;
(11) accepting credit and debit cards, other payment systems, and check verification services;
(12) bookkeeping, accounting, data processing, and recordkeeping systems and forms; formats, content, and frequency of reports to us of sales, revenue, financial performance, and condition; and
(13) any other aspects of operating and maintaining Your Franchise Business that we determine to be useful to preserve or enhance the efficient operation, image, or goodwill of the Marks and Heytea Stores.

You agree that the System Standards we prescribe in the Operations Manual, or otherwise communicate to you in writing or another tangible form (for example, via email or any other Online Presence), are part of this Agreement as if fully set forth within its text. All references to this Agreement include all System Standards as periodically modified.

**8B. VARIATION AND MODIFICATION OF SYSTEM STANDARDS.**

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You acknowledge that complete and detailed uniformity might not be possible or practical under varying conditions, and that we specifically reserve the right (as we consider best, in our sole discretion) to vary System Standards for any Heytea Store based on the peculiarities of any condition that we consider important to that Heytea Store's successful operation. As such, the System Standards may vary between franchise owners. We may also permit variations in the System Standards between Heytea Stores owned by us and Stores owned by franchisees.

We may periodically modify System Standards. These modifications may obligate you to invest additional capital in Your Franchise Business and/or incur higher operating costs. You agree to implement any changes in System Standards within the time period we request, whether they involve refurbishing or remodeling Your Heytea Store(s), buying new Operating Assets, adding new products and services, adding personnel or otherwise modifying the nature of your operations, as if they were part of this Agreement as of the Effective Date. We shall use our best effort to make, but not guarantee, you total additional capital invested for this purpose less than 5% of your total investment you make to Your Heytea Business.

You shall not to implement any modification in the System Standards or in the Franchised Business without our prior written approval. If you or any of your employees makes an improvement to the System Standards or in the Franchised Business, such improvement will be our property. All recipe and menu changes you submit to us for our consideration and approval will become our property. We will have the right to use such improvements and recipe and menu changes anywhere and authorize our Affiliates and other franchisees to use them. You assign to us all rights to such improvements and you agree to sign any documents and to require that your employees sign any documents that we may reasonably request from time to time to evidence such assignment.

## 8C. CONDITION AND APPEARANCE OF HEYTEA STORES.

During the Term you must regularly clean, repaint and repair the interior and exterior of each Premise(s), repair or replace damaged, worn out or obsolete Operating Assets and otherwise maintain the condition of Your Heytea Store(s), the Premise(s) and all Operating Assets to meet the highest standards of professionalism, cleanliness, sanitation, efficient, courteous service and pleasant ambiance. If the general state of repair, appearance or cleanliness of any Premise(s) or the Operating Assets does not meet our standards at any time in our reasonable judgment, we may notify you, specifying the action you must take to correct the deficiency. If you do not initiate action to correct such deficiencies within ten (10) days after you receive our notice, and/or do not complete any required maintenance or refurbishing in good faith and with due diligence within thirty (30) days (other than the case of force majeure), we have the right, to the extent permitted by applicable law or upon your permission, in addition to all other remedies, to enter the Premise(s) and do any required maintenance or refurbishing on your behalf. You shall reimburse us on demand for all expenses and costs we or our Affiliates (including any third party contractor(s) engaged by us or our Affiliates) incur in maintaining the Premise(s) on your behalf. We have right to terminate this Agreement if such deficiency is irremediable.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You will place or display at each Premise(s) (interior and exterior) only those signs, emblems, designs, artwork, lettering, logos, and display and advertising materials that we from time to time approve in advance. We reserve our right to require you to take down any unapproved designs, signs, emblems, designs, artwork, lettering, logos, and display and advertising materials. If you refused to take down such unapproved signs, emblems, designs, artwork, lettering, logos, and display and advertising materials, we have right to terminate this Agreement.

## 8D.  APPROVED PRODUCTS AND SERVICES.

You agree that: (i) you will only offer for sale or sell at Your Franchise Business the products and services that we specify from time to time; (ii) you will offer for sale or sell at Your Franchise Business approved products and services only in the manner and at the locations we have prescribed and will not sell any products (including any Operating Asset, Essential Ingredients and Computer System) or services wholesale or through alternative channels of distribution (including, the internet or retail stores); (iii) you will not offer for sale or sell at Your Franchise Business, the Premise(s) or any other location any products or services we have not approved in advance (including any delivery, catering or other off-site services we have not authorized); (iv) you will discontinue selling and offering for sale at Your Franchise Business any products or services that we at any time decide (in our sole discretion) to disapprove; (v) you will purchase and use only the brands, types, or models of products, materials, supplies and services (including the Operating Assets, Essential Ingredients and the Computer System) that we designate for operating Your Franchise Business; and (vi) Your Franchise Business will provide services and sell products only on the days and during the hours approved by us; provided that you shall pay us a Prohibited Activity Fee for each instance you fail to strictly comply with any of the foregoing and such fee shall be paid by you together with any Service Fee and Royalty due and payable to us.

We reserve the right, at any time in our sole discretion, to require that you offer and provide delivery, catering and/or other off-site services from Your Franchise Business. If we require you to offer and provide delivery, catering and/or other off-site services, you must bring Your Franchise Business into compliance with our System Standards for such services within sixty (60) days from the date you receive our notice of the requirement, including by purchasing or leasing any necessary motor vehicles and/or Operating Assets, making any required changes to signage and advertising materials, and updating your Computers System to include any software, hardware or other equipment necessary to offer such services through an online and/or automated system. You shall record all orders from delivery, catering or any off-site services on a per-order basis in to the Computer Systems promptly following performance of any such order. You shall deliver to us all statements and evidences from third party delivery, catering and off-site service platforms that demonstrate the amount of sales you have made on a monthly basis together with any monthly sales report. We or third-party delivery providers we designate may limit the geographic area in which you may offer delivery, catering and/or any other off-site services, and we may modify that geographic area from time to time, in our sole discretion. If we specify a geographic area in which you may offer and provide delivery, catering and/or other off-site services, you agree not to offer or provide such services outside of that area.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

If we at any time (including after our initial approval) determine that you fail to meet our System Standards for providing any products or services that we require (including delivery, catering and/or any other off-site services, if applicable), we may permanently or temporarily terminate your right to offer such products or services; provided that nothing contained herein shall be deemed a waiver of our right to terminate pursuant to Section 14.

## 8E.  APPROVED DISTRIBUTORS AND SUPPLIERS.

We will designate, approve or develop standards and specifications for Suppliers of products and services to Your Franchise Business. We and our Affiliates are the sole and exclusive Supplier of the Essential Ingredients. If we provide you notice that any product or service has been categorized as an Essential Ingredient, you must immediately cease purchasing that product from any other Supplier, and cancel any purchase orders or arrangements, for such products from any other Supplier. We may determine what products and services constitute Essential Ingredients in our sole discretion. You must purchase all other raw materials, and products and services other than the Essential Ingredients we periodically designate from other Suppliers, but these raw materials, products and services must meet the terms and according to the specifications we approve.  We have sole right to check these raw materials, products and services and to determine whether they meet the specifications we approve.  We may also vary the approved Suppliers for Your Franchise Business based on the location and conditions applicable to Your Store(s). You shall pay us a Prohibited Activity Fee for each instance you fail to strictly comply with any of the foregoing and such fee shall be paid by you together with any Service Fee and Royalty due and payable to us.

We may concentrate purchases with one or more Suppliers to obtain discounts, lower prices, advertising support and/or services for any group of Heytea Stores franchised or operated by us or our Affiliates. We may also designate a single Supplier for any product, service, Operating Asset, or other material, or approve a Supplier only for certain products. You acknowledge and agree that we and/or our Affiliates may derive revenue based on your purchases (including from charging you for products and services we or our Affiliates provide to you and from promotional allowances, rebates, volume discounts and other payments, services or consideration we receive from Suppliers that we designate or approve for some or all of our franchise owners).  We and/or any of our Affiliates may use such revenue or profit without restriction.

Approval of a Supplier may be conditioned on requirements relating to product/raw material quality, prices, consistency, reliability, financial capability, labor relations, customer relations, frequency of delivery, concentration of purchases, standards of service, including prompt attention to complaints, or other criteria and may be temporary, pending our continued evaluation of the Supplier from time to time.

If you would like us to consider approving a Supplier that is not an approved Supplier, you must submit your request in writing before purchasing any items or services from that Supplier. We will make all determinations about whether to approve an alternative Supplier in our sole discretion based on our then-current criteria, which may change from time to time. We have the right to inspect the proposed Supplier's facilities and to require that product samples from

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

the proposed Supplier be delivered either directly to us or to a third party we designate for testing. We may also refuse to consider and/or approve any proposed alternative Supplier for any reason whatsoever. We reserve the right to charge you a fee to evaluate any proposed alternative Suppliers. We may, with or without cause, revoke our approval of any Supplier at any time. We reserve the right to periodically re-inspect the facilities and products of any approved Supplier from time to time.

## 8F. COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES.

You must secure and maintain all required licenses, permits and certificates relating to Your Franchise Business and must at all times operate Your Franchise Business in full compliance with all applicable laws, ordinances and regulations. You shall comply and assist us in our compliance efforts with any and all laws and regulations, including but not limited to those relating to truth in lending, restaurant and food service businesses, safety and sanitation, environment, tax, privacy, truth in advertising, occupational hazards, health and anti-discrimination laws, and anti-terrorist activities (including the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury and/or other applicable regulations to which you are or may become subject). In connection with such compliance efforts, you shall not to enter into any illegal transactions or transactions not approved by us, including transactions on any unauthorized platform such as online deliveries or group purchasing et al, and to properly perform other activities relating to Your Franchise Business as may be required by us or by law. You confirm that you are not listed in the Annex to Executive Order 13224 and shall not to hire any Person so listed or have any dealing with a Person so listed (the Annex is currently available at http://www.treasury.gov). You are solely responsible for ascertaining what actions must be taken by you to comply with all such laws, orders and/or regulations, and specifically acknowledge and agree that your indemnification responsibilities (as provided in Section 16.D) apply to your obligations under this Section.

Your Franchise Business must adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct in all dealings with customers, Suppliers, us and the public. You agree to refrain from any business or advertising practice which may injure our business and the goodwill associated with the Marks, Franchised Systems and other Heytea Stores. You must notify us in writing within five (5) days of the threat of or commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect your operation or financial condition or that of an Your Franchise Business and of any notice of violation of any law, ordinance, or regulation relating to Your Franchise Business.

## 8G. INFORMATION SECURITY

You must implement all administrative, physical and technical safeguards that we and applicable laws require to protect any information that can be used to identify Personal Information. No assistance, guidance, standards or requirements that we provide you constitute a representation or warranty of any kind, express or implied, that Your Franchise Business or business are complaint with applicable privacy and data laws, codes, or regulations, or acceptable

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

industry standards. It is your responsibility to confirm that the safeguards you use to protect Personal Information comply with all laws and industry best practices related to the collection, access use, storage, disposal and disclosure of Personal Information.

If you become aware of a suspected or actual breach of security or unauthorized access involving Personal Information, you will notify us immediately and specify the extent to which Personal Information was compromised or disclosed. We reserve the right to conduct a data security and privacy audit of any of Your Franchise Business and your Computer Systems at any time, from time to time, to ensure that you are complying with our requirements for handling Personal Information. The cost of such audit shall be paid by you. You agree to cooperate with us fully during the course of this audit. If we exercise any of these rights, we will not interfere unreasonably with Your Franchise Business' operation.

You acknowledge and agree that your indemnification responsibilities (as provided in Section 16D) apply to your obligations under this Section.

## 8H. MANAGEMENT OF YOUR HEYTEA STORE(S).

Your Operating Partner is solely responsible for managing and overseeing Your Franchise Business. You must also appoint at least one Designated Store Manager to participate in your management of each of Your Heytea Store(s); provided that if your Operating Partner directly manages and supervises any one of Your Heytea Store(s) on a daily basis, the Designated Store Manager can be the same individual person as your Operating Partner with respect to that Heytea Store alone. However, if your Operating Partner elects not to directly manages and supervises any one of Your Heytea Store(s) on a daily basis, you must appoint, for that particular Heytea Store, at least one Designated Store Manager who is not the same individual person as Your Operating Partner to supervise that particular Heytea Store; provided that Designated Store Manager may also serve the role of a Designated Shift Manager for that particular Heytea Store. Each Designated Store Manager and Designated Shift Manager (if applicable) must supervise the day-to-day operations of Your Heytea Store(s) and continuously exert best efforts to promote and enhance such Heytea Store and the goodwill associated with the Marks. You must identify each Designated Store Manager and Designated Shift Manager on **Exhibit A** and we reserve the right to approve or disapprove each Designated Store Manager and Designated Shift Manager as well as any replacement thereof. In the event that you elect not to appoint a Designated Store Manager or Designated Shift Manager, any Designated Store Manager or Designated Shift Manager's employment is terminated, or we disapprove any Designated Store Manager or Designated Shift Manager at any time, your Operating Partner must immediately assume the full-time responsibilities of operating Your Heytea Store(s) that is not managed by a Designated Store Manager or Designated Shift Manager pursuant to the terms of this Agreement, and you must use your best effort to identify and appoint replacements within fourteen (14) days thereof.

You shall operate Your Heytea Store(s) continuously during the Term. You shall promptly notify us in advance of any closure of Your Heytea Store(s) or Your Franchise Business that is outside of the normal course of business. All of your obligations under this Agreement, including your obligation to provide reports and pay Service Fee and Royalty, shall continue to bind you during

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

any closure period unless otherwise agreed to by us in writing. If you close Your Heytea Store(s) for  24h  without our approval or not because of force majeure, we reserve our right to terminate this Agreement.

## 8I. EMPLOYEES, AGENTS & INDEPENDENT CONTRACTORS.

You acknowledge and agree that you are solely responsible for all decisions relating to employees, agents, and independent contractors that you may hire to assist in the operation of Your Franchise Business. You agree that any employee, agent or independent contractor that you hire will be your employee, agent or independent contractor, and not our employee, agent or independent contractor. You also agree that you are exclusively responsible for the terms and conditions of employment of your employees, including recruiting, hiring, firing, training, compensation, work hours and schedules, work assignments, safety and security, discipline, and supervision. You agree to manage the employment functions of Your Franchise Business in compliance with applicable employment laws. You shall ensure that at least one employee at Your Heytea Store(s) is certified or licensed to provide food and beverage services (if applicable) in the state or locality in which Your Heytea Store(s) operates at all times during the operation hours of Your Heytea Store(s).

We reserve the right to require that any employee, agent or independent contractor that you hire execute a non-disclosure agreement to protect the Confidential Information. We reserve the right to regulate the form of non-disclosure agreement that you use (including by requiring you to use the agreement attached as **Exhibit D**) and to be a third-party beneficiary of those agreements with independent enforcement rights. You acknowledge that any form of non-disclosure that we require you to use, provide to you, or regulate the terms of (including the agreement attached as **Exhibit D**) may or may not be enforceable in a particular jurisdiction. You agree that you are solely responsible for obtaining your own professional advice with respect to the adequacy of the terms and provisions of any confidentiality agreement that your employees, agents and independent contractors sign.

You are solely responsible for hiring sufficient personnel to adequately staff Your Heytea Store(s). If Your Heytea Store(s) is not operating according to any terms of this Agreement, Operations Manual or System Standards, we reserve the right to require the Operating Partner, Designated Store Manager, Designated Shift Manager and/or any other managers or employees to participate in remedial initial training instruction, which will be provided by us and paid by you in full at the then-current fee rate for any such remedial instruction, as published in the Operations Manual or by other written communication to you. You shall be responsible for all travel, living, incidental and other expenses incurred by your personnel in order to receive such remedial initial training of such training is conducted at our designated site and, in the event such training is conducted at Your Store(s), all Assistant's Expenses incurred by us or any of our representatives, employees or agent in providing such training. We reserve our right to terminate this Agreement or suspend your operation if we believe you do not have sufficient qualified personnel to operate your Heytea Store(s).

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You acknowledge and agree that your indemnification responsibilities (as provided in Section 16.D) apply to your obligations under this Section, including any claims raised by your employees, agents, contractors and other personnel.

## 8J. INSURANCE.

During the Term you must maintain in force at your sole expense comprehensive public liability, general liability, personal injury liability, motor vehicle liability, property, product liability, workmen's compensation, employment practices liability, commercial liability umbrella and other types of insurance we request, including the types and minimum amounts of insurance specific to delivery, catering and/or other off-site services, if applicable. We reserve the right to require that you obtain all or a portion of your insurance policies from a designated Supplier and on the terms and according to the specifications we approve. The liability insurance must cover claims for bodily and personal injury, death, and property damage caused by or occurring in connection with Your Franchise Business' operation or activities of your personnel in the course of their employment (within and outside Your Heytea Store(s) and each Premise(s)). All of these policies must contain the minimum coverage we prescribe from time to time and must have deductibles not to exceed the amounts we specify. We may periodically increase the amounts of coverage required under these insurance policies and/or require different or additional insurance coverage (including reasonable excess liability insurance) at any time. These insurance policies must be purchased from licensed insurers having a rating of "A/VIII" or higher (or the equivalent rating in the Development Territory) by the then-current edition of Best Insurance Reports published by A.M. Best Company (or other similar publication or criteria we designate).

Each insurance policy must name us and any Affiliates we designate as additional named insureds using a form of endorsement we have approved. You must provide for thirty (30) days' prior written notice to us of any material modification, cancellation or expiration of any of tour policies for your Franchise Business. Each insurance policy must contain a waiver of all subrogation rights against us, our Affiliates and their successors and assigns. You must routinely furnish us copies of your certificates of insurance or other evidence of your maintaining this insurance coverage and paying premiums. If you fail or refuse to obtain and maintain the insurance we specify, we may terminate this Agreement.

## 8K. PRICING.

We may periodically set a maximum or minimum price that you may charge for products and services offered by Your Franchise Business. If we impose a maximum price for any product or service, you may not, directly or indirectly, charge more for the product or service than the maximum price we impose. If we impose a minimum price for any product or service, you may not, directly or indirectly, charge less for such product or service than the minimum price we impose. For any product or service for which we do not impose a maximum or minimum price, we may require you to comply with an advertising policy adopted by us which will prohibit you from, directly or indirectly, advertising any price for a product or service that is different than our suggested retail price. Although you must comply with any advertising policy we adopt, you will not be prohibited from selling any product or service at a price

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

above or below the suggested retail price unless we impose a maximum price or minimum price for such product or service.

**9.   MARKETING.**

**9A.  ADVERTISING REQUIRED BY US.**

You agree that we or our Affiliates or designees may establish or direct any Advertising Program. The Advertising Program will be organized and governed by written documents or in any other form and manner determined by us, and begin operating on a date that we determine in advance. Such written documents will be available for participating franchise owners to review. We may change, dissolve, merge and reinstate any Advertising Program. If we have established an Advertising Program for the geographic area in which Your Franchise Business is located as of the time you sign this Agreement, you shall participate in the Advertising Program, subject to our approval, and you shall sign any necessary documents and contribute your Advertising Program Contribution as we require. The amount of your Advertising Program Contribution will be determined within a reasonable time at the time the Advertising Program is established and shall be included as a part of the Service Fees.

You must advertise in any advertising medium we determine, using forms and contents of advertisement we approve. You must also list Your Heytea Store(s) with the online directories and subscriptions we periodically prescribe, and/or establish any other Online Presence we require or authorize. You must comply with all of our System Standards for your local advertising, including your Online Presences.We reserve our right to terminate this Agreement if you fail to comply with this Section.

**9B.  ADVERTISING BY YOU.**

Our policy as of the Effective Date of this Agreement is to allow you to market to customers located in the Development Territory, but we reserve the right to change this policy and to implement other marketing policies and requirements from time to time. You shall comply with any such mandatory policies and requirements as they may be implemented or modified.

You agree that your advertising, promotion, and marketing will be completely clear, factual, and not misleading and conform to the highest standards of ethical advertising, the System Standards, and any marketing and the advertising policies that we prescribe from time to time. We may vary the System Standards for advertising, promotion, and marketing that will apply to Your Heytea Store(s). At least thirty (30) days before you intend to use them, you shall send us samples of all advertising, promotional and marketing materials for our written approval. If we do not approve of the materials within seven (7) days of our receipt of such materials, then they shall be deemed disapproved. You may not use any advertising, promotional, or marketing materials that we have not approved or have disapproved.

You acknowledge and agree that your indemnification responsibilities (as provided in Section 16.D) apply to your advertising activities under this Section. We reserve our right to terminate this Agreement if you fail to comply with this Section.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## 9C. MINIMUM MARKETING SPENDING.

Recognizing the value of advertising and marketing to the goodwill and public image of your Heytea Stores, you acknowledge and agree that you shall spend at least the Marketing Spending amount by participating the Advertising Program per Section 9.A and/or conducting any advertising, promotion and marketing program or activities on your own per Section 9.B for each of Your Heytea Store during the Term. For the avoidance of doubt, the amount of required Marketing Spending will increase proportionally based on the number of Your Heytea Store(s), if you operate multiple Stores under the terms of this Agreement. Your Marketing Spending covers both our national Advertising Program and local marketing efforts.

## 9D. FRANCHISE SYSTEM WEBSITE.

We may establish, acquire, or host any Franchise System Website to advertise, market, and promote Heytea Stores, the products and services that Heytea Stores offer and sell, and/or a Heytea Store franchise opportunity. We may (but are not obliged to) provide you with a webpage on a Franchise System Website that references Your Heytea Store(s). If we provide you with a webpage on a Franchise System Website, you must: (i) provide us the information and materials we request to develop, update, and modify your webpage; (ii) notify us whenever any information on your webpage is not accurate; and (iii) if we give you the right to modify your webpage, notify us whenever you change the content of your webpage and you shall not modify the web-page without our prior consent. We may include in any Franchise System Website one or more pages that identify any or all the Heytea Stores, including Your Heytea Store(s), by geographic region, address, telephone number and other contact information.

You acknowledge that we have the sole right to register the Internet domain: www.heytea.com or www.heycha.com, and to establish sites using the domain name and will own all intellectual property and other rights in all Franchise System Websites, including any webpage(s) referencing Your Heytea Store(s) and all information it contains (including the domain name, any associated email address, any website analytical data, and any personal or business data that visitors supply). You acknowledge that all Franchise System Website and all domain names relating thereto is our sole property. You shall in no event use, in any manner, any computer medium or electronic medium (including any home page, website, bulletin board, metatag or other internet related medium or activity) that uses any domain names of any Franchise System Websites or any of the Marks without our express written consent, or as expressly permitted in our Operations Manual.

We may periodically update and modify any Franchise System Website (including your webpage). You acknowledge that we have final approval rights over all information on any Franchise System Website (including your webpage). We may implement and periodically modify System Standards relating to any Franchise System Website.

Even if we provide you with any webpage on a Franchise System Website, we will only maintain any such webpage while you are in full compliance with this Agreement and all System Standards we implement. If you are in default of any obligation under this Agreement or our

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

System Standards, then we may remove any webpage referencing any of Your Store(s) from any Franchise System Website until you fully cure the default. We will permanently remove reference to any Termination Store from all Franchise System Websites upon the occurrence of a Termination Event for that Termination Store.

We may require you to provide notice of any Franchise System Website in the advertising, marketing, and promotional materials that you develop for Your Franchise Business in the manner we designate. We reserve the sole right to sell the products sold by Heytea Stores through any Online Presence, including any Franchise System Website.

We reserve the right to require you to obtain from us and use an email address associated with our registered domain name. If we require you to obtain and use such an email address, you must do so according to our then-current System Standards.

Except as provided above, or as approved by us in writing or in the Operations Manual, you shall not develop, maintain or authorize any Online Presence that mentions Your Franchise Business, links to any Franchise System Website or displays any of the Marks, engage in any promotional or similar activities, whether directly or indirectly (including publishing any promotional material or information under any Marks through any Online Presence), or attempt to offer or sell any products or services through any Online Presence. If we approve the use of any such Online Presence in the operation of Your Franchise Business, you will develop and maintain such Online Presence only in accordance with our guidelines issued from time to time, including our guidelines for posting any messages or commentary on other third-party websites. We will own the rights to each such Online Presence. At our request, you shall grant us access to each such Online Presence, and to take whatever action (including signing an assignment or other documents) we request to evidence our ownership of such Online Presence, or to help us obtain exclusive rights in such Online Presence. We reserve our right to terminate this Agreement is you fail to comply with this Section.

## 10.   RECORDS, REPORTS, AND FINANCIAL STATEMENTS.

You shall establish and maintain at your own expense a bookkeeping, accounting, and recordkeeping system conforming to the requirements and formats we prescribe from time to time for the duration of the Term of this Agreement and any successor Term and as otherwise required by law. You will keep such complete and accurate set of books and records of the operation of Your Franchise Business, produce monthly financial statements in accordance with generally accepted accounting principles for each calendar month and furnish copies of these statements to us within ten (10) days after the end of each month.

You must use the Computer System to maintain certain sales data, customer information and other information. You agree that we shall have access to your Computer System at all times and that we shall have the right to collect and retain from the Computer System any and all data concerning Your Franchise Business. We may require that you hire a service-provider that we designate as your provider of accounting, payroll and/or bookkeeping services. If we designate a service provider for accounting, payroll and/or bookkeeping services, you shall

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

cooperate with such service-provider and provide such service-provider with all information you would appropriately provide us under this Section 10.

You shall generate, in the manner and format that we may prescribe from time to time, the additional statements and reports that we require, and provide us such other financial statements, tax returns, or other forms, records, books and other information we may periodically require relating to Your Franchise Business.

Subject to applicable law, you shall preserve and maintain all records and agreements you and your employees are required to, including any confidentiality agreements we require you or your employees to sign, in a secure location for at least five (5) years (including, but not limited to, sales checks, purchase orders, invoices, payroll records, customer lists, check stubs, sales tax records and returns, cash receipts journals, cash disbursement journals, and general ledgers). We reserve the right to require you to have audited financial statements prepared at your expenses annually during the Term. We also reserve the right to require you to deliver to us originals or copies of any of the foregoing records and agreements for our reference.

You shall maintain and furnish to us upon request complete copies of all income, sales, value added, use and service tax returns, and employee withholding, workers' compensation and similar reports filed by you reflecting activities of the Franchised Business. You shall preserve all records described in this Section for a period of at least five years after their creation, or such longer period as may be required by law, during both the term and each renewal term of this Agreement and following the expiration or termination of this Agreement

## 11.  INSPECTIONS AND AUDITS.

### 11A. OUR RIGHT TO INSPECT YOUR STORE(S).

To determine whether you and Your Franchise Business are complying with this Agreement and all System Standards, we and our designated agents or representatives may at all times and without prior notice to you: (i) inspect Your Franchise Business; (ii) photograph Your Franchise Business (to the extent not violation of any privacy law) and observe and videotape (including through any monitoring system installed in Your Heytea Store(s)) Your Franchise Business' operation for consecutive or intermittent periods we deem necessary; (iii) continuously or periodically monitor Your Franchise Business using electronic surveillance or other means; (iv) remove samples of any products and supplies; (v) interview Your Franchise Business' personnel and customers; (vi) inspect and copy any books, records, and documents relating to any of Your Franchise Business' operation; and (vii) inspect your Computer System, including hardware, software, security, configurations, connectivity, and data access. Additionally, we may contract with third parties to conduct mystery shopper, customer survey or other market research testing, and quality assurance inspections at Your Franchise Business. You shall cooperate with us fully during the course of these inspections and tests. If we exercise any of these rights, we will not interfere unreasonably with any of Your Franchise Business' operation.

### 11B. OUR RIGHT TO AUDIT.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

We may at any time during your business hours, and with or without prior notice to you, examine your and any of Your Franchise Business' business, bookkeeping, and accounting records, sales and income tax records and returns, and other records during the Term, any successor Term and for five years after the expiration or termination of this Agreement. You shall cooperate fully with our representatives and independent accountants in any examination. If any examination discloses an understatement of your Net Sales, you shall pay us the Service Fee, Royalty, Marketing Spending, and any other fees understated and/or underpaid, plus interest on the understated amounts from the date originally due until the date of payment, within fifteen (15) days after receiving the examination report. If an examination is necessary due to your failure to furnish reports, supporting records, or other information as required, or to furnish these items on a timely basis, you shall reimburse us for the costs of the examination, including the charges of attorneys and independent accountants and the travel expenses, room and board, and compensation of our employees. If any examination reveals an understatement of Net Sales for more than three (3) intermittent months (including intermittent three (3) months) or an understatement of Net Sales exceeding two percent (2%) of the amount that you actually reported to us for the period examined, you shall not only reimburse us for the aforementioned costs of the examination, but also pay us an amount equal to twice the amount of the discrepancy. These remedies are in addition to our other remedies and rights under this Agreement and applicable law, and the provisions of this Section do not and shall not be construed to waive or excuse any breach reflected by an underpayment or understatement and are in addition to all of our other rights and remedies.

Our rights to inspect the books and records of the Franchised Business and to take excerpts, and to audit the Franchised Business, will continue for a period of six months following the expiration or termination of this Agreement; but we may only inspect such books and records or perform any such audit following the expiration or termination of this Agreement upon at least 24 hours' prior notice to you.

## 12.   TRANSFER.

### 12A.  BY US.

You acknowledge that we maintain a staff to manage and operate the Franchise System and that staff members can change as employees come and go. You acknowledge that you did not sign this Agreement in reliance on the continued participation by or employment of any of our shareholders, directors, officers, or employees.  We may change our ownership or form of organization and/or assign this Agreement and any other agreement to a third party without restriction. After our assignment of this Agreement to a third party who expressly assumes the obligations under this Agreement, we no longer will have any obligations under this Agreement.

This Agreement and any other agreement will inure to the benefit of any transferee or other legal successor to our interest in it.

### 12B.  BY YOU.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

You acknowledge that the rights and duties this Agreement creates are personal to you and your owners and that we have granted you the franchise in reliance on our perception of your and your owners' individual or collective character, skill, aptitude, attitude, business ability, and financial capacity. Accordingly, any Transfer without our approval is a breach of this Agreement and has no effect.

Additionally, you may not pledge or encumber this Agreement, Your Franchise Business or its assets or an ownership interest in you or your owners (to someone other than us) as security for any loan or other financing, unless (1) we grant our prior written consent and (2) the lender agrees that its claims will be subordinate to all amounts you owe at any time to us or our Affiliates.

For this Section purpose, "Transfer" means your (or your owners') voluntary, involuntary, direct or indirect assignment, sale, gift, pledge or other disposition of: (i) any legal or beneficial ownership or voting interest in you or your owner: (ii) this Agreement, (iii) any material asset of the Your Franchised Business; or (iv) the lease or ownership of the Premises (unless we agree to a relocation or unless the transfer of ownership does not affect your leasehold rights and obligations). "Transfer" also includes (v) the merger or consolidation of you or your owners; (vi) the issuance of additional securities or other ownership or voting interests of your or your owners, and (vii) the admission or departure of a partner or owner; (viii) transfers resulting from proceedings under the U.S. Bankruptcy Code or any similar law; (ix) transfers resulting from divorce; and (x) any grant of a security interest to a third party without our approval.

You shall notify us of any planned Transfer, and to provide us with any information we may reasonably request in order to permit us to evaluate the planned Transfer. If we do not exercise our right of first refusal under Section 12E, we agree not to unreasonably withhold our approval of a Transfer. If we approve the Transfer, then you will be free, for 60 days following such approval, to affect the Transfer to the person or persons approved by us.

## 12C. CONDITIONS FOR APPROVAL OF TRANSFER.

Subject to the other provisions of this Section 12, if you and your owners are fully complying with this Agreement, we will approve a transfer that meets all of the requirements in this Section 12.C.

If you wish to transfer a non-controlling ownership interest in you or your owners (determined as of the date on which the proposed transfer will occur), we will approve such transfer if: (i) the proposed transferee and its direct and indirect owners (if the transferee is an Entity) are of good character and meet our then-current standards for our franchise owners (including no ownership interest or performance of services for a Competitive Business); (ii) you and your owners sign all of the documents we are then requiring in connection with a transfer, in a form satisfactory to us, including a general release of any and all claims against us and our Affiliates and our and their owners, officers, directors, employees, and agents; and (iii) you reimburse our reasonable out-of-pocket expenses associated with processing the transfer, including reasonable attorneys' fees for preparing transfer documentation.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

If you wish to transfer this Agreement, Your Franchise Business, substantially all the assets of Your Franchise Business, or a Controlling Ownership Interest in you or one of your owners (whether through one transfer or a series of transfers, regardless of the time period over which these transfers take place), we will approve such transfer if:

(1) the transferee satisfied all of our then-current criteria for a new franchisee, and has sufficient business experience, aptitude, integrity and financial resources to take over the operation of Your Franchise Business;

(2) you have paid all Royalties, Service Fees, and other amounts owed to us, our Affiliates, and third-party Suppliers, and have submitted all required reports and statements;

(3) you have fully spent the pro rata amount of any requisite amount of Marketing Spending;

(4) you have not breached any provision of this Agreement or any other agreement with us or our Affiliates during both the sixty (60) day period before you requested our consent to the transfer and the period between your request and the effective date of the transfer;

(5) neither the transferee nor its owners (if the transferee is an Entity) or affiliates have an ownership interest (direct or indirect) in or perform services for a Competitive Business;

(6) the transferee (or its Operating Partner) and any other manager and/or assistant manager we designate (including any applicable Designated Store Manager), satisfactorily complete our then-current Initial Training Program;

(7) the landlord of each Premise(s) allows you to transfer the Lease or to sublease for that Premise(s) to the transferee;

(8) the transferee shall (if the transfer is of this Agreement), or you shall (if the transfer is of a controlling ownership interest in you or one of your owners), sign our then- current form of franchise agreement and related documents, any and all of the provisions of which may differ materially from any and all of those contained in this Agreement, including the Service Fee, Royalty and the Marketing Spending; provided, however, that the term of the new franchise agreement signed will equal the remainder of the then-remaining Term;

(9) you pay us a transfer fee equal to the Initial Franchise Fee for each Heytea Store directly or indirectly transferred in connection with the proposed transfer;

(10) you pay us cost or expenses incurred in the Transfer, including costs and expenses incurred in reviewing transferring documents;

(11) you (and your owners) and the transferee (and its owners) sign all of the documents we are then requiring in connection with a transfer, in a form satisfactory to us, including a general release of any and all claims against us and our Affiliates and our and their owners, officers, directors, employees, and agents;

(12) we have determined that the purchase price and payment terms will not adversely affect the transferee's operation of the transferred business;

(13) if you or your owners finance any part of the purchase price, you and/or your owners agree that all of the transferee's obligations under promissory notes, agreements, or security interests reserved in any of Your Franchise Business are subordinate to the transferee's obligation to pay Service Fees, Royalties, Marketing Spending Contributions, and other amounts due to us, our Affiliates, and third-party Suppliers related to the operation of Your Store(s) and otherwise to comply with this Agreement;

(14) you or the transferee shall upgrade, remodel, and refurbish Your Heytea Store(s) in accordance with our then-current requirements and specifications for Heytea Stores within the time period we specify following the effective date of the transfer (we will advise the transferee before the effective date of the transfer of the specific actions that it must take and

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

the time period within which such actions must be taken) and the transferee agrees to escrow an amount we approve for payment of the required upgrade, remodel or refurbishment;

(15) you provide us the evidence we reasonably request to show that appropriate measures have been taken to affect the transfer as it relates to the operation of the Heytea Stores, including, by transferring all necessary and appropriate business licenses, insurance policies, and material agreements, or obtaining new business licenses, insurance policies and material agreements; and

(16) you and your transferring owners agree to terminate this Agreement in accordance with its terms, and comply with all applicable post-termination obligations, including by complying with the restrictive covenants found in Sections 15.E and 15.F of this Agreement.

We reserve the right to prohibit you from transferring Your Franchise Business or Your Heytea Store(s) separately from (i) a transfer of all of Your Heytea Store(s), if you operate multiple Heytea Stores under the terms of this Agreement, (ii) a transfer of this Agreement, or (iii) a transfer of any area development agreement pursuant to which you developed Your Heytea Store(s).

We may review all information that you give the transferee regarding Your Franchise Business, correct any information that we believe is inaccurate, and give the transferee copies of any reports that you have given us, or we have made regarding Your Franchise Business.

Our consent to a transfer pursuant to this Section is not a representation of the fairness of the terms of any contract between you and the transferee, a guarantee of Your Franchise Business' or transferee's prospects of success, or a waiver of any claims we have against you (or your owners) or of our right to demand the transferee's full compliance with this Agreement.

You acknowledge and agree that your indemnification obligation in Section 16 D covers any claims against us or our Affiliates as a result of or relating to the Transfer provided herein.

## 12D.  TRANSFER TO A WHOLLY-OWNED ENTITY.

Notwithstanding Section 12.C above, if you are in full compliance with this Agreement, and obtain our approval, you may transfer this Agreement to an Entity in which you maintain management control, and of which you own and control one hundred percent (100%) of the equity and voting power of all issued and outstanding ownership interests; provided, that (i) that Entity will own all of Your Franchise Business' assets, and will conduct all of Your Franchise Business' business, and (ii) that Entity will conduct no business other than Your Franchise Business and, if applicable, other Heytea Stores. The Entity must expressly assume all of your obligations under this Agreement. You agree to remain personally liable under this Agreement as if the transfer to the Entity did not occur, and you and your owners sign the form of consent to assignment and assignment satisfactory to us which may include a general release of any and all claims against us and our owners, officers, directors, employees and agents. You further agree to provide us with all organizational documents for the Entity that we require.

## 12E.  OUR RIGHT OF FIRST REFUSAL.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

If you (or any of your owners) at any time decide to sell an interest in this Agreement, Your Franchise Business, substantially all the assets of Your Franchise Business, or an ownership interest in you or one of your owners (except to or among the current owners of such Entity), you (or your owners) agree to obtain a bona fide executed written offer, relating exclusively to the transfer of this Agreement, Your Franchise Business, substantially all the assets of Your Franchise Business, or the ownership interest in you or one of your owners (as applicable), from a responsible and fully disclosed buyer and send to us a true and complete copy of that written offer. The offer must include names of proposed buyer or its owners, details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price, closing conditions. To be a valid, bona fide offer, the proposed purchase price must be in a dollar amount, and the proposed buyer must submit with its offer an earnest money deposit equal to five percent (5%) or more of the offering price.

We may also require you (or your owners) to send us copies of any materials or information sent to the proposed buyer or transferee regarding the possible transaction. We may elect to purchase the interest offered for the price and on the terms and conditions contained in the offer, provided that:

(1)  we notify you or your selling owner(s) that we intend to purchase the interest or within thirty (30) days after we receive a copy of the offer and all other information we request;

(2)  we may substitute cash for any form of payment proposed in the offer;

(3)  our credit will be deemed equal to the credit of any proposed buyer (meaning that, if the proposed consideration includes promissory notes, we or our designee may provide promissory notes with the same terms as those offered by the proposed buyer);

(4)  we will have an additional thirty (30) days to prepare for closing after notifying you of our election to purchase;

(5)  we will have you sign a general release of all claims against us or our Affiliates; and

(6)  we must receive, and you and your owners shall make, all customary representations and warranties given by the seller of the assets of a business or the ownership interests in an Entity, as applicable, including representations and warranties regarding: (a) ownership and condition of and title to ownership interests and/or assets; (b) liens and encumbrances relating to ownership interests and/or assets; and (c) validity of contracts and the liabilities, contingent or otherwise, of the Entity whose assets or ownership interests are being purchased.

If we exercise our right of first refusal, the seller and we will execute a written agreement, in a form satisfactory to us, acknowledging the seller's continuing obligations. If you own the Premises, we or our assignee or affiliate will only have a right to lease the Premises for the remaining term of this Agreement, excluding renewals, at fair market value.

We have the unrestricted right to assign this right of first refusal to a third party, who then will have the rights described in this Section 12.E.

If we do not exercise our right of first refusal, you or your owners may complete the sale to the proposed buyer on the original offer's terms, but only if we otherwise approve the transfer in accordance with Sections 12.B and 12.C above, and if you (and your owners) and the transferee comply with the conditions in Sections 12.B and 12.C above. Notwithstanding anything in this

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

Section to the contrary, the right of first refusal process will not be triggered by a proposed transfer that would not be allowed under Sections 12.B and 12.C above.

If you do not complete the sale to the proposed buyer within sixty (60) days after we notify you that we do not intend to exercise our right of first refusal, or if there is a material change in the terms of the sale (which you agree to tell us promptly), we or our designee will have an additional right of first refusal. We or our designee must exercise this additional right of first refusal during the thirty (30) day period following either the expiration of the sixty (60) day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our or our designee's option.

## 12F.  YOUR DEATH OR DISABILITY.

On the death or disability of you, your Operating Partner or any Controlling Owner or the Operating Partner's or such Controlling Owner's executor, administrator, conservator, guardian, or other personal representative must transfer your interest in this Agreement, or the Operating Partner's or Controlling Owner's ownership interest in you, to a third party (which may be your or the Operating Partner's or Controlling Owner's heirs, beneficiaries, or devisees). That transfer must be completed within a reasonable time, not to exceed six (6) months from the date of death or disability, and is subject to all of the terms and conditions in this Section 12.C (except that any transferee that is the spouse or immediate family member of you or your Operating Partner or such Controlling Owner, shall not have to pay the transfer fee described in Section 12.C(8) if the transfer meets all the other conditions in Section 12.C). A failure to transfer your interest in this Agreement or the Operating Partner's or such Controlling Owner's ownership interest in you within this time period is a breach of this Agreement. If Your Heytea Store(s) is not being managed by an approved Designated Store Manager at the time of your or your Operating Partner's death or disability, your or the Operating Partner's executor, administrator, conservator, guardian, or other personal representative must within a reasonable time, not to exceed fifteen (15) days from the date of death or disability, appoint a Designated Store Manager in accordance with the terms and conditions of Section 8.H. A new Operating Partner acceptable to us also must be appointed within thirty (30) days.

For purpose of this Agreement, the term "disability" means a mental, emotional or physical injury, illness, incapacity, disability or impairment that is reasonably expected to prevent or actually does prevent a person from performing the obligations set forth in this Agreement for more than 30 days. A person's disability for purposes of this section will be determined by a licensed practicing physician selected by us upon examination of such person or, if such person refuses to be examined, then such person will automatically be deemed disabled for purposes of this section as of the date of refusal. We will pay the cost of the examination to the extent it is not covered by insurance.

## 13.  EXPIRATION OF THIS AGREEMENT.

## 13A.  YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

Upon expiration of this Agreement, you will have the right to apply to acquire a successor franchise to operate Your Franchise Business for one (1) additional consecutive term in accordance with our franchise policy in force when the Your Successor Notice is submitted to us, if you meet the following conditions:

(1) you (and each of your owners) have substantially complied with this Agreement during its term;

(2) you (and each of your owners) are, both on the date you give us written notice of your election to acquire a successor franchise (as provided in Section 13.B below) and on the date on which the term of the successor franchise would commence, in full compliance with this Agreement and all System Standards;

(3) you maintain possession of and agree to remodel and/or expand Your Store(s), add or replace improvements and Operating Assets, and otherwise modify Your Store(s) as we require to comply with System Standards then-current for new Stores;

(4) you sign the franchise agreement we then use to grant franchises for Heytea Stores (modified as necessary to reflect the fact that it is for a successor franchise) and pay all fees pursuant to that franchise agreement with respect to all of Your Heytea Store(s), which may contain provisions that differ materially from those contained in this Agreement;

(5) your Operating Partner and any Designated Store Managers attend any refresher training courses we require;

(6) you and your owners agree to sign, in a form satisfactory to us, guarantees and general releases of any and all claims against us and our shareholders, officers, directors, employees, agents, successors, and assigns;

(7) you comply with our then-current financial qualifications and training requirements for new franchise; and

(8) you provide us with evidence that you have right to remain in possession of the Premises s for the duration of the term of the successor franchise agreement.

If you (and your owners) fail to meet the conditions set forth in this Section, you acknowledge that we need not grant you a successor franchise, whether or not we had, or chose to exercise, the right to terminate this Agreement during its term under Section 14.B. If you shall be operating multiple Heytea Stores under this Agreement and any applicable Franchise Agreement Supplement at the time of submitting any Your Successor Notice, you may not obtain a successor franchise to operate fewer than all of Your Heytea Store(s) for a successor term.

## 13B.  GRANT OF A SUCCESSOR FRANCHISE.

You shall provide us with Your Successor Notice of your election to acquire a successor franchise no more than one (1) year and no less than one hundred eighty (180) days before this Agreement expires. We agree to give you Our Successor Notice of our decision to grant or not to grant you a successor franchise not more than six (6) months after we receive Your Successor Notice. If applicable, Our Successor Notice will describe the remodeling, maintenance, expansion, improvements, technology upgrades, trade dress updates, and/or modifications required to bring Your Franchise Business into compliance with then-current System Standards and state the actions you must take to correct operating deficiencies and the time period in which you must correct these deficiencies.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

If Our Successor Notice states that you must remodel Your Store(s) and/or must cure certain deficiencies of Your Heytea Store(s) or its operation as a condition to our granting you a successor franchise, and you fail to complete the remodeling and/or to cure those deficiencies, we will give you written notice of our decision not to grant a successor franchise, not less than ninety (90) days before this Agreement expires; provided, that we need not give you ninety (90) days' notice if we decide not to grant you a successor franchise due to your breach of this Agreement during the ninety (90) day period before it expires. We may extend this Agreement's term for the time period necessary to give you either reasonable time to correct deficiencies or the ninety (90) days' notice of our refusal to grant a successor franchise. If you fail to notify us of your election to acquire a successor franchise within the prescribed time period, we need not grant you a successor franchise.

If you do not sign a successor franchise agreement before the term of this Agreement expires and you continue to operate under the terms and conditions of this Agreement after the date of expiration, we shall seek all legal and other remedies to protect our interest.

## 14.  TERMINATION OF AGREEMENT.

### 14A.  TERMINATION BY YOU.

You may terminate this Agreement if you are in full compliance with this Agreement and we materially fail to comply with this Agreement, and (i) we fail correct the failure within 180 days after you deliver written notice of the material failure to us, or (ii) if we cannot correct the failure within 180 days, we fail give you within 180 days after your notice reasonable evidence of our effort to correct the failure within a reasonable time. Your termination under this Section will be effective 180 days after you deliver to us the written notice of termination. If you terminate this Agreement other than according to this Section 14.A, the termination will be deemed a termination without cause and a breach of this Agreement. You may not terminate fewer than all of Your Store(s), if you operate multiple Stores under the terms of this Agreement, or less than the entirety of this Agreement. Your failure to give such notice will constitute a waiver of your right to terminate on the basis of such breach.

### 14B.  TERMINATION BY US.

We may terminate this Agreement, effective on delivery of written notice of termination to you, if:
(1) you (or any of your owners) have made or make any material misrepresentation or omission in acquiring the franchise or operating Your Franchise Business;
(2) you do not pay us any of the Initial Franchise Fee, Subsequent Franchise Fee, Initial Service Fee, Service Fee, Royalty, Legal Processing Fee, the Security Deposit or any other required amount on or before their respective due date pursuant to the terms of this Agreement and/or any Franchise Agreement Supplement and any amendment or addendum thereto;
(3) you do not open Your Heytea Store(s) by the deadlines specified in your Development Schedule attached as **Exhibit B**, or any Additional Heytea Store(s) by the deadlines specified in any Franchise Agreement Supplement, if applicable;

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

(4)  you fail to obtain our approval before opening Your Store(s), or you fail to satisfy any of the other conditions in Section 2.H before opening Your Store(s), including, obtaining our approval for the site of the Premise(s) and a fully-executed Store Rider for the Premise(s);

(5)  you purchase any product or service that we have notified you is deemed an Essential Ingredient from any Supplier other than us or our designated Affiliate;

(6)  you carry out any services or offer any products other than Your Franchise Business;

(7)  you abandon or fail to actively operate Your Heytea Store(s) for more than five (5) consecutive business days or fourteen (14) days during any twelve-month period without our prior written consent. except any circumstances of force majeure;

(8)  you (or your owners) make or attempt to make any transfer in violation of Section 12;

(9)  you directly or indirectly agree or grant the right to any other Person to operate Your Heytea Store(s) without our written approval;

(10) you (or any of your owners) are or have been convicted by a trial court of, or pleaded guilty or no contest to, a felony or any other crime or offense that we reasonably believe is likely to adversely affect our reputation;

(11) you fail to maintain the insurance we require or to deliver certificates of coverage as we require and do not correct the failure within seven (7) days after we deliver written notice of that failure to you;

(12) you or any of your owners engage in any dishonest or unethical conduct which, in our sole opinion, adversely affects the reputation of Your Franchise Business or the goodwill associated with the Marks;

(13) you lose the right to occupy any Premise(s) whether or not through any fault of yours;

(14) you or any of your owners knowingly make any unauthorized use or disclosure of any Confidential Information or Marks;

(15) you violate any health, safety, sanitation or consumer protection law, ordinance, or regulation, or operate Your Franchise Business in an unsafe manner, and do not begin to cure the violation immediately, and correct the violation within forty-eight (48) hours after you receive notice from us or any other party;

(16) you violate any other applicable law, regulation, ordinance or consent decree, or fail to maintain any bond, license or permit, and do not cure such violation or failure within ten (10) days after we or any applicable government agency deliver notice to you of that violation or failure;

(17) you fail to pay us or our Affiliates any amounts due, including Royalties, and do not correct the failure within ten (10) days after we deliver written notice of that failure to you;

(18) you fail to provide us with evidence that you have paid when due any income, service, sales, withholding or other taxes due on your Net Sales within ten (10) days after we request such evidence, or you fail to pay any such taxes when owed unless you are in good faith contesting your liability for these taxes;

(19) you understate your Net Sales three (3) times or more during this Agreement's Term or by more than two percent (2%) on any one occasion;

(20) you (or any of your owners) (a) fail on three (3) or more separate occasions within any twelve (12) consecutive month period to comply with this Agreement, whether or not we notify you of the failures, and, if we do notify you of the failures, whether or not you correct the failures after our delivery of notice to you; or (b) fail on two (2) or more separate occasions within any six (6) consecutive month period to comply with the same obligation under this Agreement, whether or not we notify you of the failures, and, if we do notify

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

you of the failures, whether or not you correct the failures after our delivery of notice to you;

(21) you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or the substantial part of your property; any assets of Your Franchise Business are attached, seized, subjected to a writ or distress warrant, or levied on, unless the attachment, seizure, writ, warrant, or levy is vacated within thirty (30) days; or any order appointing a receiver, trustee, or liquidator of you or Your Franchise Business is not vacated within thirty (30) days following the order's entry;

(22) your or any of your owners' assets, property, or interests are blocked under any law, ordinance, or regulation relating to terrorist activities, or you or any of your owners otherwise violate any such law, ordinance, or regulation;

(23) you fail to pay the landlord of any Premise(s) rent or any other amounts due under the applicable Lease within thirty (30) days after the due date;

(24) you fail to immediately send us a revised **Exhibit A** or obtain our approval for the revised **Exhibit A**, if you are required pursuant Section 1.D hereto;

(25) you (or any of your owners) fail to comply with any other provision of this Agreement or any System Standard with respect to Your Franchise Business and do not correct the failure within thirty (30) days after we deliver written notice of the failure to you;

(26) there is a termination of any other franchise agreement or other agreement between you or your Affiliates and us (or any of our Affiliates);

(27) you or any of your personnel that we require to take the Initial Training Program fails the Initial Training Program;

(28) you receive a below average or unsatisfactory grade on two (2) or more separate mystery shopper examinations or data security audits for Store within any twelve (12) consecutive month period;

(29) you attempt to sublicense the Marks in violation Section 5.B;

(30) you fail to comply with your representations, warranties and covenants provided herein; or

(31) you fail to pay when due any Supplier and do not cure such failure within the applicable cure period.

If you operate multiple Heytea Stores under the terms of this Agreement, we may, in our sole discretion, elect to terminate your rights under this Agreement with respect to some, but not all, of Your Heytea Store(s). If we elect to terminate your rights under this Agreement fewer than all of Your Store(s), this Agreement will continue with respect to the Stores that we have not specifically terminated, and you must comply with all obligations under this Agreement with respect to those Stores that have not specifically been terminated.

Unless otherwise expressly indicated above, we will have the right to terminate this Agreement as described above whether or not we notify you of the violation, and if we do notify you of the violation, whether or not you correct the violation after our delivery of notice to you. Our right to terminate this Agreement as provided above in no way limits our other remedies under this Agreement, including our right to late payment interest as described in Section 3.F for all amounts not paid when due.

## 14C.  TERMINATION BY MUTUAL AGREEMENT.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

This Agreement may be terminated at any time by mutual consent of the parties, provided that such consent to terminate must be in writing and signed by each of the parties.

## 15.   RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION.

Subject to Revised Code of Washington Code 19.100.180,

## 15A.  PAYMENT OF AMOUNTS OWED TO US.

You shall pay us the Royalties, Service Fee, Advertising Program Contribution, interest, and all other amounts owed to us (and our Affiliates), calculated as of the date of payment, for each Termination Store within fifteen (15) days after the applicable Termination Event. We have the right to set off any amount you or your owners owe us or our Affiliates against any amounts we or our Affiliates owe you, your owners or your Affiliates. You acknowledge that no Termination Event will affect your liability for amounts you (or your owners or affiliates) owe any third-parties or creditors and we do not assume any such liabilities.

## 15B.  DE-IDENTIFICATION OR THE TERMINATION STORE.

Upon the occurrence of a Termination Event, for each Termination Store, you and your owners must immediately:
(1)  terminate all rights and licenses granted to you under this Agreement;
(2)  submit to us any reports and other information you may be required to submit to us with respect to the operation of the Franchised Business up to the date of expiration or termination;
(3)  close the Termination Store for business and cease to directly or indirectly sell any products or services of any kind or in any manner from the Termination Store, unless we direct you otherwise in connection with our exercise of our option to purchase your Termination Store pursuant to Section 15.D;
(4)  except with other Heytea Stores you own and operate, cease to identify yourself or any business as a current or former Store or as one of our current or former franchise owners; use any Mark, any colorable imitation of a Mark, or other indicate of a Store in any manner or for any purpose; or use for any purpose any trade name, trade or service mark, or other commercial symbol that indicates or suggests a connection or association with us;
(5)  take the action required to cancel or assign all fictitious or assumed name or equivalent registrations relating to any Termination Store;
(6)  if we do not exercise our option to purchase the Termination Store pursuant to Section 15.D, at your own expense, remove all signs, sign-faces, sign-cabinets, marketing materials, forms, and other materials containing any Mark or otherwise identifying or relating to a Store, and make the other alterations we specify in the Operations Manual (or otherwise) to distinguish the Termination Store and its Premise(s) clearly from its former appearance and from other Stores in order to prevent public confusion and comply with the non-competition covenants in Section 15.E;
(7)  cease using and, at our direction, either disable all telephone numbers, directory listings, Online Presences and other contact information for that Termination Store or instruct the

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

registrar to transfer exclusive control and access of any of the foregoing to us or our designee in accordance with our instructions. You agree that, as between you and us, we have the sole right and interest in telephone numbers, directory listings, Online Presences and other contact information for any Termination Store, and you appoint us as your attorney-in-fact to direct the telephone company, directory, hosting company, or registrar or other third-party to assign the same to us and to sign any required documents on your behalf;

(8)   comply with all other obligations that are expressly or by implication intended to survive or be triggered by a Termination Event;

(9)   comply with all other System Standards we establish from time to time and all applicable laws for the closure and de-identification of a Termination Store; and

(10)  you agree to give us, within thirty (30) days after the Termination Event, evidence satisfactory to us of your compliance with these obligations.

If you fail to take any of the actions (or refrain from taking any of the actions) described above, we may take whatever action and sign whatever documents we deem appropriate on your behalf to cure the deficiencies, including, without liability to you or third parties for trespass or any other claim, to enter any Premise(s) of a Termination Store and remove any signs or other materials containing any Marks.

## 15C. CONFIDENTIAL & PERSONAL INFORMATION.

Upon the occurrence of a Termination Event, you agree that you will immediately cease using any of our Confidential Information in any business or otherwise and return to us all copies of the Operations Manual and any other Confidential Information that we have loaned you (unless it is being used for any other Stores you are permitted to operate). You also agree to comply with all of our directions for returning or disposing of Personal Information, in any form, in your possession or the possession of any of your employees. We may require you to certify in writing that you have returned or securely disposed of all Personal Information.

## 15D. OUR RIGHT TO PURCHASE YOUR STORE(S).

We have the option to purchase any Termination Store upon the occurrence of a Termination Event. We may exercise this option by giving you written notice within thirty (30) days after the date of the Termination Event. We have the unrestricted right to assign this option to a third party purchase. If we purchase any Termination Store, we are entitled to all customary warranties and representations in our asset purchase, including representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities affecting the assets, contingent or otherwise.

If we elect to purchase any Termination Store, and you lease the respective Premise(s) from an unaffiliated lessor, you agree, at our election to (i) assign the Lease to us, (ii) enter into a sublease with us for the remainder of the Lease term on the same terms (including renewal options) as the Lease, or (iii) lease the Premise(s) to us for an initial term of five (5) years with, at our option, up to three (3) additional terms of five (5) years each on commercially reasonable terms.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

We (or our assignee) will pay the purchase price for the Termination Store(s) and/or Premise(s) that we elect to purchase (calculated as described below) at the closing, which will take place not later than sixty (60) days after the purchase price is determined, although we (or our assignee) may decide after the purchase price is determined not to purchase the Termination Store(s). You acknowledge and agree that we may set off against the purchase price, and reduce the purchase price by, any and all amounts you or your owners owe us or our Affiliates. You acknowledge and agree that you approve the amount of the purchase price. At the closing, you agree to deliver instruments transferring to us (or our assignee):

(1) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and other transfer taxes paid by you;

(2) all of the licenses and permits for any of the Termination Store(s) which may be assigned or transferred; and

(3) the leasehold interest (as applicable) in the respective Premise(s), and a lease assignment or lease or sublease, as applicable, for Your Store(s) that we are purchasing.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, we and you may elect to close the sale through an escrow. You and your owners further agree to execute general releases, in a form satisfactory to us, of any and all claims against us and our owners, officers, managers, employees, agents, successors and assigns.

If we purchase any Termination Store upon a Termination Event, the purchase price for such Termination Store will be its book value, provided that these items will not include any value for the rights granted by this Agreement, any goodwill attributable to our Marks, brand image, and other intellectual property, or any participation in the network of Stores. We may exclude from the assets purchased any Operating Assets and supplies that are not reasonably necessary (in function or quality) to the operation of the purchased Termination Store or that we have not approved as meeting System Standards, and the purchase price will reflect these exclusions.

## 15E. NON-INTERFERENCE.

Upon the occurrence of a Termination Event, you and your owners, investors, partners, directors and/or officers agree that, for two (2) years beginning on the date of the Termination Event, or the date on which all persons restricted by this Section begin to comply with this Section, whichever is later, neither you nor any of your owners (or their immediate family members) will interfere, or attempt to interfere with our or our Affiliates' relationships with any customers, vendors, franchisees or consultants.

## 15F. NON-DISPARAGEMENT.

For two (2) years beginning on the date of the Termination Event, You shall not (and to use your best efforts to cause your current and former owners, investors, partners, directors and/or officers not to) (i) disparage or otherwise speak or write negatively, directly or indirectly, of us, our Affiliates, any of our or our Affiliates' directors, officers, employees, representatives or affiliates, the "HEYTEA" brand, the Franchise System, any Heytea Store, any business using the Marks, or (ii) take any other action which would, directly or indirectly, subject the

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

"HEYTEA" brand to ridicule, scandal, reproach, scorn, or indignity, or which would negatively impact the goodwill of us or the "HEYTEA" brand.

## 15G.  CONTINUING OBLIGATIONS.

All of our and your (and your owners, investors, partners, directors and/or officers') obligations which expressly or by their nature survive this Agreement's expiration or termination will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

## 16.  <u>RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.</u>

## 16A.  INDEPENDENT CONTRACTORS.

You and we understand and agree that each of us is an independent business and that you and we are and will be independent contractors. This Agreement does not create a fiduciary relationship between you and us, and that nothing in this Agreement is intended to make either you or us a general or special agent, joint ventures, partner, or employee of the other for any purpose.  You agree to identify yourself conspicuously to all Persons (including customers, Suppliers, public officials, and employees of Your Franchise Business) as the owner of Your Franchise Business and indicate clearly that you operate Your Franchise Business separately and independently from our business operations. Upon our request, you shall place notices of independent ownership on all interior and exterior signage, forms, business cards, stationery, advertising, and other materials that we may require from time to time. You may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in our name or on our behalf or represent that your and our relationship is anything other than franchisor and franchise owner.

We have no right or duty to direct your employees in the course of their employment for you. You are solely responsible for the terms and conditions of employment of your employees. We will not be obligated for any damages to any person or property directly or indirectly arising out of your operation of Your Franchise Business.

## 16B.  NO LIABILITY FOR ACTS OF OTHER PARTY.

We and you may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other or represent that our respective relationship is other than franchisor and franchise owner. We will not be obligated for any damages to any person or property directly or indirectly arising out of your operation of Your Franchise Business or the business you conduct under this Agreement.

## 16C.  TAXES.

We will have no liability for any sales, use, service, occupation, excise, gross or net revenue, income, property, or other taxes, whether levied on you or Your Franchise Business, due to the business you conduct (except for our income taxes). Subject to Section 3.J, you are

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

responsible for paying for any sales, use, service, occupation, excise, gross revenue, income, property, or other taxes, whether levied on you or Your Store(s), or arising from the operation of your Franchise Business (except for our income taxes).

## 16D.  INDEMNIFICATION.

You agree to indemnify, defend, and hold harmless the Indemnified Parties against, and to reimburse any one or more of the Indemnified Parties for, all Claims, obligations, and damages directly or indirectly arising out of your operation of Your Franchise Business, the business you conduct under this Agreement, or your breach of this Agreement, including those alleged to be or found to have been caused by the Indemnified Party's gross negligence or willful misconduct, unless (and then only to the extent that) the Claims, obligations, or damages are determined to be caused solely by our gross negligence or willful misconduct in a final, unappealable ruling issued by a court with competent jurisdiction or arbitrator. Each Indemnified Party may, in its discretion and at your expense, control the defense of any Claim against it (including choosing and retaining its own legal counsel), agree to settlements of Claims against it, and take any other remedial, corrective, or other actions in response to such Claims.

This indemnity will continue in full force and effect subsequent to and notwithstanding any Termination Event. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a Claim for indemnity under this Section. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover under this Section.

## 16E. REPRESENTATIONS AND WARRANTIES.

You represent and warrant as follows:

   (1) you are not currently a party to or subject to any contract or agreement, including any other franchise agreement, employment agreement or any covenant not to compete which would directly or indirectly be breached by entering into this Agreement or which would directly or indirectly prohibit or restrict Franchisee's signing of this Agreement or performance thereunder;

   (2) you are executing this Agreement and purchasing the license herein for your own account and not as an agent or representative of another (unless for an Entity otherwise named herein and in compliance herewith);

   (3) you intend to be actively involved in the Your Franchised Business for the entire term of this Agreement and knows of no reason that you might become a passive owner;

   (4) you are basing your decision to purchase this franchise, in full, upon statements and representations contained in this Agreement and our Franchise Disclosure Document and upon facts obtained pursuant to your own investigation.  You are not relying upon any statements or any information received either directly or indirectly from us or any person acting or purporting to act on behalf of us which information or statements are not contained in this Agreement or our Franchise Disclosure Document or otherwise in writing

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

and signed by an officer of us.  You have not received any earnings claims or financial performance information, directly or indirectly, from us excepting only such information as may be contained in our Franchise Disclosure Document;

(5) you have not terminated and will not terminate your existing employment or cease any other income-producing activity until after franchisee has an approved location, has successfully completed the Initial Training, and is open for business.  If you elect, notwithstanding this sub-paragraph to terminate employment or income-producing activity, you knowingly assume the risk of loss of income and does so contrary to our advice.

(6) you received our Franchise Disclosure Documents at least 14 days before the earlier of the date on which you (i) signed this Agreement or any related agreement or (ii) paid any consideration in connection with the sale or proposed sale of a Heytea Store;

(7) you have read and understood this Agreement and have had opportunity to consult with an attorney and other advisors of your own choosing about the potential benefits and risks of entering into this Agreement.  You acknowledge that we have so advised you;

(8) All statements you have made and all materials and information you have submitted to us in connection with your application for and purchase of the franchise are accurate and complete and you have not made any misrepresentations to us or omitted disclosing any material information to us; and

(9) you (if you are an Entity) are duly organized, validly existing and in good standing under the laws of formation and have requisite corporate power, authority to execute and deliver this Agreement and to perform obligations hereunder.

## 17.  <u>ENFORCEMENT.</u>

## 17A. SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS.

Except as expressly provided to the contrary in this Agreement, each section, paragraph, term, and provision of this Agreement is severable, and if any part of this Agreement is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation for any reason (in a final, unappealable ruling issued by any court, agency, or tribunal with competent jurisdiction), that ruling will not impair the operation of, or otherwise affect, any other portions of this Agreement, which will continue to have full force and effect and bind the parties.

If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.

If any applicable and binding law or rule of any jurisdiction requires more notice of this Agreement's termination or of our refusal to enter into a successor franchise agreement, than this

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

Agreement requires, or some other action that this Agreement does not require, or if any provision of this Agreement or any System Standard is invalid, unenforceable, or unlawful, the notice and/or other action required by the law or rule will be substituted for the comparable provisions of this Agreement, and we may modify the invalid or unenforceable provision or System Standard to the extent required to be valid and enforceable or delete the unlawful provision in its entirety. You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

## 17B.  WAIVER OF OBLIGATIONS.

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction on the other under this Agreement, effective on delivery of written notice to the other or another effective date stated in the notice of waiver.  Any waiver granted will be without prejudice to any other rights we or you have, will be subject to continuing review, and may be revoked at any time and for any reason effective on delivery of ten (10) days' prior written notice.

We and you will not waive or impair any right, power, or option this Agreement reserves (including our right to demand exact compliance with every term, condition, and covenant or to declare any breach to be a default and to terminate this Agreement before its term expires) because of any custom or practice at variance with this Agreement's terms; our or your failure, refusal, or neglect to exercise any right under this Agreement or to insist on the other's compliance with this Agreement, including any System Standard; our waiver of or failure to exercise any right, power, or option, whether of the same, similar, or different nature, with other Stores; the existence of franchise agreements for other Stores which contain provisions different from those contained in this Agreement; or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement, or accord and satisfaction. We are authorized to remove any legend or endorsement, which then will have no effect.

Neither we nor you will be liable for loss or damage or be in breach of this Agreement if our or your failure to perform our or your obligations results from: (i) compliance with the orders, requests, regulations, or recommendations of any federal, state, or municipal government; (ii) acts of God; (iii) fires, strikes, embargoes, war, acts of terrorism or similar events, or riot; or (iv) any other similar event or cause. Any delay resulting from any of these causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that these causes will not excuse payments of amounts owed at the time of the occurrence or payment of Royalties or Marketing Spending due afterward.

## 17C.  COSTS AND ATTORNEYS' FEES.

The prevailing party in any arbitration or litigation arising out of or relating to this Agreement shall be entitled to recover from the other party all damages, costs and expenses, including arbitration and court costs and reasonable attorney's fees, incurred by the prevailing party in successfully enforcing any provision of this Agreement.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## 17D.  RIGHTS OF PARTIES ARE CUMULATIVE.

Our and your rights under this Agreement are cumulative, and our or your exercise or enforcement of any right or remedy under this Agreement will not preclude our or your exercise or enforcement of any other right or remedy which we or you are entitled by law to enforce.

## 17E.  ARBITRATION.

Subject to the provisions in the Washington Franchise Agreement Addendum as attached in **Exhibit G** hereto, We and You agree that all controversies, disputes, or claims between us or any of our Affiliates, and our and their respective shareholders, officers, directors, agents, and employees, on the one hand, and you (and your owners, guarantors, affiliates, and employees), on the other hand, arising out of or related to: (i) this Agreement or any other agreement between you (or any of your owners) and us (or any of our Affiliates); (ii) our relationship with you; (iii) the scope or validity of this Agreement or any other agreement between you (or any of your owners) and us (or any of our Affiliates) or any provision of any of such agreements (including the validity and scope of the arbitration provision under this Section, which we and you acknowledge is to be determined by an arbitrator, not a court); or (iv) any System Standard, must be submitted for binding arbitration, on demand of either party, to SCIA . The arbitration proceedings will be conducted by one arbitrator and, except as this Section otherwise provides, according to the then-current arbitration rules of the SCIA. All proceedings will be conducted at a location in city of Shenzhen, Guangzhou province, China. The interim and final awards of the arbitrator shall be final and binding upon each party, and judgment upon the arbitrator's awards may be entered in any court of competent jurisdiction.

The arbitrator has the right to award or include in his or her awards any relief which he or she deems proper, including, without limitation, money damages, pre- and post-award interest, interim costs and attorneys' fees, specific performance, and injunctive relief, provided that the arbitrator may not declare any of the trademarks owned by us or our Affiliates generic or otherwise invalid, or award any punitive or exemplary damages against any party to the arbitration proceeding (we and you hereby waiving to the fullest extent permitted by law any such right to or claim for any punitive or exemplary damages against any party to the arbitration proceeding). Further, at the conclusion of the arbitration, the arbitrator shall award to the prevailing party its attorneys' fees and costs.

We and you agree to be bound by the provisions of any applicable contractual or statutory limitations provision, whichever expires earlier. We and you further agree that, in any arbitration proceeding, each party must submit or file any claim which would constitute a compulsory counterclaim within the same proceeding. Any claim which is not submitted or filed as required will be forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us.

WE AND YOU AGREE THAT ARBITRATION WILL BE CONDUCTED ON AN INDIVIDUAL BASIS AND THAT AN ARBITRATION PROCEEDING BETWEEN US AND ANY OF OUR AFFILIATES, OR OUR AND THEIR RESPECTIVE SHAREHOLDERS,

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

OFFICERS, DIRECTORS, AGENTS, AND EMPLOYEES, ON THE ONE HAND, AND YOU OR YOUR OWNERS, GUARANTORS, AFFILIATES, AND EMPLOYEES, ON THE OTHER HAND, MAY NOT BE: (I) CONDUCTED ON A CLASS-WIDE BASIS, (II) COMMENCED, CONDUCTED OR CONSOLIDATED WITH ANY OTHER ARBITRATION PROCEEDING, (III) JOINED WITH ANY SEPARATE CLAIM OF AN UNAFFILIATED THIRD-PARTY, OR (IV) BROUGHT ON YOUR BEHALF BY ANY ASSOCIATION OR AGENT. Notwithstanding the foregoing, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute, controversy or claim that otherwise would be subject to arbitration under this Section, then all parties agree that this arbitration clause shall not apply to that dispute, controversy or claim and that such dispute, controversy or claim shall be resolved in a judicial proceeding in accordance with the dispute resolution provisions of this Agreement.

We and you agree that, in any arbitration arising as described in this Section, the arbitrator shall have full authority to manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute. The parties may only serve reasonable requests for documents, which must be limited to documents upon which a party intends to rely or documents that are directly relevant and material to a significant disputed issue in the case or to the case's outcome. The document requests shall be restricted in terms of time frame, subject matter and Persons to which the requests pertain, and shall not include broad phraseology such as "all documents directly or indirectly related to." You and we further agree that no interrogatories or requests to admit shall be propounded, unless the parties later mutually agree to their use.

With respect to any discovery of electronically stored information, you and we agree that such requests must balance the need for production of electronically stored information relevant and material to the outcome of a disputed issue against the cost of locating and producing such information. You and we agree that:
(1) production of electronically stored information need only be from sources used in the ordinary course of business. No party shall be required to search for or produce information from back-up servers, tapes, or other media;
(2) the production of electronically stored information shall normally be made on the
(3) basis of generally available technology in a searchable format which is usable by the party receiving the information and convenient and economical for the producing party. Absent a showing of compelling need, the parties need not produce metadata, with the exception of header fields for email correspondence;
(4) the description of custodians from whom electronically stored information may be collected shall be narrowly tailored to include only those individuals whose electronically stored information may reasonably be expected to contain evidence that is relevant and material to the outcome of a disputed issue;
(5) the parties shall attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters; and
(6) where the costs and burdens of electronic discovery are disproportionate to the nature of the dispute or to the amount in controversy, or to the relevance of the materials requested, the arbitrator shall either deny such requests or order disclosure on condition

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

that the requesting party advance the reasonable cost of production to the other side, which cost advance will not be awarded to the prevailing party in any final award.

In any arbitration each side may take no more than three depositions, unless the parties mutually agree to additional depositions. Each side's depositions are to consume no more than a total of 15 hours, and each deposition shall be limited to 5 hours, unless the parties mutually agree to additional time.

The provisions of this Section are intended to benefit and bind certain third-party non-signatories. The provisions of this Section will continue in full force and effect subsequent to and notwithstanding any Termination Event.

Any provisions of this Agreement below that pertain to judicial proceedings shall be subject to the agreement to arbitrate contained in this Section.

Both We and You irrevocably agree that the arbitration is the exclusive dispute resolution mechanism between the parties and a litigation shall not be used to solve any disputes concerning, in connection with, or arising out of this Agreement.

## 17F. GOVERNING LAW.

SUBJECT TO THE PROVISIONS OF THE WASHINGTON FRANCHISE INVESTMENT PROTECTION ACT, CHAPTER 19.100 REVISED CODE OF WASHINGTON, THIS AGREEMENT, THE FRANCHISE, AND ALL CLAIMS ARISING FROM THE RELATIONSHIP BETWEEN US AND YOU WILL BE GOVERNED BY LAWS OF PEOPLE'S REPUBLIC OF CHINA, WITHOUT REGARD TO ITS CONFLICT OF LAWS RULES, EXCEPT THAT ANY STATE OR NATIONAL LAW REGULATING THE OFFER OR SALE OF FRANCHISES OR GOVERNING THE RELATIONSHIP OF A FRANCHISOR AND ITS FRANCHISEE WILL NOT APPLY UNLESS ITS JURISDICTIONAL REQUIREMENTS ARE MET INDEPENDENTLY WITHOUT REFERENCE TO THIS SECTION.

## 17G. CONSENT TO JURISDICTION.

SUBJECT TO SECTION 17E ABOVE AND THE PROVISIONS BELOW, WE AND YOU AND YOUR OWNERS AGREE THAT ALL ACTIONS ARISING UNDER THIS AGREEMENT OR OTHERWISE AS A RESULT OF THE RELATIONSHIP BETWEEN YOU AND US MUST BE COMMENCED IN SHENZHEN, CHINA AND WE AND YOU AND EACH OWNER IRREVOCABLY WAIVE ANY OBJECTION TO EITHER THE JURISDICTION OF OR VENUE IN SHENZHEN, CHINA. NONETHELESS, WE AND YOU AND YOUR OWNERS AGREE THAT ANY OF US MAY ENFORCE ANY ARBITRATION ORDERS AND AWARDS IN ANY COURTS HAVING JURISDICTION.

## 17H. WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

EXCEPT FOR YOUR OBLIGATION TO INDEMNIFY US FOR THIRD PARTY CLAIMS UNDER SECTION 16.D, WE AND YOU (AND YOUR OWNERS) WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN US AND YOU, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

WE AND YOU IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER OF US.

## 17I. BINDING EFFECT.

This Agreement is binding on us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns, and successors in interest. Subject to our right to modify the Operations Manual and System Standards, this Agreement may not be modified except by a written agreement signed by both our and your duly-authorized officers.

## 17J. LIMITATIONS OF CLAIMS AND CLASS ACTION BAR.

SUBJECT TO WASHINGTON FRANCHISE INVESTMENT PROTECTION ACT AND OTHER CIRSUMATNCES AS PROVIDED IN THE WASHINGTON FRACNHISE AGREEMENT ADDENDUM AS ATTACHED IN **EXHIBIT G** HERETO, EXCEPT FOR CLAIMS ARISING FROM YOUR NON-PAYMENT OR UNDERPAYMENT OF AMOUNTS YOU OWE US, ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR OUR RELATIONSHIP WITH YOU WILL BE BARRED UNLESS A JUDICIAL OR ARBITRATION PROCEEDING IS COMMENCED IN ACCORDANCE WITH THIS AGREEMENT WITHIN TWO (2) YEARS FROM THE DATE ON WHICH THE PARTY ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIMS.

NO PREVIOUS COURSE OF DEALING SHALL BE ADMISSIBLE TO EXPLAIN, MODIFY, OR CONTRADICT THE TERMS OF THIS AGREEMENT. NO IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING SHALL BE USED TO ALTER THE EXPRESS TERMS OF THIS AGREEMENT.

## 17K. CONSTRUCTION.

The preambles and exhibits are a part of this Agreement which, together with the System Standards contained in the Operations Manual (which may be periodically modified, as provided in this Agreement) and the related documents, constitutes our and your entire agreement, and there are no other oral or written understandings or agreements between us and you, or oral or written representations by us, relating to the subject matter of this Agreement, the franchise relationship, or Your Franchise Business. Any understandings or agreements reached, or any representations made, before this Agreement are superseded by this Agreement. Nothing in this or in any

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

related agreement, however, is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you.

Any policies that we adopt and implement from time to time to guide us in our decision-making are subject to change, are not a part of this Agreement, and are not binding on us.

Except as expressly provided in this Agreement, nothing in this Agreement is intended or deemed to confer any rights or remedies on any Person not a party to this Agreement.

Except where this Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed, initiated, or completed actions that require our approval. The headings of the sections and paragraphs are for convenience only and do not define, limit, or construe the contents of these sections or paragraphs.

References in this Agreement to "we," "us," and "our," with respect to all of our rights and all of your obligations to us under this Agreement, include any of our Affiliates with whom you deal.

If two or more Persons are at any time the owners of Your Franchise Business, whether as partners or joint ventures, their obligations and liabilities to us will be joint and several.

In the case of a proposed transfer of an ownership interest in you or one of your owners, the determination of whether a Controlling Ownership Interest is involved must be made as of both immediately before and immediately after the proposed transfer to see if a Controlling Ownership Interest will be transferred (because of the number of owners before the proposed transfer) or will be deemed to have been transferred (because of the number of owners after the proposed transfer).

Unless otherwise specified, all references to a number of days shall mean calendar days and not business days.

## 18. DELEGATION OF PERFORMANCE.

You agree that we have the right to delegate the performance of any portion or all of our obligations under this Agreement to third party designees, whether these designees are our agents or independent contractors with whom we have contracted to perform these obligations. If we do so, such third-party designees will be obligated to perform the delegated functions for you in compliance with this Agreement.

## 19. NOTICES AND PAYMENTS.

All written notices, reports, and payments permitted or required to be delivered by this Agreement or the Operations Manual will be deemed to be delivered: (i) at the time delivered by hand, (ii) at the time delivered via electronic or facsimile transmission, or (iii) ten (10) business day after being placed in the hands of a nationally recognized commercial courier service for

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

next business day delivery such as DHL or Fedex. Any notice must be sent to the party to be notified at its most current principal business address of which the notifying party has notice; except that, it will always be deemed acceptable to send notice to you at the address of the Premise(s). Any required payment or report we do not actually receive during regular business hours on the date due will be deemed delinquent.

## 20.    BUSINESS JUDGMENT.

We retain the right to operate, develop and change the Franchise System and the products and services offered by Heytea Stores in any manner that is not specifically prohibited in this Agreement or applicable laws. Whenever we have reserved the right in this Agreement to take or refrain from taking any action, or to prohibit you from taking or refraining from any action, we may, except as otherwise specifically provided in this Agreement or applicable laws, make our decision or exercise our rights in our sole and unfettered discretion, based on the information then readily available to us and on our judgment of what is in our best interests, the best interests of our Affiliates and/or the best interests of Heytea Stores as a whole at the time the decision is made, regardless of whether we could have made other reasonable, or even arguably preferable, alternative decisions and regardless of whether our decision or action promotes our interests, those of our Affiliates or any other Person.

## 21.    EXECUTION

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. This Agreement and all other documents related to this Agreement may be executed by manual or electronic signature. Either party may rely on the receipt of a document executed or delivered electronically, as if an original had been received.

## 22.    DEFINITIONS

"**Additional Stores**" – Any Stores we approve you to own and operate in addition to the Store(s) you are required to operate upon the Effective Date of this Agreement. You must sign the Franchise Agreement Supplement prior to us granting you the right to operate Additional Stores.

"**Advertising Program**" – A planned and systematic campaign of advertising activities aimed at promoting any and all HEYTEA product or service, attracting target audiences, and enhancing brand awareness required by us.

"**Advertising Program Contribution**" – The amount of money we require you to contribute to your Advertising Program.

"**Agreement**" – This Franchise Agreement.

"**Affiliate**" – Any Person which is directly or indirectly owned or controlled by, under common control with, or owning or controlling you or us.

"**Assistant's Expenses**" – All travel/transportation and living expenses and out-of- pocket costs we incur in sending our assistance staff member(s) to Your Store(s), including, food, lodging, transportation, mobile communication fees and assistant's fee to be mutually determined by you and us in good faith.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

"**Claims**" – All obligations, leases, damages (actual, consequential or otherwise), causes of action, and costs that any Indemnified Party reasonably incurs in defending any claim against it, including reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration or alternative dispute resolution is commences.

"**Competitive Business**" – Any business (excluding any Heytea Stores operated under a franchise agreement with us or our Affiliate), which operates, or grants franchises or licenses to others to operate, any business (including retail businesses) principally engaged in the offer and sale of boba tea, bubble tea, brewed tea, milk tea, fruit tea, coffee, Cheezo tea, Cheese tea, Cheezo coffee, Cheese coffee, juices, bottled drinks, pre-packaged food, pastries, smoothies, other hot and cold beverages and/or any other products or services that are being offered by Heytea Stores.

"**Computer System**" – The computer hardware, sales and scheduling software, point-of- sale system and/or other operating software we specify from time to time, in our Operations Manual or otherwise.

"**Confidential Information**" – All information relating to the establishment, operation and franchising of the Heytea Stores that we may from time to time furnish to you including but not limited to: trade secrets; potential location plans, business statistics, profits, financial data, marketing plans, business strategies; proprietary recipes, formulas and mixtures, cooking, specification and preparation processes relating to all of our products and services; Store performance information, customer lists and related data techniques, processes, instructional materials and curricula, policies, procedures, systems, data, and know-how; training and operations materials, including the Operations Manual; the System Standards; market research, promotional, marketing and advertising strategies; layout, designs and strategic plans; knowledge of specifications, lists, terms and pricing information relating to Suppliers, Operating Assets and other products and supplies; computer software or similar technology that is proprietary to the Franchise System; knowledge of operating results and financial performance of Stores other than your own; any information generated by, used or developed in Your Franchise Business; and any other information we designate or reasonably treated as confidential or proprietary.

"**Control**" – The power to direct or cause the direction of management and policies of Your Franchise Business.

"**Controlling Owner**" – Any owner who has a majority and controlling interest in you (if you are an Entity).

"**Controlling Ownership Interest**" – The percent of the voting shares or other voting rights that result from dividing one hundred percent (100%) of the ownership interest by the number of owners.

"**Designated Store Manager**" – One or more individuals appointed to supervise a Store on a daily basis.

"**Designated Shift Manager**" - One or more individuals appointed to assist the Designated Store Manager in the supervision a Store on a daily basis.

"**Staff**" - One or more individuals working for any of the Store(s) under the supervision of an Operating Partner, Designated Store Manager and/or Designated Shift Manager.

"**Development Schedule**" – The schedule identified on **Exhibit B** designating the deadlines by which you must develop and open Your Store(s).

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D28CA744E

"**Development Territory**" – The geographic area specified on **Exhibit B**, in which we limit you to develop and open Your Store(s).

"**Disability**" – A mental or physical disability, impairment, or condition that is reasonably expected to prevent or actually does prevent your Operating Partner or such Controlling Owner from supervising the management and operation of Your Franchise Business.

"**Effective Date**" – The date indicated on the cover page of this Agreement.

"**Entity**" – A corporation, limited liability company, or general or limited partnership.

"**Essential Ingredients**" – The products or services that we deem, in our sole discretion, to be essential ingredients to Your Franchise Business and to the approved products and services you offer for sale at each of Your Heytea Store. Please see our list of Essential Ingredients at **Exhibit ___**.

"**Franchise Agreement Supplement**" – A supplementary agreement to the Franchise Agreement, which you must execute in order to operate Additional Stores.

"**Franchise System**" – The distinctive business formats, business system, methods, procedures, signs, designs, layouts, standards, specifications we authorize for any and all to use in connection with the operation of Stores, and the Marks, all of which we may improve, further develop, or otherwise modify from time to time.

"**Franchise System Website**" – Any website(s), including www.heytea.com, www.haycha.com or other Online Presence we may establish, acquire, or host to advertise, market and promote Stores, offer and sell the products and services and/or a Store franchise opportunity.

"**Indemnified Parties**" – Us, our Affiliates, and our and their respective owners, managers, directors, officers, employees, consultants, agents, advisors, successors, and assignees.

"**Initial Franchise Fee**" – A nonrecurring initial franchise fee that you must pay to us in the amount set out in **Exhibit E**. This Initial Franchise Fee is fully earned and payable when you execute this Agreement and shall be non-refundable under any circumstances.

"**Initial On-Site(s) Assistance**" – Advice, guidance and on-site operations support we will provide you for Your Store(s), as described in Section 4.B.

"**Initial Service Fee**" – A nonrecurring and non-refundable initial service fee in addition to the Initial Franchise Fee that you must pay to us in the amount set out in **Exhibit E** as consideration for all Services we provide to you prior to the opening of any of Your Store(s), including (a) Premise selection; (b) design of your Premises; (c) installation of Computer Systems and maintenance during the Term; and (d) Initial Training Program provided to personnel designated by you in accordance with the terms set forth in this Agreement.

"**Initial Training Program**" – The training we provide in the material aspects of operating a Store to your personnel, as described in Section 4.A.

"**Lease**" – Any lease, sublease or other documents you sign to obtain the Premise(s) for Your Store(s).

"**Legal Processing Fee**" – A nonrecurring fee that you must pay to us upon execution of any amendment to the Agreement, the Franchise Agreement Supplement or any other agreements related thereto that you have requested in the per-instance amount set out in **Exhibit E**.

"**Marks**" – The trademarks, service marks, commercial marks and other commercial symbols we authorize Heytea Stores to use.

"**Marketing Spending**" – The amount we require you to spend on advertising programs, which shall be a minimum of Twenty Thousand Dollars ($20,000) during the first 12 months of the

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

Term and a minimum of Ten Thousand Dollars ($10,000) per annum for the remainder of the Term.  We reserve right to adjust our fees from time to time.

"**Net Sales**" – All revenue or consideration that you generate, directly or indirectly, from operating Your Franchise Business, including, all revenue or consideration you receive at or away from the Premise(s), and whether from cash, check, credit and debit card, barter exchange, trade credit, or other credit transactions after deducting all sales returns, allowances and discounts expressly allowed under this Agreement and the Operations Manual. Net Sales DOES NOT include any and all applicable sales, use or service taxes collected from customers and paid to the appropriate taxing authority. There will be no deductions to Net Sales for (a) uncollected or uncollectible accounts, or (b) any service fee, delivery fee, payment channel fee or processing fee arising from delivery sales.

"**Online Presence**" – Any website, domain name, email addresses, social media accounts, user name, other online presence or presence on any electronic medium of any kind.

"**On-Site Assistance Fee**" - Fee calculated on a per trainer per day basis as set out in **Exhibit E** for any training or assistance (other than the Initial Training Program) held on site at your request and as approved by us.

"**Operating Assets**" – The fixtures, furniture, equipment, components of the Computer System, furnishings, and signs that we approve as meeting our specifications and standards for quality, design, appearance, function, and performance.

"**Operating Partner**" – A natural person who we approve and who: (a) owns at least 10% ownership and voting interest in you, (b) agrees to devote a reasonable amount of his or her time and efforts to the operation, promotion and enhancement of the business under this Agreement, and (c) has the authority to and takes the responsibility to deal with us on your behalf in respect of all matters whatsoever which may arise in respect of this Agreement.

"**Operations Manual**" – The manual containing our mandatory and suggested specifications standards, operating procedures and rules that we prescribe for operating Stores. The Operations Manual also may include one or more separate manuals, as well as audiotapes, videotapes, compact discs, computer software, information available on any Online Presence, other electronic media, bulletins and/or other written materials.

"**Our Successor Notice**" – A written notice of whether to grant or not grant you a successor franchise.

"**Owner**" – Any Person who holds a direct or indirect ownership interest (whether of record, beneficially, or otherwise) or voting rights in you (or a transferee of this Agreement and Your Franchise Business or an ownership interest in you), including any Person who has a direct or indirect interest in you (or a transferee), this Agreement or Your Franchise Business and any Person who has any other legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets.

"**Person**" – Any natural person, Entity, unincorporated association, cooperative, or other legal or functional entity.

"**Personal Information**" – Any information that can be used to identify an individual, including names, addresses, telephone numbers, e-mail addresses, employee identification numbers, signatures, passwords, financial information, credit card information, biometric or health data, government-issued identification numbers and credit report information.

"**Premise(s)**" – The site on which you operate a Store.

"**Prohibited Activity Fee**" - A fee in the amount set out in **Exhibit E**, calculated on a per instance basis.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

"**Royalty**" – A fee equal to three percent (3%) of the preceding month's Net Sales during the Term.

"**Relocation Fee**" – A fee in the amount set out in **Exhibit E** for the services we provide in connection with your relocation, including reviewing and approving a new site and assisting with the design and construction of the new site.

"**SCIA**" – Shenzhen Court of International Arbitration.

"**Security Deposit**" – A deposit in the amount set out in **Exhibit E**, which is fully refundable to you with no interest within 30 days of expiry of the Term should you be in compliance with all terms and conditions of any agreement you have with us or our Affiliates.

"**Services**" - Any of the following services provided by us to Your Franchise Business, including (a) research and development of new products and recipes, including related training, or adjustments to recipes of existing products according to seasonal variation and changes to market preferences with respect to key ingredients, including any Essential Ingredients; (b) supervisory and daily operation guidance service, including human resource management ,workflow management optimization; (c) IT system maintenance and upgrades (including ordering system, marketing and sales system, store management and supply chain system); (d) general marketing service, including brand promotion like IP co-branding, and national or regional marketing campaign）(e) research and development of standardized equipment, including any Operating Assets to improve capabilities of Your Franchise Business to deliver standardized products;

"**Service Fee**" – A fee paid by you for the Services we provide (excluding Initial Service Fee). Based on the Services we provided, the Service Fee shall be equal to four percent (4%) of the preceding months' Net Sales accrued as consideration for the Services provided by us.

"**Site(s) Documents**" – The documents we require before we countersign any Store Rider, which typically include necessary permits and certificates to operate the Store, insurance documents, a self-audit checklist and a copy of the Lease.

"**Site(s) Evaluation Report**" – A form we may prescribe to you, containing information that supports your selection of a proposed site for the Premise(s).

"**Store Rider**" – A form attached to this Agreement as **Exhibit C**, and which must be executed by the parties prior to opening Your Store(s). Our counter-signed Store Rider represents our approval for the Premise(s) of Your Store(s).

"**Heytea Stores**" – The distinctive retail store and café concept offering boba tea, bubble tea, brewed tea, milk tea, fruit tea, coffee, Cheezo tea, Cheese tea, Cheezo coffee, Cheese coffee, juices, bottled drinks, pre-packaged food, pastries, smoothies, other hot and cold beverages and related products under the Marks.

"**Subsequent Franchise Fee**" – A nonrecurring subsequent franchise fee in the amount we then require in the amount set out in **Exhibit E** for the right to open Additional Stores as identified on the Franchise Agreement Supplement, which you must pay to us in accordance with the terms of the Franchise Agreement Supplement.

"**Suppliers**" – The manufacturers, distributors and suppliers of products and services to Your Franchise Business that we approve.

"**System Standards**" – The required and suggested specifications, standards, operating procedures, and rules that we periodically prescribe for operating Heytea Stores, including recipes for our principal menu-offerings, such as Operations Menu.

"**Term**" – The term of this Agreement begins on the Effective Date and expires three (3) years from that date, unless sooner terminated pursuant to this Agreement, subject to any succession or extension as expressly permitted under this Agreement.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

"**Termination Event**" – Termination Events include: (i) this Agreement is terminated for any reason, (ii) the Term (including any successor term) expires, or (iii) Your Store(s) has been terminated under this Agreement.

"**Termination Stores**" – Any Stores that we have terminated, which may be all or less than all of Your Stores if you have developed multiple Stores under this Agreement, upon a Termination Event.

"**Your Successor Notice**" – A written notice from you to us of your election to acquire a successor franchise no more than one (1) year and no less than one hundred eighty (180) days before this Agreement expires.

"**Your Franchise Business**" – The business of owning and operating Your Store(s), together with the number of Additional Stores you operate under any Franchise Agreement Supplement, and any other business operations associated with franchise you have been awarded under this Agreement; provided that any other business not expressly permitted by the franchise under this Agreement shall not be Your Franchise Business.

"**Your Store(s)**" – The Store you operate with the Marks in accordance with the terms and conditions under this Agreement, including any Additional Stores you are awarded under any Franchise Agreement Supplement.

[SIGNATURE PAGE TO FOLLOW]

Docusign Envelope ID: 1F10A9C5-4996-488E-9F77-520D28CA744E

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement on the dates noted below, to be effective as of the Effective Date.

**HK HEYCHA LIMITED**
a Hong Kong private company

Sign: _____

Name: 刘智超 | Zhichao Liu

Title: Director

**DATED:** Jul-28-2024

**FRANCHISE OWNER:**   HT Redmond LLC
(Name of Franchisee Entity) _____

993921245

Business Registration: _____

Sign: _____

Name: _____ Yue Zhang

ID or Passport Number: WDL7871CG33B

Title: Owner

**DATED:** Jul-27-2024

61

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## EXHIBIT A
## YOU AND YOUR OWNERS

1. **Form**.
You operate as a: _____ corporation, __X__ limited liability company, or _____ partnership (CHECK ONE).

2. **Formation**.
You were formed on __7/10/2024__(DATE), under the laws of _state of washington_____ (JURISDICTION).

3. **Management**.
The following is a list of your directors, officers, managers or anyone else with a management position or title:

| Name of Individual | Position(s) Held |
|---|---|
| Yue Zhang | Store operator |
| | |
| | |
| | |

4. **Owners**.
The following list includes the full name of each individual who is one of your owners, or an owner of one of your owners, and fully describes the nature of each owner's interest (attach additional pages if necessary):

| Owner's Name | Percentage/Description of Interest |
|---|---|
| Yue Zhang | Owner |
| Yue Deng | Owner |
| | |
| | |
| | |

5. **Operating Partner**.
Name: __YUE Zhang__          Address: 609 4th St Kirkland WA 98033
E-mail Address: Dengzhangcompany@gmail.com
Percentage/Description of Interest in you: 51%
Telephone Number: 5203325686

6. **Name and Address of Designated Store Manager (if applicable)**.
Name:
E-mail Address:_____ Telephone Number:_____

Name:
E-mail Address:_____ Telephone Number:_____

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

**7. Name and Address of Designated Shift Manager (if applicable).**
Name:
E-mail Address:_____   Telephone
Number:_____

Name:
E-mail Address:_____   Telephone
Number:_____

**[HK HEYCHA LIMITED]**
a [Hong Kong private company]
Sign: _____
Name:刘智超 Zhichao Liu
Title: Director
DATED: Jul-28-2024

**FRANCHISE OWNER:**   HT Redmond LLC
(Name of Franchisee Entity) _____
Sign: _____
Name: Yue Zhang
Title: Owner
DATED: Jul-27-2024

63

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## EXHIBIT B
## DEVELOPMENT SCHEDULE

**Your Franchise Business:**
You have acquired a Franchise Business for [1] HEYTEA Store(s)

**Development Territory:**
Your Development Territory is comprised of: ___16595 Redmond Way Suite 165, Redmond, WA 9805___, as depicted on the following map. If the Development Territory is identified by counties or other political subdivisions, political boundaries will be fixed as of the date of this Agreement and will not change, notwithstanding a political reorganization or change to the boundaries or regions.

[INSERT MAP]

**Development Schedule:**
You must open Your Store(s) indicated above according to the schedule below:

First Store: within 180 days after the Effective Date of the Agreement;

Each Subsequent Store: within 180 days after the Effective Date of the applicable Franchise

Agreement Supplement

You acknowledge that you may not open any Stores other than as indicated on this **Exhibit B**, and/or after the expiration of this Development Schedule, without our prior written consent.

**[HK HEYCHA LIMITED]**
a [Hong Kong private company]

Sign: _____
Name: 刘智超 | Zhichao Liu
Title: Director
**DATED:** Jul-28-2024

**FRANCHISE OWNER:** HT Redmond LLC
(Name of Franchisee Entity)
_____

Sign: _____
Name: Yue Zhang
Title: Owner
**DATED:** Jul-27-2024

64

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## EXHIBIT B-1
### FRANCHISE AGREEMENT SUPPLEMENT

**THIS FRANCHISE AGREEMENT SUPPLEMENT** (this **"Supplement"**) is made as of Jul-28-2024 (the **"Supplement Effective Date"**) by and between **[HK HEYCHA LIMITED]**, a [Hong Kong] company, with its principal business address at [Hong Kong] (**"we," "us,"** or **"our"**), and HT Redmond LLC, a LLC whose principal business address is 16595 Redmond Way suite 165, Redmond, WA 98052 ("you" or "your"). Capitalized terms that are used but not defined in this Supplement will have the meanings ascribed to them in the Franchise Agreement.

### RECITALS

A. You and we are parties to that certain Franchise Agreement dated Jul-28-2024 (the **"Franchise Agreement"**), which governs your right to develop and operate one or more "HEYTEA" Store(s) (**"Your Store(s)"**) in the Development Territory.

B. You have requested the right to develop 1 Additional Store(s) pursuant Section 1.C of the Franchise Agreement and we are willing to provide you with this right subject to the terms and conditions of this Supplement.

### AGREEMENT

**FOR AND IN CONSIDERATION** of the foregoing Recitals, the covenants set forth herein and other valuable consideration, receipt and sufficiency of which are hereby acknowledged, we and you agree as follows:

1. **Grant of Right to Develop Additional Store(s)**.  Provided you remain in compliance with the Franchise Agreement, we hereby grant you the right to develop _____ Additional Store(s) in the Development Territory. You acknowledge that our consent is not our representation, express or implied, that the Development Territory can support, or that there are or will be sufficient sites for, the Additional Store(s) you are required to open under this Supplement.   We are relying on your representation that you have conducted your own independent investigation and have determined that you can satisfy the obligation to develop such Additional Store(s) in the Development Territory.

2. **Supplement Development Schedule**.    Section 2.A of the Franchise Agreement requires you to open Your Store(s) as set forth in the Development Schedule attached as **Exhibit B** thereto.   By entering this Supplement, you agree that in addition to Your Store(s) that you develop under the Development Schedule described in **Exhibit B** of your Franchise Agreement, you hereby agree to develop and open the Additional Store(s) described on **Appendix A** of this Supplement (your **"Supplement Development Schedule"**).

3. **Failure to Comply with the Minimum Development Obligation**.    In addition to our rights under Section 14 of the Franchise Agreement, you acknowledge and agree that your failure to develop the Additional Store(s) in the Supplement Development Schedule set forth on **Appendix A** may result in our terminating this Supplement, your Franchise Agreement,  and your right to develop the Additional Store(s).

4. **Subsequent Franchise Fee, Initial Service Fee, Security Deposit**.   You must pay us the non-refundable Subsequent Franchise Fee, the Initial Service Fee and the Security Deposit in accordance with the provisions outlined in **Appendix A** hereto in consideration of our granting you the right to develop Additional Store(s).

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

5. **Release**.    Subject to Washington Franchise Investment Protection Act and other circumstances as provided in the Washington Franchise Agreement Addendum as attached in **Exhibit G** of the Franchise Agreement, You, on behalf of yourself and your affiliates, and your and their respective current and former parents, affiliates, and subsidiaries, and each such foregoing person's or entity's respective agents, spouses, heirs, principals, attorneys, solicitors, owners, officers, directors, employees, representatives, predecessors, successors, and assigns (collectively, the " **Releasing Parties** "), do hereby absolutely and irrevocably release and discharge us and our current or former parents, subsidiaries, and affiliates, and their respective current and former owners, officers, directors, employees, managers, agents, representatives, predecessors, successors, and assigns (the "**Released Parties**"), of and from any and all claims, obligations, debts, proceedings, demands, causes of actions, rights to terminate and rescind, liabilities, losses, damages, and rights of every kind and nature whatsoever (collectively, "**Released Claims**"), whether at law or in equity and known or unknown, suspected or unsuspected, which any of the Releasing Parties had, has, or may have had, in any way arising out of or relating to any relationship or transaction from the beginning of time to the Supplement Effective Date, including, without limitation, any and all Released Claims in any way arising out of or relating to the Franchise Agreement, the relationships created by the Franchise Agreement, or the development, ownership, or operation of any and all of the Stores, or any other agreements entered into between you and us. The Releasing Parties, and each of them on behalf of themselves and the other Releasing Parties, further covenant not to sue any of the Released Parties on any of the Released Claims released by this Section 5, and warrant and represent that they have not assigned or otherwise transferred any Released Claims released by this Section 5.

6. **Miscellaneous**.    The Franchise Agreement shall be amended only in the particulars set forth above. All other provisions of the Franchise Agreement shall continue in full force and effect as set forth therein. The terms of this Supplement form an integral part, and hereby are incorporated into and made a part, of the Franchise Agreement. In the event of a conflict between the terms contained in the Franchise Agreement and this Supplement, the terms and conditions of this Supplement shall govern, control, and supersede any inconsistent or conflicting terms of the Franchise Agreement. This Supplement may be signed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by email is hereby authorized and shall have the same force and effect as an original.

*[SIGNATURE PAGE TO FOLLOW]*

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

**IN WITNESS WHEREOF,** you and we have signed this Supplement on the dates shown below and made effective as of the Supplement Effective Date.

**[HK HEYCHA LIMITED]**
a [Hong Kong private company]

Sign:
Name: 刘智超 | Zhichao Liu
Title: Director
**DATED:** Jul-28-2024

**FRANCHISE OWNER:** HT Redmond LLC
(Name of Franchisee Entity)

Sign:
Name: Yue Zhang
Title: Owner
**DATED:** Jul-27-2024

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## APPENDIX A
## DEVELOPMENT SCHEDULE

**Development Schedule:**

You must open and have in operation the number of Additional Store(s) as indicated on the following schedule:

For Each Additional Store:

within 180 days after the Effective Date of the applicable Supplement

**Subsequent Franchise Fee, Initial Service Fee, Security Deposit:**

For Each Additional Store:

within five (5) days of the effective date of the applicable Supplement by wire transfer of

immediately available funds to an account we designate, or by any other method we specify.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

**EXHIBIT C**
**STORE RIDER**

**THIS STORE RIDER** (this "**Rider**") is made and entered into by and between [**HK HEYCHA LIMITED**], a [Hong Kong] private company ("**we**," "**us**," or "**our**"), and <u>HT Redmond LLC</u>, an <u>LLC</u> ("**you**" or "**your**") as of the Effective Date.

A. You and we are parties to that certain Franchise Agreement dated <u>Jul-28-2024</u> (the "**Franchise Agreement**"), under which we have granted you the right, and you have undertaken the obligation to develop the "HEYTEA" Stores indicated on **Exhibit B** thereto (the "**Stores**").

B. Under the terms of the Franchise Agreement and one or more Franchise Agreement Supplement, under which we have granted you the right, and you have undertaken the obligation to develop the Additional Stores indicated therein (if applicable), you are required to obtain our approval of a proposed site for Your Store(s), secure possession of its site, and execute our current form of Store Rider to confirm each approved and secured site as the Premise(s)s of Your Store(s).

C. You have selected, we have approved, and you have secured the site for Your Store(s), as set forth below.


**AGREEMENT**

**1. Premise(s)**.

You and we hereby acknowledge and agree that the following site will serve as the approved Premise(s) for Your Store(s):

<u>16595 Redmond Way suite 165,</u> Redmond, WA 98052


**2. Development**.

The execution of this Rider is intended solely to satisfy your obligation to secure the Premise(s) for one of Your Stores under the Franchise Agreement or one of the applicable Franchise Agreement Supplement (as applicable). Nothing in this Rider will be deemed to satisfy or waive any of your other obligations under the Franchise Agreement, including your obligation to develop the Premise(s) and to develop and secure sites for all other Stores you have agreed to develop, and to develop and open all of the Stores, in strict compliance with the terms of the Franchise Agreement.


**3. Acknowledgement**.

You acknowledge and agree that we may terminate your right to operate the Store located at the Premise(s) under the terms of the Franchise Agreement, after which the Store operated at the Premise(s) will constitute a Termination Store.

*[Signature page to follow]*

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement on the dates noted below, to be effective as of the Effective Date.

**[HK HEYCHA LIMITED]**
a [Hong Kong private company]

Sign: _____
Name: 刘智超 | Zhichao Liu
Title: Director
**DATED:** Jul-28-2024

**FRANCHISE OWNER:** HT Redmond LLC
**(Name of Franchisee Entity)**

Sign: _____
Name: Yue Zhang
Title: Owner
**DATED:** Jul-27-2024

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## EXHIBIT D
## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This "Agreement" is made and entered into as of ___Jul-28-2024___, 20___, by and among ___HT Redmond LLC___ ("**Franchisee**"), **[HEYTEA ENTITY]**, a [Hong Kong private company] ("**Franchisor**"), and ___Yue Zhang___, being [an employee of Franchisee who will have access to Confidential Information], [an officer], or [a director] or [general partner] or [managing member] or [a third party who will have access to Confidential Information] of Franchisee ("**Covenantor**").

## 1. PREAMBLES.
Franchisor has executed or intends to execute a **"Franchise Agreement"** with Franchisee under which Franchisor grants to Franchisee certain rights with regard to the operation of certain café and retail stores specializing in offering boba tea, bubble tea, brewed tea, milk tea, fruit tea, coffee, Cheezo tea, Cheese tea, Cheezo coffee, Cheese coffee, juices, bottled drinks , pre-packaged food, pastries, smoothies, other hot and cold beverages, packaged snacks and related products under the name "HEYTEA" (each referred to herein as a "**Store**"). Before allowing Covenantor to have access to the Confidential Information and as a material term of the Franchise Agreement necessary to protect Franchisor's confidential know-how and distinctive systems, designs, decor, trade dress, specifications, standards and procedures authorized or required by Franchisor from time to time for use in the operation of any Store, and Franchisor's proprietary rights in and Franchisee's right to use the Confidential Information, Franchisor and Franchisee require that Covenantor enter into this Agreement.

As a condition of Covenantor's employment or continued employment with Franchisee or Covenantor's appointment as a director or officer of Franchisee, or Covenantor's receipt of other compensation from Franchisee and to induce Franchisor to enter into the Franchise Agreement, Covenantor agrees to enter into this Agreement. Due to the nature of Franchisor's and Franchisee's business, any use or disclosure of the Confidential Information other than in accordance with this Agreement will cause Franchisor and Franchisee substantial harm.

## 2. DEFINITIONS.
Certain terms that are capitalized in this Agreement are defined in this section or at the places they first appear.

A. THE TERM **"COMPETITIVE BUSINESS"** AS USED IN THIS AGREEMENT MEANS ANY BUSINESS (EXCLUDING ANY STORES OPERATED UNDER A FRANCHISE AGREEMENT WITH US OR OUR AFFILIATE) OPERATING, OR GRANTING, FRANCHISES OR LICENSES TO OTHERS TO OPERATE, ANY BUSINESS (INCLUDING RETAIL BUSINESSES) PRINCIPALLY ENGAGED IN THE OFFER AND SALE OF BOBA TEA, BUBBLE TEA, BREWED TEA, MILK TEA, FRUIT TEA, COFFEE, CHEEZO TEA, CHEESE TEA, CHEEZO COFFEE, CHEESE COFFEE, JUICES, BOTTLED DRINKS , PRE-PACKAGED FOOD, PASTRIES, SMOOTHIES, OTHER HOT AND COLD BEVERAGES, PACKAGED SNACKS AND/OR ANY OTHER PRODUCTS OR SERVICES THAT ARE BEING OFFERED BY STORES.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

B. THE TERM **"CONFIDENTIAL INFORMATION"** AS USED IN THIS AGREEMENT MEANS CERTAIN CONFIDENTIAL AND PROPRIETARY INFORMATION RELATING TO THE DEVELOPMENT AND OPERATION OF THE STORES, WHICH INCLUDES, BUT IS NOT LIMITED TO: (1) TRAINING AND OPERATIONS MATERIALS, INCLUDING THE OPERATIONS MANUAL; (2) THE SYSTEM STANDARDS AND OTHER METHODS, FORMATS, SPECIFICATIONS, STANDARDS, SYSTEMS, PROCEDURES, SALES AND MARKETING TECHNIQUES, KNOWLEDGE, AND EXPERIENCE USED IN DEVELOPING AND OPERATING STORES; (3) MARKET RESEARCH, PROMOTIONAL, MARKETING AND ADVERTISING STRATEGIES AND PROGRAMS FOR STORES; (4) STRATEGIC PLANS, INCLUDING EXPANSION STRATEGIES AND TARGETED DEMOGRAPHICS; (5) KNOWLEDGE OF, SPECIFICATIONS FOR AND SUPPLIERS OF, AND METHODS OF ORDERING, OPERATING ASSETS AND OTHER PRODUCTS AND SUPPLIES; (6) ANY COMPUTER SOFTWARE OR SIMILAR TECHNOLOGY WHICH IS PROPRIETARY TO FRANCHISOR OR THE FRANCHISE SYSTEM, INCLUDING DIGITAL PASSWORDS AND IDENTIFICATIONS AND ANY SOURCE CODE OF, AND DATA, REPORTS, AND OTHER PRINTED MATERIALS GENERATED BY, THE SOFTWARE OR SIMILAR TECHNOLOGY; (7) KNOWLEDGE OF THE OPERATING RESULTS AND FINANCIAL PERFORMANCE OF ANY STORE; (8) INFORMATION GENERATED BY, OR USED OR DEVELOPED IN, ANY STORE'S OPERATION, INCLUDING INFORMATION RELATING TO CUSTOMERS SUCH AS CUSTOMER NAMES, ADDRESSES, TELEPHONE NUMBERS, E-MAIL ADDRESSES, CREDIT CARD INFORMATION, BUYING HABITS, PREFERENCES, DEMOGRAPHIC INFORMATION AND RELATED INFORMATION, AND ANY OTHER INFORMATION CONTAINED FROM TIME TO TIME IN THE COMPUTER SYSTEM OF ANY STORE; (9) ANY OTHER INFORMATION DESIGNATED AS CONFIDENTIAL OR PROPRIETARY BY FRANCHISOR.

### 3. PROTECTION OF CONFIDENTIAL INFORMATION.

Covenantor agrees to use the Confidential Information only to the extent reasonably necessary to perform his or her duties on behalf of Franchisee taking into consideration the confidential nature of the Confidential Information. Covenantor may disclose the Confidential Information only as agent for Franchisee. Covenantor acknowledges and agrees that neither Covenantor nor any other person or entity will acquire any interest in or right to use the Confidential Information under this Agreement or otherwise other than the right to utilize it as authorized in this Agreement and that the unauthorized use or duplication of the Confidential Information, including, without limitation, in connection with any other business would be detrimental to Franchisor and Franchisee and would constitute a breach of Covenantor's obligations of confidentiality and an unfair method of competition with Franchisor and/or other Stores owned by Franchisor or Franchisees.

Covenantor acknowledges and agrees that the Confidential Information is confidential to and a valuable asset of Franchisor. The Confidential Information will be disclosed to Covenantor solely on the condition that Covenantor agrees to the terms and conditions of this Agreement. Covenantor therefore agrees that during the term of the Franchise Agreement and thereafter, he or she: (1) will not use the Confidential Information in any other business or capacity; (2) will maintain the absolute confidentiality of the Confidential Information; (3) will not make

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

unauthorized copies of any portion of the Confidential Information disclosed or in written form; and (4) will adopt and implement all reasonable procedures prescribed from time to time by Franchisor and Franchisee to prevent unauthorized use or disclosure of or access to the Confidential Information.

Notwithstanding anything to the contrary contained in this Agreement, the restrictions on Covenantor do not apply to (1) disclosure or use of information, methods, or techniques which are generally known and used in the industry (as long as the availability is not because of a disclosure by Covenantor or Covenantor's agents, and such disclosure or use is not otherwise prohibited by this Agreement), provided that Covenantor has first given Franchisor written notice of his or her intended disclosure and/or use; and (2) disclosure of the Confidential Information in legal proceedings when Covenantor is legally required to disclose it, provided that Covenantor has first given Franchisor the opportunity to obtain an appropriate legal protective order or other assurance satisfactory to Franchisor that the information required to be disclosed will be treated confidentially.

### 4. IN-TERM RESTRICTIVE COVENANT.

Covenantor acknowledges and agrees that Franchisor and Franchisee would be unable to protect the Confidential Information against unauthorized use or disclosure and Franchisor would be unable to achieve a free exchange of ideas and information among Stores if persons authorized to use the Confidential Information were permitted to engage in, have ownership interests in or perform services for Competitive Businesses. Covenantor therefore agrees that for as long as Covenantor is (1) a director, officer, general partner, or managing member of Franchisee, (2) an employee of Franchisee who will have access to Confidential Information, or (3) a third party who has been given access to Confidential Information by the Franchisee, Covenantor shall not (i) have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business; or (ii) perform services as a director, officer, member, employee, manager, consultant, representative, agent or otherwise for any Competitive Business. Covenantor further acknowledges that the restrictions contained in this Section will not hinder his or her activities or those of members of his or her immediate family under this Agreement or in general.

### 5. SURRENDER OF DOCUMENTS.

Covenantor agrees that as of the effective date of a Termination Event Covenantor shall immediately cease to use the Confidential Information disclosed to or otherwise learned or acquired by Covenantor and return to Franchisee or to Franchisor if directed by Franchisor all copies of the Confidential Information loaned or made available to Covenantor.

### 7. COSTS AND ATTORNEYS' FEES.

In the event that Franchisor or Franchisee is required to enforce this Agreement in an action against Covenantor, Covenantor shall reimburse Franchisor and/or Franchisee if it/they prevail (whether or not awarded a money judgment) for its/their reasonable attorneys' fees, whether such fees are incurred before, during or after any trial or administrative proceeding or on appeal.

### 8. WAIVER.

Failure to insist upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

relinquishment of any right or remedy hereunder at any one or more times be deemed a waiver or relinquishment of such right or remedy at any other time or times.

## 9. SEVERABILITY.

Each section, paragraph, term and provision of this Agreement and any portion thereof shall be considered severable and if for any reason any such provision is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which Franchisor is a party, that ruling shall not impair the operation of or have any other effect upon such other portions of this Agreement as may remain otherwise intelligible. Such other portions shall continue to be given full force and effect and bind the parties hereto. Any portion held to be invalid shall be deemed not to be a part of this Agreement from the date the time for appeal expires if Covenantor is a party thereto or upon Covenantor's receipt of a notice from Franchisor that it will not enforce the section, paragraph, term or provision in question.

## 10. RIGHTS OF PARTIES ARE CUMULATIVE.

The rights of the parties hereunder are cumulative and no exercise or enforcement by a party hereto of any right or remedy granted hereunder shall preclude the exercise or enforcement by them of any other right or remedy hereunder or which they are entitled by law to enforce.

## 11. BENEFIT.

This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. In the event Franchisor does not execute this Agreement (regardless of the reason) Franchisor shall be deemed a third-party beneficiary of this Agreement and shall have the right to enforce this Agreement directly.

## 12. EFFECTIVENESS.

This Agreement shall be enforceable and effective when signed by Covenantor regardless of whether and when Franchisor or Franchisee signs this Agreement.

## 13. GOVERNING LAW; VENUE.

This Agreement and the relationship between the parties hereto shall be construed and governed in accordance with the internal laws of the State of Washington, U.S.A without regard to its conflict of laws principles. Any disputes or controversies arising from or relating to this Agreement and the relationship between the parties hereto may be brought in any court having jurisdiction.

*[Signature page to follow]*

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the day, month, and year first set forth below.

**INDIVIDUAL:**

*(signature)*

Name: _____Yue Zhang_____ , an individual

*(please print your name in the blank provided above)*

Date: _____Jul-27-2024_____

**FRANCHISEE:**

*(stamp)*    HT Redmond LLC

**(Name of Franchisee Entity)**

Sign: _____

Name: _____Yue Zhang_____

Title: _____Owner_____

Date: _____Jul-27-2024_____

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D28CA744E

**EXHIBIT E**
**FEE SCHEDULE**

[ONE OF THE FOLLOWING]
[CATEGORY A]

| | |
|---|---|
| Security Deposit | $20,000 |
| Initial Franchise Fee | $50,000 |
| Subsequent Franchise Fee | $50,000 |
| Legal Processing Fee | $5,000 per instance |
| Relocation Fee | $10,000 |
| Initial Service Fee - For Initial Training Program held in China Mainland | $23,100 |
| Initial Service Fee - For Initial Training Program held in Singapore | $29,100 |
| Initial Service Fee - For Initial Training Program held in Your Store or in locations (other than China, Singapore) set out in our published list of training locations, which may be updated from time to time | $35,100 |
| Initial Training Program cost for additional personnel | As agreed by you and us |
| On-Site Training Fee | $300 per trainer per day |
| Prohibited Activity Fee | As set forth in Exhibit H |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

**EXHIBIT F**
**ESSENTIAL INGREDIENTS**

| Items | Name | Category | Details |
|-------|------|----------|---------|
| Essential Ingredients | Foodstuffs | Fresh Fruits and Vegetables | |
| Essential Ingredients | Foodstuffs | Fruit Juice & Pulp/Processed Fruit & Vegetables | |
| Essential Ingredients | Foodstuffs | Dairy products | |
| Essential Ingredients | Foodstuffs | Syrups | Syrups, flavored syrups, pearl powder rounds and other textures, etc. |
| Essential Ingredients | Foodstuffs | Tea & Coffee Drinks | Tea, tea products, coffee, solid beverages, alcoholic beverages, etc. |
| Essential Ingredients | Foodstuffs | Bakery | |
| Essential Ingredients | Packaging Materials | Plastic Packaging | Plastic cups, lids, bottles, cutlery, etc.; biodegradable cups, lids, straws, cutlery, etc.; insulated bags, packaging bags, sealing stickers, easy-tear stickers, etc. |
| Essential Ingredients | Packaging Materials | Paper Packaging | Paper straws, paper bags, cup covers, card holders, etc. |
| Essential Ingredients | Packaging Materials | Other Packaging Materials | Glass bottles, aluminum-plastic accessories, etc. |
| Essential Ingredients | Advertising & Operating Materials & Peripherals | Advertising Materials | |
| Essential Ingredients | Advertising & Operating Materials & Peripherals | Chemicals | |
| Essential Ingredients | Advertising & Operating Materials & Peripherals | Labour Supplies | |
| Essential Ingredients | Advertising & Operating Materials & Peripherals | Peripherals | Cups/bags/bags/kits, etc. |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

## EXHIBIT G
## WASHINGTON FRANCHISE AGREEMENT ADDENDUM

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW (Revised Code Washington) will prevail.

RCW 19.100.180 may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

A release or waiver of rights executed by a franchisee may not include rights under the Washington Franchise Investment Protection Act or any rule or order thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial, may not be enforceable.

Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the franchise agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington. RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement or elsewhere are void and unenforceable in Washington.

No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement,

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

The undersigned does hereby acknowledge receipt of this addendum. Dated this _____ day of _____ 202___ .

Jul-28-2024

Franchisor                                      Franchisee

79

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

**EXHIBIT H**

**STORE MANAGEMENT POLICY**

**General**

1. In order to protect the long-term development interests of the company, the brand, all HEYTEA franchisees , and stores, standardize the daily operating procedures of stores, improve the overall operating standards of stores, and ensure that stores can continue to provide customers with high-quality quality and services. The *"HEYTEA Franchise Store Management Policy"* is specially formulated according to the relevant provisions in the "Franchise Agreement".

2. In order to help franchisees continuously and effectively improve the operational efficiency of the store, the store needs to maintain the functionality of the video camera, and the video archives needs to be stored and saved for at least 6 months. The headquarters will use various methods such as online or offline audits and check the stores from time to time every month. The audits will enable stores to continuously improve their operating standards set forth by the headquarters.

3. Integrity is the most fundamental requirement and criterion for HEYTEA, and it is also the bottom line that cannot be violated. The operation supervisor/inspection partner must truthfully provide the actual and unbiased findings of the store audits. The headquarters will conduct video surveillance on the operation inspection behavior. If any phenomenon of favoritism and fraud (including but not limited to not being serious in auditing, not truthfully reflecting store operation problems (including potential hidden dangers), checking fraud, etc.) were discovered, the franchisee will be penalized according to the specific findings, including but not limited to deducting penalty fees from the security deposit, termination of the "Franchise Agreement" and so on.

4. If you discover any behavior that violates the integrity and values of the company at work or in the process of cooperation, you can make a complaint and report through any listed contact method of  "Integrity Protector Hotline".

5. If a store damages the video camera for no reason and does not maintain the normal function of the video camera, or fails to restore the camera function after being notified that the camera cannot be used normally, etc., resulting in the inability to perform inspections through playback, the store's inspection operation audit score will be 0. A penalty of 700 U.S. dollars will be imposed each time.

6. The currency in this *"HEYTEA Franchise Store Management Policy"* is in U.S. dollars. In the event of a breach of the document, franchisees are required to pay in U.S. dollars.

**Scope of Application**

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

The store management policy is applicable to all franchise stores.

**Instructions for monthly online and offline shop inspections**

☐   The headquarters will audit the store online or offline through various ways without prior notice, and the audits will be based on the "Quality Checklist", "Store Food Safety On-Site Checklist", "Store Food Safety Video Checklist" and other standards. The stores will be evaluated in accordance with the operating standard clauses and key violations will be penalized.

☐   After the inspection is completed, the inspection report will be sent to the store (Certain reports will be issued at the end of the month).

☐   The frequency of monthly inspections will be determined according to the operating conditions of the store. In addition, the interval between two (similar) inspections should not be less than 48 hours (except for special circumstances). Therefore, the store must complete the rectification of the opportunity point within 48 hours after the inspection.

☐   The store shall pay the penalty to the designated account within 5 working days. For each overdue day, 0.5% of the overdue amount needs to be paid as a late-payment fee until all fees are paid in full.

**Appeals**

☐   Within 48  hours of receiving the audit report, the store will need to feedback materials such as the content of the appeal, pictures or videos to the supervisor. If it exceeds 48 hours, the appeal channel for the inspection will be closed, and store appeals will no longer be accepted.

☐   The inspection department of the headquarters will verify and provide feedback on the appeal within 48 hours;

  Effective appeal —- the inspection department will adjust the score of the corresponding question in the report;

  nvalid appeal—-the inspection department will notify the supervisor of the result, and the store will make rectification or pay penalties according to the post-audit process after receiving the notification

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

HEYTEA Franchise Store Management Policy, details as follows:

| Item | Category | Descriptions | Damages for Breach of Policy in USD $ | Our Rights |
|------|----------|-------------|---------------------------------------|------------|
| Material Violation - Agreement Termination | | | | |
| 1 | Breach of contract | Violation of relevant provisions of the Anti-Commercial Bribery Agreement. | Handled in accordance with the "Anti-Commercial Bribery Agreement" | Terminate the contract |
| 2 | Violation/ Breach of confidentiality | Leaking company secrets, formula or raw materials sold ,company operating resources, marketing strategies, supplier information, raw material prices to external parties. | Penalty in accordance with the "Confidentiality Agreement" | Terminate the contract |
| 3 | Violation/ Breach of confidentiality | Leaking the company's online and offline activity plans and activity plans to external parties. | Penalty in accordance with the "Confidentiality Agreement" | Terminate the contract |
| 4 | Breach of contract | The store has a store-related order rectification notice because of failure to operate legally and compliantly, resulting in penalties from the local government and posing an impact on the brand) or penalty decision issued by the supervisory department. | Penalty according to the contract | Terminate the contract |
| 5 | Breach of contract | Using raw materials beyond their shelf life or use-by date, using raw materials that do not meet food safety standards, using severely moldy and deteriorated raw materials or failure to stick the use-by date lable with the requirements or tampling with the use-by date; The above has appeared three times or more accumulatively during the contract period. | Penalty according to the contract | Terminate the contract |
| 6 | Breach of contract | Receive cash without permission or conceal and falsely report turnover to the company. | Penalty according | Terminate the contract |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| | | | to the contract | |
|---|---|---|---|---|
| 7 | Breach of contract | Prevent company staff and third-party personnel entrusted by the company (staff must have a company work card, work card or power of attorney) to enter the store work area for inspection. If the store does not cooperate, this will be considered malicious obstruction and failure to sign the inspection form. | Penalty according to the contract | Terminate the contract |
| 8 | Breach of contract | Private store establishments on food delivery and other platforms: Or privately build stores with sales platforms such as food delivery or operate on any online/offline platforms that have not been authorized/approved by the headquarter. | Penalty according to the contract | Terminate the contract |
| 9 | Breach of contract | Plan and carry out omni-channel activities that have not been reported to or approved by the headquarters. This includes all marketing and business cooperation behaviors generated by Tiktok, Instagram, Facebook, Xiaohongshu, Douyin, MCN, talents , etc. | Penalty according to the contract | Terminate the contract |
| 10 | Breach of contract | Sale of drinks, food or any other items that are not on the company menu or approved by the headquarter. | Penalty according to the contract | Terminate the contract |
| 11 | Breach of contract | Transfer of stores, brand management rights, and change of store operators without authorization from the headquarter. Or operate the store in partnership/joint stock which is not in accordance with company requirements and without the consent of the headquarter. | Penalty according to the contract | Terminate the contract |
| 12 | Breach of contract | Using the HEYTEA brand to establish a personal purchasing agent store. | Penalty according to the contract | Terminate the contract |
| 13 | Breach of contract | Publish inappropriate comments (including but not limited to political, pornographic, food safety and other sensitive content) in the community such as Facebook, WhatsApp, Instagram, Telegram, Kakao Talk, Xiaohongshu, WeChat group, trigger social media public opinion, and created a significant negative impact on the brand. | Penalty according to the contract | Terminate the contract |
| 14 | Negative media coverage | Customers make complaints and feedback on the products or services provided by the store, and expose them on media platforms which generates negative public opinions. The published content includes but is not limited to store service, food safety, product quality and other incidents; arrears of employee wages; store management problems; customer experience or personal injury security incidents. (Media | Penalty according to the contract | Terminate the contract |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| | | platforms including traditional media such as TV stations, radios, and websites, and influential social network media such as Facebook, Instagram, TikTok, Twitter, and other social media) | | |
|---|---|---|---|---|
| 15 | Goods purchase | Violations of section (16 -1 9 clauses) related to goods procurement has appeared twice accumulatively (twice is by the number of times the behavior occurred, not the number of times it was discovered or punished by the company). | Penalty according to the contract | Terminate the contract |
| **Material Violation – High Risk Items** | | | | |
| 16 | Goods purchase | 1ˢᵗ time offender<br><br>Purchase of equipment and facilities outside the approved list provided by the company (without the consent of the company). | 10,000 /store/pena lty | Destroy the purchased equipment and cancel the qualificatio n of the signatory for multi-store |
| 17 | Goods purchase | 1ˢᵗ time offender<br><br>Purchase of fruits outside the approved list provided by the company or not in accordance with the company's product regulations and requirements (without the consent of the company) | 10,000 /store/pena lty | Destroy the purchased products and cancel the qualificatio n of the signatory for multiple stores |
| 18 | Goods purchase | 1ˢᵗ time offender<br><br>Purchase of raw materials, semi-finished products and other materials privately or not in accordance with the company's product regulations and requirements (without the consent of the company) | 10,000 /store/pena lty | Destroy the purchased products and cancel the qualificatio n of the signatory for multiple stores |
| 19 | Goods purchase | 1ˢᵗ time offender<br><br>Procurement of packaging materials privately (without the company's consent). | 10,000 /store/pena lty | Destroy the purchased products and cancel the qualificatio n of the |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| | | | | signatory for multiple stores |
|---|---|---|---|---|
| 20 | Brand | Without permission from headquarters, franchisees are not allowed to accept media interviews, interviews (paid or unpaid), or publish negative, confidential and inappropriate information related to the company on media and social platforms (on store's accounts or individual's accounts). All information disclosed to the public needs to be reviewed and approved by the headquarters. | 4,200 /store/pena lty | Dismiss the involved parties |
| 21 | Brand | There are media appointments for interviews, but they are not accepted and not reported to the company. | 1,260 /store/pena lty | |
| 22 | Product SOP | Randomly tamper with the formula (including beverage and semi-finished product steps, processes, etc.), severely affecting the quality of the product. | 2,100 /store/pena lty | Dismiss the involved parties |
| 23 | Food Safety | Tampering with the use-by date at will, failure to stick the use-by date lable with the requirements, severely affecting the food safety of the store. | 2,100 /store/pena lty | Dismiss the involved parties |
| 24 | Operation s Managem ent | Falsification of training/assessment/certification. (Including but not limited to: impersonation assessment/examination, false reporting of data, etc.). | 2,100 /store/pena lty | Dismiss the involved parties |
| 25 | Online Operation s | Unauthorized modification of food delivery platforms, mini-programs, Apps and other product information, including but not limited to product names, pictures, specifications, attributes, descriptions, labels, prices, etc. | 2,100 /store/pena lty | Not participatin g in ranking |
| 26 | Online Operation s | Unauthorized modification of menu classification information on platforms such as food delivery platforms and applets, including but not limited to privately operating products on or off shelves, creating/deleting menu categories, and adjusting menu classification and ordering. | 2,100 /store/pena lty | Not participatin g in ranking |
| 27 | Online Operation s | Set up any unauthorized user-related groups in any social software such as Facebook, WhatsApp, Instagram, Telegram, Kakao Talk, Xiaohongshu, WeChat group, including but not limited to fan groups or community. | 2,100 /store/pena lty | Not participate in ranking |
| 28 | Online Operation s | Publish inappropriate comments in the community (including but not limited to negative emotions, quarrels with customers, etc.), which will have a negative impact on the brand. | 2,100 /store/pena lty | Not participate in ranking |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| 29 | Execution of marketing activities | The corresponding marketing activities were not implemented according to the requirements of the company, or it is reported that the store did not implement the activities that had been advertised. | 2,100 /store/penalty | Not participate in ranking |
|---|---|---|---|---|
| 30 | Brand | Self-editing and dissemination of promotional content (such as KOL articles/videos) that has not been reported to/authorized by the headquarters, thereby affecting the brand image. | 1,260 /store/penalty | Delete the related content |
| 31 | Operations Management | Direct or indirectly Recruiting of poaching of employees from other HEYTEA stores (direct-operated and other franchise stores) who have been working or who have left the company for less than half a year. | 2,100 /store/person | Not participate in ranking |
| 32 | Operations Management | Hiring or deploying illegal, unlicensed, or unauthorized personnel to work in the store; Failure to pay wages in full and on time. Leads to violation of local laws or online complaints, and affects the brand image. | 2,100 /store/penalty | |
| 33 | Risk Monitoring | A store-related rectification notice issued by the supervisory department appeared in the store (unexposed). | 2,100 /store/penalty | Not participate in ranking |
| 34 | Risk Monitoring | The store has not obtained a business license, food business license, or other licenses required by the local regulatory authority, expired license, or which the business scope does not match, etc. | 2,100 /store/penalty | Suspend business for rectification |
| 35 | Food Safety | Serious food safety complaints caused by store responsibilities (including but not limited to: vicious foreign objects (metal, glass, flies, cockroaches, mice, hard plastic, etc.), chemical pollution, etc.) | 2,100 /store/penalty | Not participate in ranking |
| 36 | Food Safety | The store does not have a valid disinfection service contract (must be a disinfection service provider approved by Heytea) or cannot provide a disinfection service report (subject to the report of the Shoteyes, the frequency meets the basic requirements). | 140 /store/penalty | |
| 37 | Food Safety | Store responsibility caused 3 or more consumers to feel unwell within a day (without impact on the brand) | 2,100 /store/penalty | Suspend business for rectification |
| 38 | Food Safety | A total of 4 or more consumer food safety complaints were filed in the month | | Not participate in ranking |
| 39 | Operations Management | The local regulatory has clear health requirements for employees, but the store failed to implement. | 2,100 /store/penalty | |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| 40 | Online Operations | A physical conflict with an omni-channel takeaway rider published/circulated on social media, causing a major negative impact on the brand. | 2,100 /store/penalty | |
| 41 | Breach of contract | Maliciously defaming the company or defaming, insulting or personal attack of the company staff. | 2,100 /store/penalty | |
| 42 | Breach of contract | Engaging in unfair competition with other Heytea stores in the same area and defaming other stores of the same brand | 2,100 /store/penalty | |
| 43 | Operations Management | During the inspection of partners such as supervisors/quality control/quality officers, it was found that the on-the-job personnel did not pass the job certification. | 2,100/store /person | Recertification of the involved parties |
| 44 | Operations Management | The store is damaged for no reason and does not maintain the normal functionality of the video camera or does not restore the camera function after being notified that the camera cannot be used normally (or intentionally blocked). | 2,100 /store/penalty | |
| 45 | Operations Management | Failure/delay without reason to perform routine tasks arranged by the company or refuse to change after being advised by supervisors. | 1,260 /store/penalty | |
| **Online and Offline Store Tour** | | | | |
| 46 | Food Safety | Failed inspection results [0 points] | 2,100 /store/penalty | Takeaway platform closed for 1 day for rectification |
| 47 | Food safety | Failed inspection results [01<score<40] | 1,260 /store/penalty | Close early or delay opening to make rectifications and complete 2-hour food safety training for all employees |
| 48 | Food safety | Failed inspection results [40≤score<70] | 420 | |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| | | | /store/pena lty | |
|---|---|---|---|---|
| 49 | Product quality | Failed the product quality inspection [0 points] | 1,260 /store/pena lty | |
| 50 | Product quality | Failed the product quality inspection [01<score<40] | 840 /store/pena lty | |
| 51 | Product quality | Failed the product quality inspection [40≤score<70] | 420 /store/pena lty | |
| 52 | Food safety | 1st Offence<br>The third-party microbial sampling test found that the self-made drinks, ice cubes and direct drinking water failed to meet the microbial sampling standards. | / | Not participate in ranking |
| 53 | Food safety | In re-inspection of third-party microbial sampling inspection, the microbial sampling inspection of self-made drinks, ice cubes and direct drinking water failed to meet the standards. | 1,260 /store/pena lty | Not participate in ranking, and close the store for rectification until the re-inspection passes |
| 54 | Food safety | During daily inspections (including online or offline), extreme violations of food safety requirements are found (such as "expiration of shelf life or use-by date > 7 days", "tampering with use-by date", "extreme pest and rodent infestation", "a large number of use-by date missing " which violate the SS clauses) | 2,100 /store/pena lty | |
| 55 | Food safety | During daily inspections (including online or offline), serious non-compliance with food safety requirements is found (such as "expired materials", "food contamination", "mildew on food or equipment", "serious pest and rodent infestation", "Invalid health certificate documents that are required by the government" and other violations of the S Clause) | 1,260 /store/pena lty | |
| 56 | Food safety | During daily inspections (including online or offline), general violations of food safety requirements are found (such as "not washing hands properly", "not cleaning and disinfecting correctly", "not storing materials correctly", | 420 /store/pena lty | |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| | | "cross-contamination risk" and other violations of M Clause) | | |
|---|---|---|---|---|
| | | **Focus** | | |
| 57 | Operations Management | The staff uses their personal social platform to release the company's new product information in advance. | 420 /store/penalty | Dismiss the involved parties, and delete the related content |
| 58 | Operations Management | There was a physical conflict with the omni-channel takeaway rider, which was not spread on social media. | 420 /store/penalty | |
| 59 | Online operation | Personal use of brand assets for online operations related to commercial interests, including but not limited to brand logos, brand short video materials, brand live broadcast slices, etc. | 420 /store/penalty | |
| 60 | Online operation | Provide account numbers and passwords of social media platforms such as Xiaohongshu, Instagram, Facebook and Douyin to anyone other than HEYTEA employees. | 420 /store/penalty | |
| 61 | Goods purchase | Malicious return caused by store responsibility (including but not limited to malicious exchange and return). | 420 /store/penalty | And return the refund amount |
| 62 | Operations Management | Failure to participate in company activities and meetings without valid reason, being late or absent in the midst without reporting, etc. | 210/store/penalty | |
| 63 | Operations Management | The company has not been reported that the online/offline business hours are shorter or longer than the standard business hours without force majeure. | 210/store/penalty | |
| 64 | Operations Management | The change of store business hours has not been timely reported to the company. | 210/store/penalty | |
| 65 | Operations Management | The cash register, menu screen, camera, etc. were disconnected from the Internet for no reason and the situation was not reported. | 210/store/penalty | |
| 66 | Operations | Aged and damaged signboard lighting has not been treated and improved (within a week of supervision and inspection), from customer perspective: store image is not up to standard | 210/store/penalty | |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| | Managem ent | (the dirty area of the door is more than 1/3, the dirty area of the wall is more than 1 square meter, and the number of spider webs in the store is more than 1). | | |
|---|---|---|---|---|
| 67 | Operation s Managem ent | The store failed to complete the company's daily tasks as required. | 210/store/p enalty | |
| 68 | Operation s Managem ent | Failure to complete the required content as required by the training department. | 210/store/p enalty | |
| 69 | Operation s Managem ent | Failure to complete the "Pre-launch Readiness Inspection" on time for new products/activities. | 210/store/p enalty | |
| 70 | Operation s Managem ent | Failure to complete the "launch day inspection" on time for new products/activities. | 210/store/p enalty | |
| 71 | Operation s Managem ent | Bad reviews from customers on the online platform, and the [customer service work order] Failure to complete the feedback initiated by the headquarters within 12 hours. | 210/store/p enalty | |
| 72 | Operation s Managem ent | The opportunity points in the supervisory shop inspection report were not rectified within 1 week and the rectification results were uploaded. | 210/store/p enalty | |
| 73 | Operation s Managem ent | Failure to use 100% of smart devices (tea dispenser, KDS, etc.) according to the regulations, or failure to report for repair within 24 hours. | 210/store/p enalty | |
| 74 | Operation s Managem ent | Failure to use standard utensils to make, store/make semi-finished products and products, failure to use standard packaging materials, materials, etc. to store semi-finished products and products as required | 210/store/p enalty | |
| 75 | Operation s Managem ent | When dealing with customer service: ignoring, not replying, extremely impatient in tone and attitude, and quarreling. | 210/store/p enalty | |
| 76 | Operation s Managem ent | Staff continues frolicking and chatting on cellphones in the store, ignoring customers despite being advised by supervisors. | 210/store/p enalty | |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| 77 | Operations Management | In the absence of the reporting of uncontrollable factors, the monthly sell-out rate of Top30 products is higher than 20%. | 210/store/penalty | |
| 78 | Operations Management | The operation announcement has not been read within 24 hours or is not clear about the latest operation update | 210/store/penalty | |
| 79 | Operations Management | Supervisors require feedback within the specified time but fail to do so on time | 210/store/penalty | |
| 80 | Brand | Without authorization by the headquarters,  staff is not allowed to accept media interviews or publish negative information related to the company on media and social platforms | 210/store/penalty | Dismiss the involved parties |
| 81 | Operations Management | The staff  or franchisees did not wear uniforms, hats, aprons, gloves according to the company guidelines, and the hygiene/image was not up to standard (dirty hands, nails more than 1mm at the same level, wearing jewelry, heavy makeup, slippers, sandals, skirts or shorts below the knee, etc.).<br><br>Uniforms has serious cleaning problems (dirty, and apron color faded is obvious, the sum of dirty or damaged areas is greater than the size of 2 postcards). | 90/store/penalty | |
| 82 | Operations Management | The signboard lights are not switched on in time.<br><br>(It is required to be turned on during business hours) | 90/store/penalty | |
| 83 | Operations Management | Place non-company-approved items (decorations, publicity materials, etc.) within the customer's field of vision, and post government and property requirements materials without authorization by the headquarters. | 90/store/penalty | |
| 84 | Operations Management | Store exams passing rate of less than 80% | 90/store/penalty | |
| 85 | Operations Management | Failure to convey the latest version of the formula to the store for staff to learn within 24 hours after the update. | 90/store/penalty | |
| 86 | Operations | Smoking in the work area and within the visible range of the store during the work. | 90/store/penalty | |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| | | | | |
|---|---|---|---|---|
| | Managem ent | | | |
| 87 | Operation s Managem ent | Failure of staff to take the initiative to receive the customer within 2 minutes of their arrival at the store or asks the customer to scan the QR code to self-order. | 90/store/pe nalty | |
| 88 | Operation s Managem ent | Due to service, quality, cleanliness, food safety, and operations (including but not limited to: online store inspections, customer feedback on all channels and platforms, offline supervision and other store visits), serious behaviors that do not meet standards are discovered in the store (such as: Store odor, service attitude issues, etc.) | 210/store/p enalty | |
| 89 | Operation s Managem ent | Due to service, quality, cleanliness, food safety, and operations (including but not limited to: online store inspections, customer feedback on all channels and platforms, offline supervision and other store visits), behaviors that do not meet standards are discovered in the store (such as: Store odor, service attitude issues, etc.) | 90/store/pe nalty | |
| 90 | Operation s Managem ent | Deliberately slowing down the speed of drink productions, and no improvement despite customer feedback. | 90/store/pe nalty | |
| 91 | Online operation | Modify the front-end visual presentation of food delivery platforms & Mini-programs & Douyin & Xiaohongshu & IG & FB without permission, including but not limited to header images, in-store posters, store signs, boss recommendations, popular window displays, brand stories, store announcements, advertising promotions Materials, etc. | 210/store/p enalty | |
| 92 | Online operation | Privately configure/modify/remove takeaway & Apps & mini-programs and other marketing activities, such as adjusting prices, etc. | 210/store/p enalty | |
| 93 | Online operation | Setting up of the takeaway platform business for store operations without the consent of HEYTEA. | 210/store/p enalty | |
| 94 | Online operation | Complaint from omni-channel takeaway consumers: Such as not answering the phone, bad attitude, quarreling, etc. | 210/store/p enalty | |
| 95 | Operation s Managem ent | There was a physical conflict with the omni-channel takeaway rider, which was not spread on social media. | 210/store/p enalty | |
| 96 | Online operation | The store closed without informing the supervisor on the audit day, and the business hours of the mini-programs, Apps, and the takeaway platform were adjusted without authorization by headquarters. | 210/store/p enalty | |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| 97 | Online operation | Mini-programs, Apps and food delivery platforms need to be closed due to special circumstances, but they were not reported to the supervisor on the same day. | 210/store/penalty | |
| 98 | Online operation | Failure to package omni-channel takeaway orders in accordance with the "Standards for Takeaway Packaging Operations" (unreported in special circumstances) | 90/store/penalty | |
| 99 | risk monitoring | Failure to report as required, when the government regulatory department inspects/visits the store (including random inspection and inspection). | 210/store/penalty | |
| 100 | Operations Management | Not playing company-approved music as required | 120/store/penalty | |
| 101 | store experience | Failing to place or update the display of publicity materials at the specified time in accordance with the requirements of the headquarters (misplaced, missed, or not placed, etc.), or failing to play large-screen materials at the specified time. | 120/store/penalty | |
| 102 | New Products & Events | New products are sold in advance without approval, or they are removed from shelves in advance without reporting during the new release period. | 420 /store/penalty | |
| 103 | New Products & Events | The new product was not launched on the required time and was not reported to the company (not reported in special circumstances) | 210/store/penalty | |
| 104 | New Products & Events | New products are not implemented in accordance with the operation guidelines of omni-channel marketing activities, or there are store performance problems, resulting in damage to the brand image or serious customer complaints. | 210/store/penalty | |
| 105 | New Products & Events | The store refuses customers to use company-approved vouchers and coupons (special circumstances are not reported) | 210/store/penalty | |
| 106 | New Products & Events | Failure to implement various channel activities according to the company's requirements (operation guidelines, activity materials, oral publicity, and store services related to activities). | 210/store/penalty | |
| 107 | New Products & Events | Failure to meet brand marketing needs to prepare beverage samples (which might appear on camera) in accordance with SOP on time, ensuring quality and quantity | 210/store/penalty | |
| 108 | New Products & Events | Failed to complete the festive atmosphere layout plan notified by the company or Douyin-related on-site scene setting, framing and shooting of scenes, etc. (not reported in special cases) | 210/store/penalty | |

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

| 109 | Customer complaints management | If the store doesn't handle customer complaints with the requirements of the headquarters, the customer service staff at the Heytea headquarters has the right to handle the customer complaints on behalf of the store, including but not limited to refunds, compensation for Heytea cards and coupons, signing of settlement agreements, advance compensation, etc. For all fees paid by Heytea, the store must pay the compensation to the Heytea designated account within 5 working days after receiving the notice; the store fails to pay the above fees to the headquarters on time | 210/store/penalty | |
| 110 | Online operation | Due to bad service, quality, and cleanliness, the store was complained by customers on social media (including but not limited to Facebook, Instagram, Xiaohognshu, Twitter, etc.) | 90/store/penalty | |

The HEYTEA Franchise Store Management Policy will be revised and improved in a timely manner according to the actual situation occurred during business operations and will be implemented in accordance with the latest revised version.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

# EXHIBIT I

## ANTI-CORRUPTION AND ANTI-COMMERCIAL BRIBERY AGREEMENT

This Anti-Corruption and Anti-Commercial Bribery Agreement (hereinafter referred to as the "Agreement") is hereby executed by the Parties on [ Jul-28-2024     ] in [Nanshan District, Shenzhen City, People's Republic of China].

Franchisor: HK HEYCHA LIMITED (together with its affiliated companies/organizations referred to as the "Franchisor" hereinafter

Franchisee:[ HT Redmond LLC                         ]

(hereinafter referred to as the "Franchisee")

The Franchisor and the Franchisee shall be referred to herein as "Parties" collectively and "a Party" individually.

Franchisor requires every employee of the Franchisor, as well as its suppliers, business partners, agents, service providers, collaborators, the Franchisee and its employees to strictly comply with Franchisor's Anti-Corruption Regulations and the laws and regulations of China and all jurisdictions to which the Franchisor is subject to regarding anti-corruption and anti-commercial bribery. Additionally, Franchisee must strictly adhere to the laws and regulations of the country in which the business is conducted.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

Franchisor prohibits and has zero tolerance for any form of corruption and commercial bribery by Franchisee or its employees. During the term of any and all agreements between the two Parties (hereinafter referred to as the "Cooperation Period") and in order to strictly comply with Franchisor's Anti-Corruption Regulations and all applicable national, federal, state and other laws and regulations prohibiting anti-corruption and anti-commercial bribery, and to safeguard the mutual interests of both Parties, the Parties agree to the following:

1.  The term "commercial bribery" as used in this Agreement refers to any and all actions by the Franchisee, its employees and any Related Parties, in order to obtain cooperation opportunities with Franchisor and any related benefits, in providing any Franchisor's employees and related parties ("Related Parties" refer to Franchisor's employees' spouses, relatives business partners, and/or individuals considered to have an interest in any of Franchisor's business) with any material benefits (i.e. advantages that can be directly measured in terms of money or value) and non-material benefits (i.e. intangible benefits that are difficult to directly measure in terms of money or value, which satisfy people's needs, desires, and any other improper benefits other than material benefits, including all privileges, preferential treatment, convenience, and other advantages).

2.  The term "improper benefits" as used in this Agreement refers to any kickbacks, bribes, secret commissions, loans, physical gifts, cash or cash equivalents through electronic transfers (including but not limited to WeChat red envelopes, Alipay red envelopes, etc.), cash or cash equivalents (including consumer cards/vouchers, redemption vouchers, shopping cards, exchange vouchers, recharge cards, transportation cards, telephone cards, rechargeable and other usable or consumable value vouchers or securities), checks and property rights, travel, entertainment expenses, free consumption, personal services, housing opportunities, relocation of residence, job transfers, promotions, arrangements for studying abroad, free services (including sexual services), as well as conferring honors, titles, qualifications, status, privileges, etc., directly or indirectly provided by the Franchisee or any of its employees and Related Parties or demanded by or received by any

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

of Franchisor's employees or Related Parties, in each case for free or at an unreasonably discounted price.

3.   The term "conflict of interest" as used in this Agreement refers to the potential conflicts and contradictions between the personal interests of Franchisor's employees and any Related Parties and the interests of the Franchisor, including but not limited to: (1) provision, by the Franchisee, of any form of loans to Franchisor employees and any Related Parties; (2) During the Cooperation Period, Franchisee allowing Franchisor's employees and any Related Parties to hold or have any third party to hold an equity interest in the Franchisee (excluding funds and shares held without actual control through public securities trading markets); (3) Franchisee employing any Franchisor's employees or Related Parties (including but not limited to establishing formal employment relationships, labor dispatch, independent contractor relationship, part-time positions, consulting advisor relationship, or in any other form or manner). If Franchisee's employees is a Franchisor's employees or Related Parties as of the effective date of this Agreement and/or any other agreements between the Parties, the Franchisee should be truthfully and comprehensively disclosed to Franchisor in writing before this Agreement and any other agreements between the Parties are signed.

4.   Under no circumstances during the Cooperation Period shall Franchisee, Franchisee's employees, or any Related Parties directly or indirectly provide, promise, or authorise any form of bribery to any government officials (i.e. any personnel serving in government agencies, including officials (including candidates) or employees of any government departments, agencies, or functional organisations, as well as personnel with corresponding functions or acting on behalf of these departments, agencies, or organisations). Such bribery includes but is not limited to any cash, gift cards, vouchers, checks, assets, gifts, gifts equivalent to cash, hospitality (such as meals or travel), entertainment expenses, provision of job opportunities or resolution of personal problems, in order to influence any actions or decisions within the scope of their official capacity.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

5.  During the Cooperation Period, under no circumstances shall Franchisee or its employees provide any form of bribery, including but not limited to money, goods, or other benefits, to any business associates or partners in the name of the Franchisee or any individuals related thereto.

6.  During the Cooperation Period, when Franchisee intends to make charitable donations using company funds or assets, Franchisee must contact Franchisor in advance.

7.  If Franchisee commits any of the abovementioned improper actions (including but is not limited to providing any improper benefits, acting with conflict of interest or providing any bribery to anyone), Franchisor has the right to unilaterally terminate any and all agreements with Franchisee in whole or in part, withhold all outstanding payments to be made to Franchisee, and Franchisee shall be liable for a liquidated damage in the amount of the higher of RMB 200,000 (or foreign currency equivalents thereof) and 50% of the amount involved in any related order or contract. Franchisee shall pay the damage within 5 working days from the date Franchisor discovers Franchisee's improper actions. Regardless of whether Franchisee has voluntarily or involuntarily provided any improper benefits to Franchisor employees and Related Parties, if Franchisee proactively provides valid information to Franchisor, Franchisor will assess the situation and may offer Franchisee an opportunity to continue cooperation or reduce the abovementioned liquidated damage Franchisor has complete judgment and decision-making authority in handling the above situations.

8.  If Franchisee becomes aware of or suspects that any Franchisor employee have violated the above provisions, Franchisee shall immediately report the above to Franchisor's Audit and Inspection Center. Franchisor has established a dedicated channel for complaints from Franchisee and promises to strictly keep confidential the identity of all informants and the

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

information provided. The reporting channels include but are not limited to: mobile phone reporting: +86-13378665071, email reporting: 3507579804@qq.com, landline reporting: +86-0755-86717981, DingTalk reporting: DingTalk-Audit and Inspection Centre - I want to report.

9.  Franchisee voluntarily agrees to accept the supervision and inspection of Franchisor's Audit and Inspection Centre to the fullest extent permitted by all applicable laws, regarding the commercial transactions between Franchisor and Franchisee. Franchisee voluntarily agrees to cooperate unconditionally with the investigations carried out by Franchisor's Audit and Inspection Centre and third-Party personnel hired by Franchisor.

10. If Franchisee violates the contents of this Agreement, Franchisor has the right to disclose Franchisee's violation of this Agreement internally or externally. Franchisee shall bear all the consequences, impacts, and potential economic losses resulting from such disclosure.

11. In the event that Franchisee violates the contents of this Agreement, Franchisor has the right to initiate legal proceedings against Franchisee in accordance with this Agreement and relevant agreements and shall be entitled to reimbursement of all expenses (including but not limited to litigation costs, attorney fees, appraisal fees, investigation fees, travel expenses, and all other costs incurred during the litigation process) related to Franchisor's lawsuit against Franchisee. Franchisor also has the right to offset the above-mentioned expenses from the outstanding amounts payable to Franchisee.

12. By mutual agreement between Franchisor and Franchisee, this Agreement shall take effect on the date of execution and shall be retroactively binding commencing on the first day of the Parties' initial cooperation, including the negotiation period.

Docusign Envelope ID: 1F10A9C5-4996-468E-9F77-520D26CA744E

13. The laws of the People's Republic of China (for the purpose of this Agreement only, excluding Hong Kong Special Administrative Region, Macau Special Administrative Region and Taiwan) shall govern the formation, entry into force, performance, amendment and termination of this Agreement. Any dispute arising from or in connection with this Agreement shall be submitted to the Shenzhen Court of International Arbitration (the SCIA) for final arbitration. The place of arbitration shall be Shenzhen, China, and the language of arbitration shall be Chinese. The arbitration award is final and binding on both parties.

[Signature Page to Follow]

| Franchisor | (Seal) | Franchisee | (Seal) |
|---|---|---|---|

Signed by Authorized Signatory

Signed by Authorized Signatory

Date  Jul-28-2024

Date  Jul-27-2024

100